IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| B.X., a minor, | § | |
| Petitioner/Plaintiff, | § § | |
| v. | § § | |
| JONATHAN HAYES, in his official capacity as Interim Director of the Office of Refugee Resettlement, and SERVANDO BARRERA, in his official capacity as Federal Field Specialist, Office of Refugee Resettlement, | § § § § § § § § § | CIVIL ACTION NO. 1:19-cv-00017 |
| Respondent/Defendant. | § | |

## PETITIONER B.X.'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND ISSUANCE OF A WRIT OF HABEAS CORPUS

Petitioner B.X., asks this Court to immediately enter a temporary restraining order and order a hearing on a preliminary injunction, enjoining Respondents from moving Petitioner outside the jurisdiction of this court pending the court's consideration of his underlying claims, and mandating the release of Petitioner by Respondents to the custody of Matthew and Holly Sewell, sponsors designated by Petitioner's parents. In support hereof, Petitioner respectfully shows as follows:

1. Petitioner is a nine year old refugee immigrant child who has been in government custody over the past ten months. He was separated from his father who was deported without him in May of 2018.

2. On February 12, 2019 Petitioner filed a Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief (hereafter "Habeas Petition), seeking his release

from government custody and placement with a sponsor chosen by his parents. Said petition sets out that Petitioner is being held by Respondents in violation of his constitutional and statutory rights.

3.  On February 20, 2019, Respondent Servando Barrera was served with process in this action. Respondent Jonathan Hayes was served with process on February 27, 2019. The case has been set for an initial pretrial and scheduling conference on April 30, 2019.

4.  On March 14, 2019, despite notice of this cause of action, Respondents advised counsel for Petitioner that they intend to move Petitioner to a "foster placement" in San Antonio as early as March 15, 2019. *See Exhibit 2.* Transferring Petitioner to San Antonio would obstruct this court's jurisdiction of this cause action. *See Rumsfeld v Padilla 542 US 426, 435-436, 442-447 (2004).*

5.  On February 14, 2019, Amy Cohen, M.D., a Harvard trained child psychologist, interviewed and evaluated Petitioner at the BCFS facility in Raymondville, Texas, where he is being held by the government. Dr. Cohen's evaluation and subsequent report indicates that a delay in Petitioner's release from custody until after April 30, 2019, would more likely than not cause irreparable harm to Petitioner's mental and emotional health and that having already been moved to four separate contract facilities in four separate localities over the past ten months, it would be devastating to his health to be moved yet again, as Respondents now intend to do. *See Exhibit 1, Affidavit of Amy Cohen, M.D.*

6.  Dr. Cohen opined, based on her interview and evaluation of Petitioner, and in response to Respondent's intent to remove him from the court's jurisdiction;

> "This would be his fifth transfer by ORR to placement with another set of strangers and would, I believe, represent a serious blow to B.X.'s already fragile mental health."

2

And also that;

> "moving him yet again to yet another set of strangers would only deepen B.X.'s despair and mistrust of adults, compounding his traumatic experience and rendering any recovery from his past trauma infinitely more difficult and likely to increase his risk of permanent psychological and physiological impairment."

*See, Exhibit 1, Affidavit of Amy Cohen, M.D.*

7. The entry of an immediate temporary restraining order enjoining Respondents from removing Petitioner from the jurisdiction of the court is called for and necessary, as Respondent's proposed obstructive act of moving Petitioner from under the protection of the court and its jurisdiction would cause irreparable and grievous harm to his health, delay his rights to be heard on his plea to vindicate the violations of his constitutional and statutory rights, impede the proper administration of justice, and cause a waste of court resources in processing this cause of action by causing it to be filed again in the Western District of Texas.

8. Immediate injunctive relief is also essential because Petitioner has a substantial likelihood of success on the merits in this lawsuit, Petitioner will suffer irreparable harm in the absence of injunctive relief, there is no adequate remedy at law, the balance of hardships favor Petitioner, and the requested injunctive belief will not harm the public interest. Every day of separation causes irreparable and undeniable harm to Petitioner. Absent the entry of a temporary restraining order or timely preliminary injunction, the harm to Petitioner will be exacerbated, and irreparable. *See, Exhibit 1, Affidavit of Amy Cohen, M.D.*

9. The undersigned counsel has conferred with counsel for Respondents, Mr. Paxton Warner from the U.S. Attorney's office in McAllen, who has agreed to receive notice and service of the pleadings in this case. Mr. Warner has agreed to appear in court on this matter as the court's calendar may allow, preferring not to be called on to 26th of March, or on April 1-2, because of

prior commitments. Petitioner's counsel is available to appear before the court on this matter as early as the court may allow.

10. This court should award Petitioner his reasonable attorney's fees and costs, after hearing, pursuant to the court's inherent power to impose sanctions, as the obstructive acts of Respondents seeking to transfer Respondent beyond the court's jurisdiction were done knowingly and with the intent to interfere with the orderly administration of justice, and deny Petitioner his rights to seek a vindication of his constitutional and statutory rights. *Chambers v Nasco, Inc. 501 US 32, 42, 46, 49 (1991)*.

11. The facts and legal arguments supporting this motion are set forth in detail in Petitioner's Memorandum of Points and Authorities filed contemporaneously herewith.

12. This motion for a temporary injunction is based on the First Amended Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief, and the exhibits and declarations attached thereto, as well as the Exhibits attached hereto.

WHEREFORE, Petitioner respectfully requests this Court enter an immediate temporary restraining order enjoining Respondents from moving Petitioner from his present location, and, after hearing, directing Respondents to immediately release Petitioner into the custody of Matthew and Holly Sewell, sponsors designated by the parents of Petitioner, as provided by law, for the duration of this proceeding.

Dated: March 15, 2019

        Respectfully submitted,

        **DE ANDA LAW FIRM, PC**
        212 Flores Avenue
        Plaza de San Augustin
        Laredo, Texas 78040
        Telephone: (956) 726-3800
        Facsimile: (956) 726-0030
        deandalaw@gmail.com
        Texas Bar No. 05689500

        **AVENATTI & ASSOCIATES, APC**
        1910 Sunset Blvd., Suite 450
        Los Angeles, CA 90026
        Telephone: (949) 706-7000
        Facsimile: (949) 706-7050
        mavenatti@eaganavenatti.com
        California Bar No. 206929
        (Pro Hac Vice Pending)


        _____
        By: Ricardo de Anda

        **ATTORNEYS FOR PETITIONER/PLAINTIFF**

# CERTIFICATE OF SERVICE

I hereby certify that on ____15th____, I electronically filed the foregoing with the Clerk of the United States District court for the Southern District of Texas by using the Court's Electronic Filing ("ECF") system. A true and correct copy of this motion has been served via the Court's ECF system on:

>E. Paxton Warner
>Assistant United States Attorney
>1701 W. Bus. Hwy. 83, Suite 600
>McAllen, TX 78501
>Paxton.Warner@usdoj.gov

In addition, on ____15th____, I sent a copy of this filing by electronic mail to:

>Sarah B. Fabian
>Senior Litigation Counsel
>Office of Immigration Litigation-District Court Section
>Sarah.b.fabian@usdoj.gov

/s/ Ricardo de Anda
Ricardo de Anda

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| B.X., a minor, | § § § | |
| Petitioner/Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 1:19-cv-00017 |
| JONATHAN HAYES, in his official capacity as Interim Director of the Office of Refugee Resettlement, and SERVANDO BARRERA, in his official capacity as Federal Field Specialist, Office of Refugee Resettlement, | § § § § § § § § | |
| Respondent/Defendant. | § | |

## DECLARATION OF AMY COHEN M.D.

1. I, Amy Cohen M.D., make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct.

2. My name is Dr. Amy J. Cohen. I am licensed to practice medicine in the state of California. I am a Child Psychiatrist with over 30 years of experience working with traumatized populations of children and adults, most recently with the asylum-seeking population who have been affected by separation policies. I have published articles on the impact of trauma on children separated from parents. I have also reviewed the scholarly and research literature

1

on the impact of both separation and detention/institutionalization on the mental and physical health of asylum-seeking children.

3. I received my medical degree from the Perelman University of Pennsylvania School of Medicine where I graduated with honors, receiving the Apfel Award for excellence in Psychiatry. I served as assistant to Dr. Albert Solnit, then Director of the Yale Child Study Center and author (with Anna Freud and Donald Goldstein) of "Beyond the Best Interests of the Child". I received my internship, residency and child fellowship training at Harvard Medical School programs and completed my training in 1989.

4. I have been asked to consult on the case of B.X. by his attorney, Mr. Ricardo de Anda. In that capacity, I conducted a two-hour interview with B.X. on February 14, 2019 at the BCFS Shelter in Raymondville, Texas where he is currently confined. I subsequently conducted additional two-hour interviews with his father, David, by telephone (with use of an interpreter) and with Holly Sewell, who - with her husband - has been requested and authorized by B.X.'s family to serve as sponsor to B.X while his father is appealing his deportation.

5. I am submitting this declaration in support of Mr. de Anda's request that B.X. be released to Holly and Matthew Sewell in an expedited manner. It is my opinion that any delay in releasing B.X. will more likely than not result in protracted if not irreparable harm to B.X's mental and physical health.

6. As per B.X.'s father (David), he and B.X. fled Guatemala in May of 2018, following death threats by cartel members in which they declared their intention to kill both David and B.X. A near-fatal attack on David because of his evangelical preaching in November of 2017 and, following a 10-day hospitalization for knife wounds, David returned home only to be told that his family would now be targeted as well, B.X., then 8 years old, was singled out.

2

7. B.X. recalls his father's injuries and his extreme fear during his father's recovery. Terrified for the safety of their son, David and his wife worked to raise the money for an escape to asylum in the United States. B.X was deeply distressed by the departure from his mother, his siblings and his home but was told that David needed to seek work elsewhere and that the family would quickly follow.

8. David reports that the journey through Mexico was terrifying for both him and B.X. Father and son were given little food and water and were transported in a sweltering trailer-truck crammed with many others fleeing violence in Honduras. David often gave his meagre rations to his son and would stand for hours so that his small child might have the room to lie down and sleep in the crowded vehicle. After days of this, father and son were locked into a house uncertain of why or when they would get out. Finally, they were transported to the Rio Grande where, in the middle of the night, they were packed onto a small raft and sent across to Texas.

9. Once in the United States, B.X. and his father were picked up by CBP officials and taken to the McAllen, Texas detention facility where they were initially placed together in a fenced-in and freezing enclosure where lights remained through day and night. They were compelled to sleep on the cold floor insufficiently warmed only by thin mylar blankets.

10. Four days after their arrival, David reports that they were taken into a small office-type room where he was shackled hands and feet in front of his son and told that B.X. would be taken from him. He states that his child began to scream and cry and clung to his father. David reports that B.X. was abruptly and roughly pulled away and "dragged across the room like he was a dog".

11. B.X. has now spent more than 1/10 of his young life in government institutions. Since being taken from his father and placed in ORR custody, B.X. has been placed in 4 different shelters. He was moved in November of 2018, again in December of 2018 and finally in January of 2019 to the Raymondville facility where he currently resides. In none of these institutions have staff spoken his native, indigenous language. In one of the shelters, the other children spoke only English.

12. These moves have meant that B.X. has had to adapt to new staff, new rules and new children and has not been able to maintain any of the relationships which he may have built, and which may have helped him to counterbalance the terrible losses and isolation he suffers. His father reports that he is limited to 1 brief ten-minute call per week with his family. This may be less frequent, as David states that a call which fails to go through is not re-attempted and B.X. must wait another week before the facility attempts to contact his family again. As a consequence, B.X. may go for 2 weeks or longer with no family contact at all. During our interview he was most anxious to see if he could possibly have a video call with his father

13. His father reports that B.X. expresses distress and frustration over his protracted confinement and has been chronically upset about and fixated on when he will get out. He expresses feelings of betrayal that so many weeks and months pass without his release. At times, he ex- presses hopelessness that it will ever happen at all.

14. B.X. has "met" by video conference the Sewell family who his parents would like to sponsor him while they await the results of David's deportation appeal. He has been taken on a virtual tour of their home, met their children and been invited to ask questions. B.X. is aware that he would temporarily live with the Sewells and describes his eagerness to do so.

15. Many scholarly articles and research address the fact that institutionalized asylum-seeking children often suffer what is likely irreversible and certainly protracted psychological as well as medical/developmental damage as a consequence of their institutional confinement and that children who are instead released into the community fare far better. A number of factors place children at especially high risk, including:

    - Pre-confinement trauma
    - Young age and developmental stage
    - Long duration of confinement

    Indeed, the longer the confinement, the greater the likelihood that the child will suffer more severe medical consequences of a longer duration.

16. B.X.'s age, the trauma he has suffered - particularly in the fact and nature of his separation from his father - and especially the duration of his confinement place him at extremely high risk of irreversible damage due to toxic stress. Children experience time differently than do adults. For B.X., these months are experienced as years and every day of delay in his release feels more a week.

17. Given all of these factors, there is no doubt that further delay of B.X.'s release is increasingly likely to result in long-term and possibly irreversible, physiological and developmental impairment due to, among factors, toxic stress.

18. I have reviewed background reports from the FBI and the Texas Department of Public Safety, on Holly and Matthew Sewell and have interviewed Holly Sewell at length. I have found her to be a deeply caring and intelligent woman who, with her husband, has made this commitment

to caring for B.X. thoughtfully and with healthy motives. Holly and Matthew's dedication to caring for B.X. has been exemplified through the lengths to which they have been willing to go in order to be vetted and approved, including contacting 5 different ORR-contracted fostering facili- ties to which they were willing to apply. Ms. Sewell expresses an acute awareness of B.X's unique needs and appears willing to do all that might be required to meet those needs. For example, as I described potential issues with a child who has undergone the sort of trauma that B.X. has endured she asked me detailed and appropriate questions including whether I might refer them to a suitable therapist and whether this was a service which they should set up right away. They have expressed the wish to sustain an ongoing and close relationship with B.X's parents so that they might mini- mize the impact of the family separation and offer him as much continuity with the parenting style of his parents as possible. They have demonstrated the sincerity of this wish by sustaining contact with David through these many months of seeking to sponsor B.X.

19. I believe that any alternative to placement with the Sewells - including placement in another foster home - would not only fail to serve B.X.'s best interests but would likely result in an additional traumatic burden for him. The Sewell's are now a family who B.X. has not only met at length but has identified as surrogates for his parents. To some degree, B.X. has been sustained and soothed over these long months by the image of the Sewells and their home as the place where he will stay while awaiting his father's return. As people who his parents now know and to whom they have conveyed all that is needed to care for him, for B.X., the Sewell's are now true surrogates for his family and his placement with them would serve as the very best mitigator against further pain and injury from the separation from his family. Based on all of these factors I can unequivocally state that Matthew and Holly Sewell are extraordinarily well suited to provide for the emotional and other needs of B.X. to an extent

6

rarely found in foster families.

20. As of March 14, 2019, I have been informed that ORR plans to transfer B.X to a foster care center in San Antonio. It is my professional opinion that this is a very dangerous plan which is likely to only compound B.X.'s trauma and pain, negatively impacting his psychiatric, develop- mental and physiologic prognosis. This would be his fifth transfer by ORR to placement with another set of strangers and would, I believe, represent a serious blow to B.X.'s already fragile mental health. Placement in a foster home program would be experienced by this small child as yet another damaging, frightening and discouraging trauma. Further, such a placement would run contrary to the very rule which ORR has put forth as a reason for rejecting the Sewells; Refusal to place children with adults which whom he and his family have no pre-existing relationship. For 10 months, B.X. has endured these paradoxical placements, being moved again and again, always in the charge of complete strangers. Another foster family would represent yet another set of strangers. As B.X.'s anticipation of placement in the happy home of the Sewells has sustained him through these last months of misery and isolation, moving him yet again to yet another set of strangers would only deepen B.X.'s despair and mistrust of adults, compounding his traumatic experience and rendering any recovery from his past trauma infinitely more difficult and likely to increase his risk of permanent psychological and physiological impairment. Further, it is unlikely that any foster family in which B.X. was placed would be able to match the unique qualities which make the Sewell household such an ideal one for this young, traumatized child who has already suffered nearly a year of separation from his family, institutionalization and placement with strangers.

21. It is for these reasons that I strongly urge the expedited release of B.X. to the care of the Sewells. Further, I believe - as stated above - that any delay in B.X.'s release or alternative placement is very likely to add to his suffering and increase the long-term risk to his physical and psychological health. I believe that the urgency of the risks to his well-being mandate resolution to his confinement as soon as possible.

22. I declare under the penalty of perjury that the foregoing is true and correct based on my own personal knowledge.

EXECUTED ON THIS ___14th___, day of March 2019

_____
Amy Cohen, M.D.

# Exhibit 2



Ricardo de Anda <deandalaw@gmail.com>

## Notice of Removal to Transitional Foster Care - Byron Xol

**Warner, Paxton (USATXS)** <Paxton.Warner@usdoj.gov>  Thu, Mar 14, 2019 at 4:47 PM
To: Ricardo de Anda <deandalaw@gmail.com>

Mr. de Anda,

As we discussed on the phone, please see the official notice from ORR (below) that they will transfer B█████ to a transitional foster care program. I have confirmed that the placement will be in San Antonio, Texas.

Dear Mr. De Anda,

I write to inform you of an update regarding your client, B█████ X█████ (A# 215714907). This week, ORR plans to approve his transfer from BCFS Raymondville shelter, his current placement, to a foster placement in San Antonio.

When a child or youth remains in ORR's care for more than four months - an "extended case" – ORR attempts to find a more suitable and stable placement, typically foster care. Foster placements are particularly well-suited for younger children or others with special needs, and for children for whom release is not imminent, like B█████. They are licensed by the state and provide the full range of ORR services in a culturally sensitive manner. B█████ would remain in ORR legal custody, but would live with an individual foster family in their community. He would still be eligible for release to a sponsor, as assessed and approved according to ORR Policy.

In making B█████'s foster care placement decision, ORR has taken into consideration his mental, emotional, behavioral, and physical health needs; his ability and commitment to live in a family and community-based setting; his tender age; and the availability of an appropriate placement that will meet his unique needs. Also, in general, child welfare experts agree that children experience better outcomes when they live with families, rather than in congregant care. Finally, ORR is legally obligated to place minors in the least restrictive setting possible, and all placement decisions are made in the best interest of the child.

While B█████ is in a licensed foster care setting, ORR will continually assess that best efforts are being made to move him toward release from ORR custody and into a more permanent arrangement with an appropriate sponsor. Further logistical details will be provided to you when the foster provider accepts placement and preparations have been made to physically transport your client. Of course, you will continue to have the same level of access to your client you currently have at his new placement.

Thank you,

Stephanie Trevino, MSW
Federal Field Specialist—Chicago/Kansas
U.S. Dept. of Health and Human Services

Administration for Children and families

Office of Refugee Resettlement

Division of Unaccompanied Children Operations

202.738.3708





**E. Paxton Warner**

**Assistant United States Attorney**

**Southern District of Texas**

1701 W. Bus. Hwy. 83 | Suite 600 | McAllen, TX 78501

Office: (956) 992.9350 | Fax: (956) 618.8016 | Email: Paxton.Warner@usdoj.gov

 | www.justice.gov/usao-sdtx

---

Confidentiality Notice:  This e-mail message is covered by the Electronic Communications Privacy Act, 18 U.S.C. Section 2510-2521 and is legally privileged. Unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please contact the sender at Paxton.Warner@usdoj.gov, or by reply e-mail, or at the telephone number above, and destroy all copies of the original message.