**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| B.X., a minor, | § | |
| | § | |
| Petitioner/Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| JONATHAN HAYES, in his official | § | CIVIL ACTION NO. 1:19-cv-00017 |
| capacity as Interim Director of the Office | § | |
| of Refugee Resettlement, and | § | |
| SERVANDO BARRERA, in his official | § | |
| capacity as Federal Field Specialist, | § | |
| Office of Refugee Resettlement, | § | |
| | § | |
| | § | |
| Respondent/Defendant. | § | |

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION
FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**INTRODUCTION**

This motion for a temporary restraining order is grounded on Petitioner's First Amendment

Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief

(hereinafter "Habeas Petition). The Habeas Petition is attached hereto as Exhibit 1, which sets out

in detail the facts, declarations, and exhibits supporting this motion.

**STATEMENT OF FACTS**

Petitioner is a nine year old refugee child who has been separated from his deported father

for almost ten months.  He has been held under the custody of Respondents in four separate

government contract facilities since May of 2018.  He has recently been examined by a child

psychiatrist who reports that because of Petitioners young age, particular vulnerabilities, and the

1

prolonged period of his current detention, he will suffer irreparable harm to his emotional and mental health unless he is promptly released and placed in a suitable family environment chosen by his parents. *See, Exhibit 2, Declaration of Amy Cohen, M.D.*

Petitioner's father is a member of the plaintiffs' class subject to family reunification pursuant to order of the court in *Ms. L, et al v U.S. Immigration and Custom's Enforcement, et al, 302 F. Supp. 3d 1149 (S.D. Cal 2018).* Petitioner's father has waived his right under the Court's order to have his son repatriated to Guatemala and reunited with his family by Declaration before the *Ms. L.* Court to that effect, and has instead notified the Court that he has designated Matthew and Holly Sewell, who, along with their two children, reside in Buda, Texas, as sponsors for Petitioner. *See, Exhibit 2 of Habeas Petition.* Petitioner's parents have also appeared before a U.S. Consular Official in Guatemala City,  swearing out declarations designating Matthew and Holly Sewell as sponsors for their son, in accord with the Flores Settlement Agreement, and 8 C.F.R. § 236.3 (2002), governing the placement of unaccompanied refugee minors such as Petitioner. *See, Exhibits 7and 8 of Habeas Petition.* Dr. Amy Cohen, a child psychologist, has interviewed Holly Sewell, examined her and her husband Matthew's federal, state, and local criminal background records, and has found the Sewell household suitable for the proper care of Respondent's mental, emotional, and other needs. *See, Exhibit 2, Declaration of Amy Cohen, M.D.* The Sewell family have also shown themselves to be willing to care for Byron. *See, Exhibits 2, 7, 8, and 9 of Habeas Petition.*

The Sewell family were designated by Petitioner's parents as his sponsor family because they desire for him to be cared for by a family of their choosing, rather than for Petitioner to continue to be held in indefinite institutionalized detention, or with an unknown sponsor chosen

2

by a government contracted agency. *See, Exhibits 2, 7, 8, and 9 of Habeas Petition and Declaration of Amy Cohen, M.D.*

Respondents have summarily rejected the sponsorship of Matthew and Holly Sewell as caregivers for Petitioner, refusing to consider their suitability as sponsors, on the arbitrary basis that the Sewell family did not know Petitioner's family before Petitioner entered the country in May of 2018. *See, Exhibits 3, 4, 5 and 10 of Habeas Petition.* Respondents' summary rejection of sponsors designated by Petitioner's parents continues despite the two families having established a trusting social relationship over the past 5 months. *See, Exhibit 2, Declaration of Amy Cohen, M.D. and Exhibit 9 of Habeas Petition.*

A more detailed statement of the facts may be found in the Habeas Petition and the declaration and exhibits attached hereto. *See, Exhibit 1 of Habeas Petition.*

## LEGAL STANDARD

Preliminary injunctive relief is warranted where plaintiffs establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) an injunction is "in the public interest." *N.Y. Progress & Prot. PAC v. Walsh* 733 F3d 483, 486 (2d Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). The standard for granting a preliminary injunction and a temporary restraining order pursuant to Rule 65 of the Federal Rules of Civil Procedure is identical. *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.,* 190 F. Supp.2d 577,580 (S.D.N.Y. 2002)

## ARGUMENT

### I.      Plaintiffs Are Likely To Prevail On The Merits Of Their Claims.

"At the preliminary injunction stage, the plaintiff must show that 'it has a better than negligible chance of succeeding on the merits so that injunctive relief would be justified." *Epic Fresh Produce*, 2017 WL 6059971, at FN 3 (quoting *Personeta, Inc. v. persona Software, Inc.*, 418 F. Supp. 2d 1013, 1016 (N.D. Ill. 2005)). "This is an admittedly low requirement and is simply a threshold question." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008).

A party moving for preliminary injunctive relief is merely required to show that it has a chance of success on *at least one* of its claims for relief. *See id.* (because plaintiff "surpasses the threshold on at least one of its causes of action," court need not address other claims). Here, Petitioner has   a strong likelihood of success on at least four of the claims in his Petition:

   (1) Count Two for violation of the Flores Settlement Agreement;

   (2) Count Four for Violation of Due Process Rights;

   (3) Count Five for violations of the Trafficking Victims Protection Reauthorization Act; and

   (4) Count Six for violation of the Administrative Procedures Act.

If the Court finds that Petitioner has a likelihood of success on any of these four claims, then Petitioner have met their burden as to this factor. *

---

* The Habeas Petition also includes claims for habeas corpus relief (Count One) and violation of the Fifth Amendment right to substantive due process (Count Three). In order to simplify and shorten this filing. Petitioner does not rely on these claims for purposes of the instant motion. Petitioner does not waive these claims and expressly reserves all rights to assert these claims or any other appropriate causes of action at an appropriate time.

4

**A.      Petitioner is Likely to Succeed on His claim for Violation of The Flores Settlement Agreement.**

Government care and custody of unaccompanied immigrant minors ("UAC") is governed, inter alia, by a consent decree in the federal lawsuit of *Flores v Reno* known as The Flores Agreement. The Flores Agreement is binding on Petitioner, and is effective today. <u>Flores v. Sessions, 862 F3d 863 (9th Cir. 2017).</u> It compels Respondents to release Petitioner to a sponsor designated by his parents, as capable and willing to care for the minor's well-being in a declaration signed under penalty of perjury before a "…consular official," unless doing so would harm the minor's safety. *See, Exhibit 6 of the Habeas Petition.* In addition, the section of the Code of Federal Regulations related to the detention and release of UACs likewise authorizes a minor's parents, who are outside the country, to designate a sponsor for their child by swearing out a declaration to such affect before a US consular official. 8 C.F.R. § 236.3 (2002). Finally, the Flores Agreement mandates release of a minor to a suitable sponsor unless there is a question as to the minor's safety in doing so. *See, Exhibit 6 of the Habeas Petition.*

Petitioner's parents have both appeared before US consular officials in Guatemala City swearing out declarations finding Matthew and Holly Sewell to be capable and willing sponsors, and designating them to care for their son, as called for by the Flores Agreement and 8 C.F.R. § 1236.3 (2002). *See, Exhibits 7 and 8 of Habeas Petition.* Moreover, Dr. Amy Cohen, a child psychologist, has interviewed Matthew and Holly Sewell, examined their criminal background records, and has opined as well that the Sewell family is a fit and capable sponsor for the care of Petitioner, and that placing him with the Sewell family would not harm Petitioner's safety. *See, Exhibit 2, Affidavit of Amy Cohen, M.D.*

**B.      Petitioner is Likely to Succeed on His Claim for Violations of Due Process.**

The designation of the Sewell family by Petitioner's parents to care for him in their absence was summarily rejected by Respondents without any process whatsoever, pursuant to Respondents' rules which prohibit sponsorship of minors by non-relative adults who did not know the family prior to the minor's entry to the U.S. *See, Exhibits 4, 5, and 10 of the Habeas Petition.* Petitioner was not provided with an opportunity to show that his designated sponsors were fit, willing, and capable to meet his needs for care and attention.  Respondents also did not provide Petitioner with an opportunity to show that his safety was not at risk if he were placed with the Sewell family, or that he would be harmed in any way if he were so released from indefinite custody—the only basis on which he may be denied release to the Sewell family under the Flores Agreement and the Trafficking Victims Protection Reauthorization Act. 8 USC § 1232.

The Supreme Court has set forth three factors that normally determine whether an individual has received the "process" that is "due" under the Constitution: (1) the private interest that will be affected by the official action: (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Matthews v. Eldridge* 424 U.S. 319, 335 (1976).

A young child's freedom from detention, and his right to have his parents decide what is in his best interests, are core liberty interests affected directly by Respondent's total lack of procedure in summarily disqualifying Petitioner's designated sponsor, and arbitrarily refusing to consider the parent's wishes.  While the government's interest in ensuring Petitioner's safety is

important, providing procedural safeguards would reasonably provide for such assurance without risking an erroneous deprivation of Petitioner's core liberty interests, as it has done here.

### C.   Petitioner is Likely to Succeed on His Claim for Violations of The Trafficking Victims Protection Reauthorization Act, 8 USC § 1232.

It is clear in this case that Respondents have grievously violated provisions of the Trafficking Victims Protection Reauthorization Act (TVPRA), in refusing to consider the designation of sponsors by Petitioner's parents. The TVPRA requires Respondents to promptly place Petitioner in the least restrictive setting that is in his best interests. 8 USC § 1232.   Yet Petitioner has languished in institutionalized detention for ten months despite the designation by his parents of a suitable sponsor of their choice.   By failing to place Petitioner with suitable sponsors chosen by his parents, Respondents have failed to act promptly, and have failed to place Petitioner in the least restrictive setting—all in violation of the TVPRA.

### D.   Petitioner is Likely to Succeed on His Claim for Violation of the Administrative Procedures Act.

The APA protects individuals from final agency action that is "arbitrary, capricious, or otherwise not in accordance with law" by authorizing courts to enjoin such action. 5 U.S.C. § 706(2)(A); *Judulang v. Holder,* 565 U.S. 42, 52 (2011)   Courts must ensure that an agency has given "adequate reasons for its decision[]." *Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117, 2125 (2016).   The agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Id. At 2125 (quoting *Motor Vehicle Mfrs. Assn'n v. State Farm, Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983)).   Where the agency has failed to provide an adequate explanation, the agency action must be set aside. 5. U.S.C. § 706(2)(A).   Respondents' objectionable rule in the instant case, which renders the

7

sponsors designated by Petitioner's parents disqualified to care for him, allows for non-relative sponsors of children only if there is evidence of a pre-existing social relationship between the families. *See Exhibits 4, 5, and 10 of Habeas Petition.*

In order for an agency action to be reviewable, the action must represent the "consummation of the agency's decisionmaking process" and be the one "by which rights or obligation have been determined." *U.S. Army Corps of Engineers v. Hawkes,* 136 S. Ct. 1807, 1813 (2016 (quoting *Bennett v. Spear,* 520 U.S. 154, 177-78 (1997)). Respondents' decision to disqualify sponsors designated by Petitioner's parents based on a rule prohibiting placement with a non-relative sponsor without proof of a pre-existing social relationship represents the consummation of its decisionmaking process. A consummation of decisionmaking process occurs when the action is "typically not revisited" as opposed to "advisory in nature." *Hawkes,* 136 S. Ct. at 1813-14. That is the case here. It is impossible to find that Respondent's decision was "purely advisory' and "in no way affected the legal rights of the relevant actors." *Bennett,* 520 U.S. at 177-78. Rather, the government's decision denying Petitioner the right to be cared by sponsors of his parents' choice has had a "direct and appreciable" impact on Petitioner's right to freedom, as well as to family unity and support, among the most important and fundamental rights in existence.

While the existence of a social relationship between the families may be a legitimate factor in determining the safety of a child if placed with a particular sponsor, and while it may be reasonable for Respondents to probe the character of the relationship, it cannot be other than arbitrary to absolutely refuse as a matter of policy to consider a sponsor designated by parents who may in fact have a social relationship that did not exist at a pre-determined time. A rule designating all potential non-relative sponsors designated by parents of a detained minor as unqualified to care

for the child unless there existed a social relationship at any given period of time cannot in any meaningful way bear on the safety of a minor whose sponsor has been vetted and approved by his parents. Indeed this arbitrary and capricious rule shows no discernable regard for the best interests of children, and has resulted in Petitioner's present restrictive setting.

## II. Petitioner Will Suffer Irreparable Harm in the Absence of Injunctive Relief.

In affirmatively violating The Flores Settlement, a consent decree, and violating a child's rights to family and physical integrity, Respondents violated the affirmative rights to which Petitioner is legally entitled to, and, additionally, his constitutional rights. "[L]oss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills v. Dist. Of Columbia,* 571 F.3d 1304, 1312 (D.C. Cir. 2009) (citations omitted). As a result, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," 11A Wright & Miller, Fed. Prac. & Proc. §29481.1 (2D ED. 2004). Every day that Petitioner is incarcerated imposes additional pain and suffering and increases the risk of further lasting psychological and emotional damage. Such pain and suffering is the epitome of irreparable harm. This factor is easily satisfied. *See, Exhibit 2, Affidavit of Amy Cohen, M.D.*

## III. There Is No Adequate Remedy At Law.

Furthermore, Petitioner has no adequate remedy beyond the relief sought here, which is equitable in nature. Having "no adequate remedy at law... means that harm to the plaintiff cannot be rectified by a final judgment....that damages at the end of a trial will be seriously deficient as a remedy." *E.Z. v. Coler,* 603 F. Supp. 1546, 1562 (N.D. Ill. 1985) (citing *Roland Machinery Co. v. Dresser Industries,* 749 F. 2d 380 (7th Cir. 1984)). The harm suffered—long-term mental and

physical harm to a minor child—is the type that "it is not practicable to calculate damages to remedy this kind of harm," and "no remedy at law can adequately compensate [Plaintiffs] for their injury." *Foodcomm Int'l v. Barry*, 328 F. 3d 300, 304 (7ᵗʰ Cir. 2003) (citing *Roland Machinery*, 794 F.2d at 386). Petitioner will be permanently scarred by this experience, and the prolonged detention he continues to suffer is exactly the kind of injury that can only begin to be remedied by injunctive relief.

### IV. The Balance of Hardships, Together With the Public Interest, Weigh Heavily In Favor of Releasing a Child to a Sponsor Designated by His Parents.

A plaintiff seeking an injunction must establish that "the balance of the equities tips in its favor"—that the harm the plaintiff will suffer *without* an injunction outweighs the harm the defendant will suffer *with one. Harlan v. Scholz*, 866 F.3d 754, 758 (7ᵗʰ Cir. 2017). "[E]njoining [a party] from engaging in unlawful behavior is no hardship at all." *Mkt. Track, LLC v. Efficient Collaborative Retail Mktg. LLC*, No. 14 C 4957, 2015 WL 3637740, at *23 (N.D. Ill. June 11, 2015).

If granted, the requested relief would cause *no* injury or burden to Respondents—all Respondents would need to do is release a minor to sponsors designated by his parents—sponsors who are clearly competent and willing to care for him. *See Exhibit 1, Declaration of Amy Cohen, and Exhibits 2, 3, 7, 8, of the Habeas Petition.* Yet granting the requested relief would place Petitioner with a caring family designated by his parents according to law, end the continued violation of Petitioner's constitutional rights, and enable a family to begin to heal from forcible separation. In short, there will continue to be severe hardship to Petitioner if relief is not granted, no hardship to Respondent if relief is granted, and no amount of money could adequately

compensate Petitioner for his injury. Thus, the balance of equities heavily favors granting the requested relief.

The relief sought in this motion—the release of a child from government custody to a sponsor designated by his parents—will prevent the continued violation of Petitioner's constitutional rights. The balance clearly tips in favor of granting the requested relief, and the public interest favors the rights of children to have their parents decided what is in their best interest. The "balance of hardships" factor of the preliminary injunction assessment merges with the "public interest" factor when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The public interest factor also favors granting the requested relief. Remedying a "continuing constitutional violation...certainly would serve the public interest." *Sammartano v. First Judicial District Court,* 303 F. 3d 959, 974 (9th Cir. 2002) (holding "it is always in the public interested to prevent the violation of a party's constitutional rights."). There is an undeniable public interest in protecting children, but no public interest is served by keeping a child in detention while separated from the care of sponsors chosen by his parents according to law, when there are no concerns shown over the child's safety or welfare if placed with such sponsor. Both the balance of hardships and the public interest favor granting injunctive relief that would allow the release of Petitioner to the custody of Matthew and Holly Sewell.

## V.     The Court Should Waive Bond.

Under Federal Rule of Civil Procedure 65(c), district courts have discretion to determine the amount of the bond accompanying a preliminary injunction, and this includes the authority to set a nominal bond. In this case, the Court should waive bond because Petitioner is an indigent minor, the requested preliminary injunction is in the public interest, and the injunction is necessary

to vindicate constitutional rights. *See Pocklington v. O'Leary,* No. 86 C 2676, 1986 WL 5748, at *2 (N.D. Ill. May 6, 1986) ("[B]ecause of [the moving party's] indigent status, no bond under Rule 65(c) is required."); *Davis v. Mineta,* 302 F.3d 1104, 1126 (10th Cir. 2002) ("minimal bond amount should be considered" in public interest case); *Complete Angler, L.L.C. v. City of Clearwater,* 607 F.Supp.2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional of a fundamental constitutional right").

## CONCLUSION

For the reasons set forth above, the Court should grant immediate preliminary injunctive relief to Petitioner and order that Respondents immediately release Petitioner B.X. into the custody of Matthew and Holly Sewell, sponsors chosen by his family, for the duration of this proceeding.

Dated:  March 14, 2019

Respectfully submitted,

**DE ANDA LAW FIRM, PC**
212 Flores Avenue
Plaza de San Augustin
Laredo, Texas 78040
Telephone: (956) 726-3800
Facsimile: (956) 726-0030
deandalaw@gmail.com
Texas Bar No. 05689500

**AVENATTI & ASSOCIATES, APC**
1910 Sunset Blvd., Suite 450
Los Angeles, CA 90026
Telephone: (949) 706-7000
Facsimile: (949) 706-7050
mavenatti@eaganavenatti.com
California Bar No. 206929
(Pro Hac Vice Pending)

By: Ricardo de Anda

**ATTORNEYS FOR PETITIONER/PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on ___15th___, I electronically filed the foregoing with the Clerk of the United States District court for the Southern District of Texas by using the Court's Electronic Filing ("ECF") system. A true and correct copy of this brief has been served via the Court's ECF system on:

> E. Paxton Warner
> Assistant United States Attorney
> 1701 W. Bus. Hwy. 83, Suite 600
> McAllen, TX 78501
> Paxton.Warner@usdoj.gov

In addition, on ___15th___, I sent a copy of this filing by electronic mail to:

> Sarah B. Fabian
> Senior Litigation Counsel
> Office of Immigration Litigation-District Court Section
> Sarah.b.fabian@usdoj.gov

Ricardo de Anda

14

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| B.X., a minor, | § | |
| | § | |
| Petitioner/Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| JONATHAN HAYES, in his official | § | CIVIL ACTION NO. 1:19-cv-00017 |
| capacity as Interim Director of the Office | § | |
| of Refugee Resettlement, and | § | |
| SERVANDO BARRERA, in his official | § | |
| capacity as Federal Field Specialist, | § | |
| Office of Refugee Resettlement, | § | |
| | § | |
| | § | |
| Respondent/Defendant. | | |

**FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT
FOR DECLARATORY AND INJUNCTIVE RELIEF; EXHIBITS 1-10**

**INTRODUCTION**

1.      Petitioner B.X.[1] is a nine-year-old child who fled to the United States from

Guatemala after he and his family experienced violence and persecution in their home country.  In

May 2018, he came to the U.S. with his father, David Xol Cholom, seeking asylum due to fear of

persecution in Guatemala.  Immigration authorities apprehended the pair at the border, separating

then eight-year-old B.X. from his father.  B.X.'s father was deported shortly thereafter and B.X.

has been detained by the Office of Refugee Resettlement (ORR) for almost nine months, with no

parents or relatives in the United States to care for him.

2.      B.X. deserves the opportunity to live in a healthy, nurturing home, which his

parents have chosen for him according to the law, while awaiting adjudication of his immigration

claims.  B.X. and his parents have requested that he be released into the custody of a sponsor

---

[1] In compliance with Fed. R. Civ. P. 5.2, B.X., a minor, is identified only by his initials.

family, presenting ample evidence that the placement is in B.X.'s best interests, and of the fitness of the sponsors, all to no avail.  Respondents have summarily denied the request for B.X.'s release without justification and totally devoid of due process, despite the designation of a sponsor by his parents as capable and willing to care for him. B.X. remains in detention.

3.     B.X.'s prolonged detention is the result of ORR's unlawful policies and practices regarding family separation.  ORR has a statutory responsibility to "promptly" place B.X. "in the least restrictive setting that is in the best interest of the child."  8 U.S.C. § 1232(c)(2)(A).  For some immigrant children who come into its custody, ORR fulfills this mandate by placing children with their parents or other relatives in the United States.  For immigrant children who have no family or relatives in the U.S.—so-called "Category 4" children—ORR ignores this mandate.  Due to rules unlawfully promulgated by ORR, children like B.X. remain in detention, even where their parents lawfully designate a fit individual to care for them.

4.     Indeed, B.X.'s parents have designated a family to care for their son and have requested that B.X. be released into their custody as required by 8 C.F.R. § 236.3 and the settlement reached in *Flores v. Whitaker*, No. 85-cv-4544-DMG (AGRx) (C.D. Cal.).  Despite the statutory responsibility to "promptly" place B.X. "in the least restrictive setting that is in [his] best interest," ORR has summarily and without reason rejected his parents' designation of a fit sponsor.  ORR's failure to "promptly" act violates ORR's statutory mandate and B.X.'s constitutional rights to due process and family integrity.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2201; and 28 U.S.C. § 2241 (habeas corpus).

6.     Venue is proper in the Brownsville Division of the Southern District of Texas under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred and continue to occur in this district, including that B.X. is detained in the district.

## PARTIES

7.     Petitioner B.X. is a nine-year-old boy from Guatemala.  ORR detains B.X. at the Baptist Child and Family Services facility ("BCFS"), located in Raymondville, Willey County, Texas.  The government has classified B.X. as an unaccompanied child pursuant to 6 U.S.C. § 279. ORR has detained B.X. in juvenile detention facilities since May 21, 2018.

8.     Respondent JONATHAN HAYES is the Interim Director of ORR, the component of the U.S. Department of Health and Human Services (HHS) responsible for implementing HHS's obligations to unaccompanied minors who are immigrants.  Respondent HAYES is sued in his official capacity.

9.     Respondent SERVANDO BARRERA is an ORR Federal Field Specialist.  Federal Field Specialist BARRERA is the government official responsible for the care and custody of children who ORR has placed in the BCFS facility.   In this role, Federal Field Specialist BARRERA is responsible for determining B.X.'s placement and has authority to approve his release to an appropriate guardian's care. Federal Field Specialist BARRERA resides in San Benito, Cameron County, Texas. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

**A.      Respondents have detained B.X., a nine-year-old child, in a juvenile detention facility for almost nine months.**

10.      Petitioner B.X. is a minor detained at the Baptist Child and Family Services facility (hereafter "BCFS"), located in Raymondville, Willey County, Texas.  BCFS is a third-party contractor detaining B.X. pursuant to the authority of Respondents.

3

11. B.X. is a native of Guatemala. He was apprehended and detained by the U.S. Border Patrol close to McAllen, Texas, on or about May 18, 2018, along with his father David Xol Cholom, for not having lawful immigration status in the U.S. B.X.'s father pled for asylum, on his and on B.X.'s behalf, due to fear of persecution if they were returned to their country of origin, based on their religion (evangelical Christian), membership in a social group (family), and political opinion (anti-gang message). *See, Exhibit 1.*

12. B.X. is a K'iche' indigenous child of Mayan descent, and is a K'iche' speaker. B.X. is originally from San Miguel Limon, Alta Verapaz, Republic of Guatemala. B.X.'s father, David Xol Cholom, (hereinafter "David"), was brutally attacked and tortured by members of MS-18, a criminal gang which operates in Guatemala, on October 15, 2017, because of David's preaching against a life of crime. B.X.'s life was also threatened when David was attacked. *See, Exhibit 1.*

13. In May of 2018, fearing for their lives, David and B.X. fled Alta Verapaz and traveled to the U.S. seeking asylum. On May 21, 2018, three days after first being detained in a Border Patrol facility with his father, B.X. was forcibly separated from his father and placed under the care and custody of Respondents. David was deported to Guatemala on or about May 28, 2018, leaving B.X. behind with no relatives or family to care for him. *See, Exhibit 1.*

14. B.X. was eight years of age when separated from his father and incarcerated in BCFS facilities under Respondent's supervision. He has been held in four separate facilities operated by BCFS under authority of Respondents for almost nine months, including facilities located in Baytown, Texas, Driscoll, Texas, San Antonio, and his present incarceration in Raymondville. He has been in three separate BCFS facilities in the past three months alone.

15. As victims of the government's zero tolerance policy, David is a member of the class subject to court orders of family reunification in the *Ms. L. et al., v. U.S. Immigration and*

*Customs Enforcement, et al.*, 302 F. Supp. 3d 1149 (S.D. Cal. 2018).  However, David has waived his rights before the court to have B.X. repatriated, as he fears that B.X.'s return to Guatemala would place B.X. at grave risk of serious harm at the hands of Guatemalan gang members.  He requested instead that B.X. be placed in the custody and sponsorship of Holly and Matthew Sewell. *See, Exhibit 2.*

**B.     Respondents have a legal duty to promptly place B.X. in the least restrictive setting that is in his best interest without unnecessary delay.**

16.     On November 2, 2018, B.X. presented Respondents with sworn to affidavits from both of his biological parents designating the family of Holly and Matthew Sewell as capable and willing sponsors to care for B.X., requesting that Respondents release B.X. from incarceration and transfer him to the custody of Holly and Matthew Sewell.  *See, Exhibit 3.* By email of November 5, 2018, Respondents summarily rejected the Sewell family as sponsors for B.X., based on ORR rules prohibiting B.X. from "…. reunification with families that don't know the minor or his family." *See Exhibit 4.* By email of November 6, 2018, Respondents again rejected B.X.'s repeated entreaties that he be released according to his parent's wishes by stating: "Per policy, we are not able to reunify any child with people that are not known by the family". *See, Exhibit 5.*

17.     By separating B.X. from his father on May 21, 2018, and deporting David on May 28, 2018, the government rendered B.X. on unaccompanied child (UAC) subject to supervision by Respondents pursuant to § USC § 279 (g) (2), as B.X. has no lawful immigration status in the U.S., is a minor, and has no parent or legal guardian in the U.S.

18.     Government care and custody of UACs is governed by a legal framework consisting primarily of two statutory provisions—6 U.S.C. § 279 and 8 U.S.C. § 1232—plus a court authorized settlement agreement that is binding on the pertinent federal agencies.  In the 1980s and 1990s, immigrant children who arrived in the U.S. were routinely locked up for months

in unsafe and unsanitary jail cells in remote facilities across the country. These conditions prompted a federal lawsuit, *Flores v. Reno*, which resulted in a 1997 consent decree (the "*Flores* Agreement" or "FSA") binding on DHS and ORR, still effective today, that sets national standards for the detention, release, and treatment of immigrant children in government custody. *See, Exhibit 6.*

19.     In addition to setting certain minimal detention standards, *Flores* guarantees that children shall be released "without unnecessary delay" while they await their immigration status. As the Fourth Circuit explained, "[T]he *Flores* Agreement spells out a general policy favoring less restrictive placement of alien children (rather than more restrictive ones) and their release (rather than detention)." *D.B. v. Cardall*, 826 F.3d 721, 732 (4th Cir. 2016).

20.     In 2002, Congress took further action to protect this vulnerable population when it passed the Homeland Security Act ('HSA") and transferred the care and custody of unaccompanied immigrant children from the Immigration and Naturalization Service ("INS") to the Office of Refugee Resettlement, housed within the Department of Health and Human Services. ORR is not a security agency; its mission is to "incorporate child welfare values" into the care and placement of unaccompanied immigrant children. The *Flores* Agreement is binding on all successor agencies to the INS, including Respondents.

21.     Building on *Flores* and the provisions of the HSA regarding immigrant children, Congress further passed the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), codified at 8 U. S. C. § 1232, which grants legal protections to children in ORR custody and tasks the agency with ensuring they are "promptly placed in the least restrictive setting that is in the best interest of the child." Senator Diane Feinstein, a sponsor of the bill that would become the TVPRA, explained that the legislation was intended to redress

situations like one she had personally witnessed, where an unaccompanied child remained in custody for nine months after her initial detention.  Congress enacted the TVPRA specifically to facilitate the speedy release and minimal placement of immigrant children such as B.X.

**C.     ORR has unlawfully refused to release B.X. into the care of an appropriate sponsor designated by his parents as capable and willing to care for him, as required by law.**

22.     ORR prioritizes placement with sponsors by categorizing the children in order of priorities, as follows: Category 1 children are children eligible to be sponsored by parents or legal guardians; Category 2 children are children sponsored by immediate relatives; Category 3 children are children sponsored by other eligible adults. Sponsors for Category 3 children who are not otherwise related, however, are limited to family friends where a social relationship existed between the families before the child migrated to the U.S.[2]    All other children incarcerated by Respondents are classified as Category 4 children, which Category sets out that there are no eligible sponsors. *See, ORR Policy Guide at 2.2.1, and 2.2.4 Exhibit 10.*  B.X. is designated a Category 4 child by Respondents with no qualified sponsors that may be designated by his parents under its policies.

23.     Paragraph 14 of the *Flores* Settlement Agreement requires in relevant part that:

"Where the INS (ORR) determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS (ORR) shall release a minor from its custody without unnecessary delay, in the following order of preference, to:

a.     a parent
b.     a legal guardian

---

[2] Although Section 2.2.1 of ORR's Policy Guide allows for the designation by the parents of unrelated adults as sponsors for incarcerated children (Category 3), Section 2.2.4 provides:

"Category 3 potential sponsors who are unable to provide verifiable documentation of a familial relationship with the unaccompanied alien child must submit evidence that reliably and sufficiently demonstrates a bona fide social relationship  with the child 's family that existed before the child migrated to the United States."
*See Exhibit 10.*

> c.   an adult relative (brother, sister, aunt, uncle, or grandparent);
> d.   an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in a declaration signed under penalty of perjury before an immigration or consular officer…." *See, Exhibit 6.*

The *Flores* Agreement dovetails with 8 CFR § 1236.3, which likewise calls for the release of incarcerated minors , where the parents are outside the U.S., to a person designated under oath by the minor's parents before a U.S. consular official as capable and willing to care for the minor's well-being.  B.X.'s parents have so designated the Sewell family at the Embassy of the United States in Guatemala City. *See, Exhibits 7 and 8.* Holly and Matthew Sewell have submitted an affidavit as well, agreeing to care for B.X. as required by law. *See Exhibit 9.*

24.     The *Flores* Agreement and 8 CFR § 1236.3  do not require that the sponsor designated by the parents of an incarcerated child as capable and willing to care for the minor have a pre-existing social relationship with the child's family prior to the child's migration. Respondents have not and cannot articulate a reason for this arbitrary requirement.

25.     B.X. is the victim of the illegal rules set out in the ORR Policy Guide.  Although the Sewell and Xol-Cholom families, as well as B.X., have met with each other by video conference, and the parents of B.X., and B.X. himself, have requested the designation of the Sewell family as competent and willing sponsors, Respondents have disqualified the Sewell family out of hand, and without articulating a reason for doing so – other than their summary exclusion under the above ORR rules because the families' social relationship that in fact does exist today between the families, did not exist before May of 2018.

26.     B.X. contests his continued incarceration by means of Respondent's continued refusal to release him to an adult designated by his parents under oath before a U.S. Consular officer as capable and willing to care for B.X., as provided for in the FSA and in 8 CFR § 1236.3, on the basis that B.X.'s continued incarceration, on its face, is not required to secure his timely

appearance before immigration authorities, or to ensure his safety or that of others.  Moreover, the decision to disqualify the Sewell family as capable and fit sponsors, according to the sworn wishes of B.X.'s parents, has no factual basis, and there is not a facially legitimate and bona find reason to continue to prolong B.X.'s incarceration.

27.    B.X.'s fundamental rights to family integrity - his right to have his fit parents decide what is in his best interest, where his safety is not otherwise at risk - were violated when Respondents refused to consider his placement with a sponsor of his parents' choosing.

28.    Having determined that it would deprive B.X. of his fundamental right to family integrity, Respondents owed B.X. some form of adversarial process.  Instead, Respondents exclusively relied on its flawed rule requiring a pre-existing familial relationship to summarily invalidate his parents' designation of a sponsor for B.X. Moreover, Respondents took absolutely no action to initiate proceedings to justify its actions.

29.    This offhand and capricious preclusion of a fit sponsor designated by B.X.'s parents to care for him in lieu of continued incarceration "…. involves a breach of 'perhaps the oldest of the fundamental liberty interests' recognized by the Supreme Court – the interest of parents in the care, custody and control of their children." *D.B. v. Cardall, 826 F.3d 721, 740 (4th Cir. 2016) (quoting Troxel v. Granville, 530 U.S. 57, 65 (2000).* This total lack of procedures creates a substantial risk that B.X would be, and continuous to be, unlawfully deprived of his right to freedom and to family integrity. Respondents cannot demonstrate any interest justifying their failure to accord B.X. procedures based on due process of law.

**D.    Holly and Matthew Sewell are competent and willing sponsors.**

30.    Holly Sewell (hereinafter "Holly"), and Matthew Sewell (hereinafter "Matthew"), who are 41 and 48 years of age, respectively, are a married couple with two young children living

in Buda, Texas.  Desmond is six years of age, and Winifred, is four years of age.  The Sewell family reside in a comfortable suburban two-story home. *See, Exhibit 9.*

31.     Matthew is a professional software engineer with 12 years of experience in his practice.  He is employed by a software engineering firm, MineralSoft, based in Austin, Texas, which provides software and computer services to commercial interests.  He has been employed by MineralSoft for almost a year and earns a yearly salary of $121,000 as a Senior Software Engineer.  Matthew worked for Krummerich Engineering Co. in Ventura, California for almost five years before he was recruited by his current employer.  Matthew has successfully raised two children into adulthood by a prior marriage, as well as successfully helped raise a third child into adulthood as a legal guardian on behalf of a deceased friend. *See, Exhibit 9.*

32.     Holly is a full-time stay at home mother with 20 years of experience working in live theatre performances, both onstage and off, and as a music director and music teacher.  She is a member of the Actors Equity Association, a labor union of professional actors.  Holly is active in her local government, serving as a commissioner on the Buda Parks and Recreation Commission, and as a commissioner on the Keep Buda Beautiful Commission.  The Sewell family are members of the Austin YMCA.  The great majority of Holly's time is spent tending to her family. *See, Exhibit 9.*

33.     Winifred and Desmond attend neighborhood schools in their tight-knit neighborhood situated Southwest of Austin, composed for the most part by families with children. The Sewell children are involved in organized sports programs through the Austin YMCA.  There is ample room in the Sewell family home to house B.X. when he is released to the Sewell family by Respondents. *See, Exhibit 9.*

34.     Matthew and Holly carry no debt beyond their mortgage and two car payments. Their income is clearly sufficient to care for B.X.'s needs.  They have never been arrested and are peaceful and responsible citizens, with no criminal, financial, or other record showing otherwise. They have agreed to sponsor B.X. only with the full, clear, and unambiguous consent of B.X.'s parents after speaking with both of them, and with B.X., at length, by videoconference.  They are committed to caring for B.X. as long as necessary, and are doing so only out of what they believe is their responsibility as Americans who have the means and ability to respond in the manner they are doing to rescue a young refugee child from the traumatizing effects of prolonged incarceration. *See, Exhibit 9.*  Matthew and Holly Sewell are fit custodians for the placement of B.X. with their family, and allowing them to sponsor B.X. would ensure his safety and that of others, and is in his best interests.

35.     Holly and Matthew Sewell have each committed themselves to provide for B.X.'s presence at all called appearances on his immigration court proceedings, at all meetings or conferences called for by Respondents or other government agencies, and to keep Respondents advised of the status of their sponsorship of B.X. at all relevant times, or whenever called to do so by rules of Respondent.   Allowing the Sewell family to sponsor B.X. would not interfere with securing his timely appearance before the immigration court, or his continued non-detained supervision by Respondents.  There is no basis whatsoever for Respondents to determine that the Sewell family will not properly and fully provide for B.X.'s physical and mental well-being.

**E.     Respondents' prolonged incarceration is causing grievous and continuing harm.**

36.     It has long been recognized that even short periods of detention are inimical to the well-being of children and their separated families.  *See, generally* I.B. Holman & J. Ziedenberg, *The Dangers of Detention: The Impact of Incarcerating Youth in Detention and Other Secure*

11

*Facilities* (Justice Policy Institute, ed.) available at www.justicpolicy.org/images/upload/096-11_re_dangersofdetention_jj.pdf.

37.     As a child of eight years, speaking only K'iche when separated from his father and incarcerated in a strange and alien land, B.X. is particularly vulnerable, and the continued prolonged detention of B.X. is far worse than just generally injurious—it is inflicting devastating trauma on a child of tender age.  This grievous harm and trauma caused by his prolonged detention at the hands of the government is ongoing, as are the violations of B.X.'s constitutional, statutory, and other legal rights.

38.     This court has "…. discretion in conditioning a judgement granting relief," *Hilton v. Braunskill, 481 U.S. 770, 775 (1987).*  B.X.'s ongoing and prolonged detention bears no reasonable relation to any government purpose.  B.X.s has committed no crime.  He is not a danger to anyone.  His parents have designated a capable, and willing sponsor to care for their child, according to the requirements of law.   Matthew and Holly Sewell are in fact capable, proper, and fit sponsors, and it is highly unlikely a young child such as B.X. would abscond.  B.X. is enduring unlawful and prolonged incarceration. The court should grant the petition for a Writ of Habeas Corpus and require that B.X. be released to the care and custody of Holly and Matthew Sewell.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### HABEAS CORPUS

1.     B.X. incorporates the allegations set forth in Paragraphs 1 through 38, as if fully set forth herein.

2.     As set forth above, Respondents are holding Petitioner B.X. in federal custody in violation of the *Flores* Agreement, federal statutes, and the U.S. Constitution.

3. Accordingly, Petitioner B.X. seeks a writ of habeas corpus compelling Respondents, after hearing to release B.X. to the custody and care of Matthew and Holly Sewell.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF THE *FLORES* SETTLEMENT AGREEMENT

4. B.X. incorporates the allegations set forth in Paragraphs 1 through 38, as if fully set forth herein.

5. The *Flores* Agreement authorizes class members to challenge the placement and custodial decision regarding the minor in "any United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1." *Flores* Settlement Agreement, ¶ *24B, Exhibit 6.*

6. The standard of review for placement decisions is "de novo." *Id.*

7. As an unaccompanied immigrant minor, B.X. is a member of the *Flores* class and is therefore authorized to challenge Respondents' custodial decision in this Court.

8. Respondent's disqualification of the Sewell family, duly designated by B.X.'s parents as capable and willing to care for B.X., despite the Sewell family being fit sponsors, and Respondent's continued incarceration of B.X., is a violation of the *Flores* Agreement.

## THIRD CLAIM FOR RELIEF
## VIOLATION OF FIFTH AMENDMENT RIGHT TO SUBSTANTIVE DUE
## PROCESS

9. B.X. incorporates the allegations set forth in Paragraphs 1 through 38, as if fully set forth herein.

10. The substantive component of the Due Process Clause of the Fifth Amendment to the United States Constitution protects B.X.'s liberty interests.  B.X. has a substantive liberty

interest in family integrity. Separated from his family as an eight-year-old child in a foreign country, B.X. is suffering grave harm due to his prolonged, unjustified and unlawful detention.

11.     Respondents' policies and actions, as set forth above, have infringed upon B.X.'s substantive liberty interest in being free from prolonged confinement.  These policies and actions have caused a period of prolonged confinement in detention facilities without any allegation of criminal wrongdoing or juvenile delinquency or otherwise being related to any government need, resulting in grave harm to a young child, shocking the conscience.

12.     Respondents refusal to put into effect the wishes of B.X. and his parents in regard to his care and safety, without a legal or factual basis, infringe upon B.X.'s substantive liberty interest in family integrity, shocking the conscience.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF FIFTH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS**

13.     B.X. incorporates the allegations set forth in Paragraphs 1 through 38, as if fully set forth herein.

14.     The procedural component of the Due Process Clause of the Fifth Amendment to the United States Constitution prevents the United States from depriving B.X. of liberty without procedural protections.  It also prevents the United States from depriving B.X. of his right to family integrity without procedural protections.

15.     Respondents' policies and actions, as set forth above, have deprived B.X. of freedom from confinement and his right to family integrity without providing him notice, a right to counsel, an opportunity to respond including an opportunity to present and confront evidence, a neutral decision-maker, a written decision, and a right of appeal.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 235 OF THE TRAFFICKING VICTIMS**
**PROTECTION REAUTHORIZATION ACT, 8 U.S.C. § 1232**

16.     B.X. incorporates the allegations set forth in Paragraphs 1 through 38, as if fully set forth herein.

17.     Respondents have a non-discretionary duty to promptly place B.X. in the least restrictive setting that is in his best interests.

18.     By failing to place B.X. in the care of a sponsor chosen by his parents, Respondents have failed to act promptly.

19.     Respondents have arbitrarily and unlawfully failed to place B.X. in the least restrictive setting that is in his best interests.

**SIXTH CLAIM FOR RELIEF**

**VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT**

20.     B.X. incorporates the allegations set forth in Paragraphs 1 through 38, as if fully set forth herein.

21.      B.X. has been aggrieved by Respondents' actions in detaining B.X. and refusing to consider his placement with a sponsor of his and his parents' choosing. Respondents' detainment of. and failure to release B.X. constitutes final agency action.  ORR's Policy Guide establishes final agency action resulting in the prolonged detention and refusal to release B.X. ORR has not promulgated rules that provide procedures for challenging ORR's Policy Guide or the policies unlawfully promulgated thereby.

22.     The agency's action determined the rights of B.X. and has the legal consequence of his continued detainment, despite the designation by his parents of a fit sponsor, depriving him

of his fundamental right to freedom and family integrity.  Accordingly, B.X. is entitled to judicial review of ORR's actions under 5 U.S.C. § 704.

23.     The Administrative Procedures Act ("APA") requires agency rules to be promulgated through the notice and comment process. The APA defines a "rule" as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. §551(4).

24.     The ORR describes its Guide for Children Entering the United States Unaccompanied ("ORR Guide") as detailing ORR policies for the placement, release and care of unaccompanied alien children in ORR custody. *See, Exhibit 10.*   The ORR rule applicable to Category 4 children in ORR custody, preventing their release to appropriate sponsors, is contained in *Section 2.2.1 and 2.2.4 of the Guide. See, Exhibit 10.* The entire ORR Guide was promulgated in violation of the APA. The APA requires that an agency first publish in the Federal Register the agency's proposed rules and its claim of statutory authority for those rules to provide notice to the public, then give the public an opportunity to comment on the proposed rules, and then publish the final rules in the Federal Register at least 30 days before the effective date. 5 U.S.C. §§ 552(a)(1)(C)-(D), 553(b)-(d).

25.     ORR ignored all of these APA requirements and instead posted the ORR Guide on its website and began immediate enforcement of the requirements. Moreover, the ORR failed to articulate any explanation—much less a rational one—as to why it will not release Category 4 children to fit sponsors chosen by the parents of incarcerated children according to the dictates of the *Flores* Agreement.

16

26.     The reviewing court judges the agency's action by the grounds invoked by the agency, and where, as here, those grounds are inadequate or improper then the court is powerless to affirm the administrative action. *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947). 113. Accordingly, under 5 U.S.C. §§ 706(1), (2)(A), (2)(C), and (2)(D), this court should set aside ORR policies which require proof of a pre-existing relationship before qualifying a sponsor designated by a child's parents to care for an incarcerated child, because such a rule is arbitrary and capricious, in excess of statutory jurisdiction and fails to observe the procedures required by the APA, and compel the release of B.X. to the custody of Matthew and Holly Sewell.

27.     B.X. has exhausted all administrative remedies available to him as of right.

28.     B.X. has no recourse to judicial review other than by this action.

## SEVENTH CLAIM FOR RELIEF
## VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT PROHIBITION ON ARBITRARY, CAPRICIOUS, AND UNLAWFUL GOVERNMENT ACTION

29.     B.X. incorporates the allegations set forth in Paragraphs 1 through 38, as if fully set forth herein.

30.     B.X. has been aggrieved by agency action under the Administrative Procedure Act, 5 U.S.C. §§ 701 et. seq.  Respondents' detention of B.X. and their failure to release B.X. to a fit sponsor designated by his parents as capable and willing to care for him is arbitrary, capricious, and not in accordance with the law, ignoring the mandate of the *Flores* Settlement Agreement.

31.     B.X. has exhausted all administrative remedies available to him as of right.

32.     B.X. has no recourse to judicial review other than by this action.

**PRAYER FOR RELIEF**

Petitioner B.X. prays that the Court assume jurisdiction over this Petition and Complaint and grant the following relief:

A.       A writ of habeas corpus compelling Respondents to show cause why B.X. should not be released to the custody and care of Matthew and Holly Sewell, and an order, after hearing, compelling Respondents to release Petitioners to Holly and Matthew Sewell.

B.       A declaration that Respondents have violated B.X.'s constitutional and statutory rights.

C.       A declaration that Respondent's exclusion of sponsors designated by parents, living outside of the U.S., as competent and willing to care for their incarcerated children where there is not a showing of a pre-existing social relationship between the families, is unlawful; and an injunction against the further enforcement of those requirements of the ORR Guide.

D.       A declaration that Respondents' policy against the release of Category 4 children to appropriate and fit sponsors, where designated by the parents living outside of the U.S., on the basis of no pre-existing social relationship between the families violates the TVPRA, the Administrative Procedure Act, and the Due Process Clause.

E.       An injunction compelling B.X.'s placement in the custody of Holly and Matthew Sewell, sponsors of his parents' choosing, as required by federal statutes, the *Flores* Settlement Agreement, and the Constitution.

F.       An award of attorney's fees and costs to the extent permitted by law, including but not limited to the Equal Access to Justice Act, 5 U.S.C. § 504, 28 U.S.C. §2412; and

G.       Any other relief the Court deems just and proper.

Dated:  February 19, 2019

Respectfully submitted,

**DE ANDA LAW FIRM, PC**
212 Flores Avenue
Plaza de San Augustin
Laredo, Texas 78040
Telephone: (956) 726-3800
Facsimile: (956) 726-0030
deandalaw@gmail.com
Texas Bar No. 05689500

**AVENATTI & ASSOCIATES, APC**
1910 Sunset Blvd., Suite 450
Los Angeles, CA 90026
Telephone: (949) 706-7000
Facsimile: (949) 706-7050
mavenatti@eaganavenatti.com
California Bar No. 206929
(Pro Hac Vice Pending)

By: Ricardo de Anda

**ATTORNEYS FOR PETITIONER/PLAINTIFF**

## DECLARATION

I, Ricardo de Anda, hereby declare that I am authorized to act on behalf of Petitioner B.X., a minor, and that the above is true and correct, to my knowledge, and so declare under penalty of perjury pursuant to 28 U.S.C. § 1746.

Ricardo de Anda

19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| B.X., a minor, | § | |
| | § | |
| Petitioner/Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| JONATHAN HAYES, in his official | § | CIVIL ACTION NO. _____ |
| capacity as Interim Director of the Office | § | |
| of Refugee Resettlement, and | § | |
| SERVANDO BARRERA, in his official | § | |
| capacity as Federal Field Specialist, | § | |
| Office of Refugee Resettlement, | § | |
| | § | |
| | § | |
| Respondent/Defendant. | § | |

## ORDER

The Court having considered the Petition for the issuance of a Writ of Habeas Corpus by B.X., a

minor, pursuant to 28 U.S.C. § 2241, as well as having considered the verified facts set out in the

petition, and finding that a writ of habeas corpus should issue pursuant to 28 U.S.C. § 2243, the

court does hereby;

ORDER, ADJUDGE, AND DECREE:

1. That respondents show cause why petitioners should not be released to the custody of the

   sponsors designated by his parents;

2. That respondents shall make a return, certifying the true cause of the detention of

   Petitioner within three days from signature date herein, pursuant to 28 U.S.C. § 2243.

Entered at Brownsville, Texas, on this _____ day of February 2019.

_____
United States District Judge

20

# Exhibit 1

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRATNS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt a aclu.org
jrabinovitz a aclu.org
abalakrishman a aclu.org

Attorneys for Petitioners-Plaintiffs
Additional counsel on next page

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. BOX 87131
San Diego, CA 92138-7131
T: (619) 393-4485
F: (619) 232-0036
bvakili a aclusandiego.org

Stephen B. Kang (SBK 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
skang a aclu.org
samdur a aclu.org

*Admitted Pro Hac Vice

### UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ms. L..., et al., <br><br> *Petitioners-Plaintiffs,* <br><br> v. <br><br> U.S. Immigration and Customs Enforcement ("ICE"); et al., <br><br><br> *Respondents-Defendants* | Case No. 18-cv-00428-DMS-MDD <br><br> **DECLARATION OF DAVID XOL CHOLOM** <br><br> CLASS ACTION |

1.  My name is David Xol Cholom. I make the following declaration under penalty of perjury under the

    laws of the United States of America, as being true and correct:

2. I am 27 years of age, and was born in San Miguel de Limon, Chisec, Alta Verapaz, Republic of Guatemala, where I currently reside.

3. I live with my wife Florinda Xol and my two children Cesar Alexander Xol Bol age 7, and Alan David Xol Bol, age 2. I am currently employed as a Water Treatment Laborer at Palmas del Ixcan in La Isla del Norte, Chisec, Alta Verapaz, close to my home village. My native language is Q'eqchi'. I speak and read some Spanish and understand it to some extent. Florinda is monolingual Q'eqchi' and it is the language we speak at home. I am also the father of B        X   , age 8, who is in detention at the BCFS facility in Driscoll, Texas.

4. I am the son of Martin Xol and Amalia Xolom. My father was the pastor of an evangelical church in a nearby village named Nuevo Paraiso while I was a young boy. My father and his family returned to our home village of San Miguel after my mother died when I was 6 years of age. Since then, my father has been the associate pastor at Iglesia Evangelica Menonita in our village of San Miguel. My siblings and I have attended church regularly throughout our lives and engaged in church activities since our birth. Currently, my father and my brother Carlos, and his family, attend Iglesia Evangelica Menonita, where my father preaches. My family and I attend and practice our evangelical faith at Iglesia de Dios Jerusalén in San Miguel.

5. Because of my upbringing as the son of an evangelical preacher who taught us from an early age to practice and preach our faith. I have always been very close to my church and have preached the word of God whenever I felt it was appropriate to do so. I have engaged in church activities throughout my life since an early age, when I played with a church band that was part of our evangelical services and engaged in church affiliated youth activities. My church activities and faith in the Lord is well known, as I have always been very public in my religious calling, often preaching in private whenever I find the opportunity to do so, and sometimes at public events.

7.  Because of a lack of employment in San Miguel, I have often worked away from home in Playa Grande, Quiche, which is the urban area closest to my family's home village. Playa Grande is approximately 80 miles from my home. I would rent an apartment in Playa Grande when working there, while my family continued to live in San Miguel. I would return home for visits at least once a month to be with my family and continue my evangelical religious practice at my church in San Miguel.

8.  Playa Grande is known as a dangerous place to live as a young person because of the street gangs and drug cartels that operate in the city. It is considered a dangerous red zone due to the criminal activity practiced there and in the surrounding areas. It is known as the "estado de las pandillas" ("the gangster state"), because of the number of gangs which operate there. Active gangs in the Playa Grande and surrounding regions are the Mara 18, the Mara 13, El Calvario, and the most feared gang, named "Los Palos Gordos" (the thick sticks), because they kill people by hitting them with baseball bats.

9.  In 2015, while living in Playa Grande I started work at a wholesale clothing store in the center of Playa Grande known as Commercial Itzep. I worked there for about one and a half years. My work at Commercial Itzep consisted of filling orders, and the loading and unloading of trucks with merchandise. There were six other men who I worked with at Comercial Itzep.

10. As was my practice, I preached the word of Christ to my work mates soon after I started to work at Comercial Itzep and sought to engage them in the practice of my evangelical faith. After a few months at Comercial Itzep, I found out that 3 of my work mates were members of the Mara-18 gang, as they then sought to recruit me to join their organization. I rebuffed their efforts because of my Christian faith and upbringing, and instead sought to recruit them into the service of Christ.

11. The Mara-18 gangsters who sought to recruit me soon began to mock me, calling me "the preacher's boy" and warned that my God would not save me from the wrath of the gang, if I refused to join them. My workmates told me that I could continue my preaching only if I joined the gang. Otherwise, I would be punished by them if I continued to preach.

12. I stopped preaching and sought to distance myself from my work mates, as I did not want to engage in their criminal activity, or incur their wrath, as I discovered that the Mara-18 gang ran criminal operations on the highway assaulting truck drivers carrying merchandise, stealing the merchandise, and even murdering the drivers if the gang felt it was called for.

13. Despite all my efforts, including stopping my preaching, the gang members insisted that I join Mara-18. The seemingly good-natured mocking of my love of Christ turned to outright threats of harm to me and my family - in particular threats aimed at my eldest son, B      , who the Mara-18 men I worked with knew was my greatest love. Their threats became even more dangerous as time went on, since my gang related work mates were aware that I knew of their criminal activities because of my employment with them at Commerial Itzep, and their recruitment efforts. Eventually the threats became so pervasive and dangerous that I quit my job at Comercial Itzep and returned home to San Miguel in early 2017, hoping to escape the threats, and the muzzling of my preaching.

14. I remained at home for approximately 2 months after I left my job at Comercial Itzep, but could find no work in San Miguel to support my family. As a result, I returned to Playa Grande, rented an apartment outside of the city, and found a job at a brick factory, known as Fábrica de Bloques, also outside the city. I worked at Fabrica de Bloques for about 6 months. It was a difficult job because I worked from 6am until 7pm during my work days. As a result, I was actively looking for substitute work.

15. The threats that I endured from the Mara-18 gangsters at Comercial Itzep were renewed during the 6 months that I worked at the brick factory. One of the gangsters called on my cell phone and told me that they knew where my family and I lived, and that sooner or later they would kill me and B        if I continued to refuse to join them. He told me that when the gang starts looking for someone, it does not matter where people go, they will look for them until found. He laughed at me when I told him that my religious faith prohibited me from engaging in criminal activity and told me to stop preaching.

16. On or about October 15, 2017, I received a phone call from Hermelindo Santos, an acquaintance from work at Comercial Itzep, who informed me that there was a job opening as a delivery man in the city, but that I would need to apply immediately if I was interested, as it might not be available by the next day. As a result, I asked my boss at the brick factory for time-off, and that afternoon drove on my motorcycle towards Playa Grande to apply for the job.

17. A car with 4 men intercepted me in route to my destination, blocked my access and prevented me from proceeding. Two men got off the car and asked me to get in. When I refused one of the men hit me over the head with a baseball bat, and I was forced into the car. I was taken to an empty house where I was kept under guard for a few hours. After it became dark the four men, including two of the gang members that I had worked with while at Comercial Itzep, took me out into an empty street and tied me up to an electric utility pole. This happened in an isolated area of Playa Grande. They proceeded to hit me and torture me. I was told that it was going to be the last day of my life because I knew of their activities and refused to join them because of my stupid religion. They mocked my religious convictions while I was being tortured, and blamed God for my fate. They told me that my son B        would be next. They removed my shoes and proceeded to cut my arms and my feet with a knife. They hit me with a baseball bat to the stomach and then stabbed and cut my stomach. Finally,

one of the men put the knife to my neck, asking again if I wanted to join the gang. Despite my pleas

for mercy, and my desperate agreement to join their gang, the man cut my neck. I carry the scars of

this torture.

18. The assailants dragged me back into the car when they finished torturing me, where I lost

consciousness. When I woke up in the middle of the night, I found myself next to the Rio Seco in

Playa Grande. I was unable to stand and lay in agony asking for help until someone called an

ambulance. I was soon rescued and taken to Centro de Atencion Materno Infantil, a hospital in Playa

Grande. I received medical treatment at the hospital and spent 3 days there before I was released to

my brother Carlos, who took me home on or about October 18, 2017.

19. Mateo Yaxcal, the pastor of my church, Iglesia de Dios Jerusalén, visited me at home in San Miguel

soon after I was released from the hospital. He told me that it is probable that the Mara-18 gang tried

to kill me because I am an evangelical Christian who refused to join the gang, as the church is the

greatest enemy of the gangsters.

20. On May 4, 2018, after I sufficiently recovered from my wounds and found myself able to travel. I left

San Miguel on a journey to the United States with my oldest son B      to seek asylum, as it was by

then evident and clear to me that the Mara-18 gang would eventually kill me, my son B      , or both

of us, if we remained in Guatemala. I did not report the attack to the police as it would be futile to

expect them to protect me, and it might even cause me more danger to do so. I had to pay about

$5,000 to have B      and I transported to the U.S. Border. I could not afford to take anyone else from

my family. I believed B      and I were at the gravest risk and we fled.

21. B      and I crossed the U.S. Border close to McAllen, Texas on or about May 18. We were with a

group of 20 other refugees, most of whom were seeking asylum. After crossing the river at a point

designated by the smugglers. we turned ourselves over to border officials at around 3 A.M. after walking for about 30 minutes. I asked the official for protection and asylum when we were first apprehended. We were driven to a detention center where our fingerprints and personal information were taken, and then driven to another detention center where B      and I spent three days with many other people in metal mesh cages. All this time B:      and I were together.

22. On or about May 21, 2018, in the morning, B      and I were taken from the metal mesh cages by a U.S. official to a private office. I was asked to sign a document. I could not read it, but was told that the document would allow B·      and I to be deported. I refused to sign the document and again asked for asylum and protection, as I explained to the official that I had been attacked and feared returning to Guatemala with Byron.

23. The officer left and a few minutes later came back with another officer. The second officer told me that if I persisted in my asylum claim they would have to separate B      and I. He told me that government rules would not allow for me to be released while I asked for asylum, that I would be held for at least two years while my asylum claim was heard by a judge. and that I would be separated from B      during that time. He told me that if I asked for asylum. B·      would be placed for adoption because he could not stay with me in an adult detention center. The officer further told me that I could avoid being separated from B      only if I signed the document in front of me which he said would allow for us to be deported together. Otherwise, he said I would be held and B      . taken from me and put up for adoption. I felt crushed with fear. and B      began to cry.

24. Fearing the permanent loss of B      in a foreign land to an unknown American family was too much for me to bear. As a result, I was forced to sign the paper in front of me that I could not read, and agreed to be deported in order not to lose my 8-year-old son to adoption.

25. Immediately after I signed the document, B___ was separated from me, and the officers placed my hands and feet in shackles. I was taken back into the wire mesh cages without B___. Early that afternoon I was taken to criminal court with about 20 other refugees where I pleaded guilty to entering the country illegally. I was sentenced to time served and returned to the building with the mesh cages. Seven days later, on or about May 28, 2018, all spent in the wire mesh cages with no shower or bathing privileges, I was taken to a holding facility and then an airport where I was flown to Guatemala; but without B___, and contrary to the representations made to me by government officials. I have not seen B___ since.

26. I live in constant fear for my life as I expect that the Mara-18 gang has not finished with me. I also fear that B___ would be in danger if he is returned to Guatemala as the gangsters have threatened him as well. I also fear losing B___ to adoption in the U.S.


EXECUTED ON THIS 6th, day of December, 2018.

DAVID XOL CHOLOM


The undersigned being Sylvia Rodriguez, a U.S. Citizen and resident of the U.S. state that I am fluent in both the English and Spanish languages, that I have translated the above Declaration of David Xol Cholom to the said David Xol Cholom and read same to him in the Spanish language, that he stated to me that he

understood the Declaration in its entirety when read to him, and I further do declare under penalty of perjury that the foregoing is true and correct.

EXECUTED ON THIS 6th, day of December, 2018.

SYLVIA RODRIGUEZ

# Exhibit 2

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
F: (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org

*Attorneys for Petitioners-Plaintiffs*
*Additional counsel on next page*

Bardis Vakili (SBN 247783)
ACLU FOUNDATION OF SAN
DIEGO & IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
T: (619) 398-4485
F: (619) 232-0036
bvakili@aclusandiego.org

Stephen B. Kang (SBK 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
T: (415) 343-1198
F: (415) 395-0950
skang@aclu.org
samdur@aclu.org

*Admitted Pro Hac Vice*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Ms. L., et al.,

*Petitioners-Plaintiffs*,

v.

U.S. Immigration and Customs Enforcement ("ICE"); et al.,

*Respondents-Defendants*.

Case No. 18-cv-00428-DMS-MDD

**DECLARATION OF RICARDO DE ANDA**

CLASS ACTION

1. I, Ricardo de Anda, make the following declaration based on my personal knowledge and declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2. I am an attorney with the law firm of De Anda Law Firm, PC, located at 212 Flores Avenue in Laredo, Texas. I am counsel for David Xol-Cholom (A#215-714-906) ("Mr. Xol-Cholom"), his wife Florinda Xol-Cholom, and their minor son B          X          (A#215-714-907, DOB 6/24/2010), with respect to all of the immigration matters of Mr. Xol-Cholom and his child. I have a G-28 on file for Mr. and Mrs. Xol-Cholom's child.

3. Mr. David Xol-Cholom is the removed parent for the purposes of the above-captioned action.

4. With respect to the matters in this declaration, I have been in communication with attorneys with the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP, a member of the ACLU/Steering Committee formed at the direction of the Court in the above-captioned action.

5. I have been in touch with Mr. Xol-Cholom and his wife Florinda Xol-Cholom to determine whether Mr. Xol-Cholom desires to be reunified in his country of origin with his child as ordered in *Ms. L. v. ICE*, 3:18-cv-00428-DMS, or whether he wishes to waive such reunification. I submit this declaration to set forth the decision made by Mr. Xol-Cholom, in accordance with the Interagency Plan for Reunification of Separated Minors with Removed Parents (the "Plan") approved by the Court on August 17, 2018.

6. It is impracticable for me to obtain a written waiver of reunification form from Mr. Xol-Cholom within the timeframe set forth in the Plan. Mr. Xol-Cholom is located in a foreign country in Central America, and it is not practicable for me to meet with him in person within the time frame specified. In addition, Mr. Xol-Cholom is located in a remote region of Guatemala in conditions that prevent him from affording the transportation that would be required to receive and return a written waiver of reunification form. Finally, Mr. Xol-Cholom has indicated that it would be difficult or impossible for him to complete and return such a form from his present location within the time frame required.

7. Following a discussion with me Mr. Xol-Cholom has made a final, affirmative, knowing, and voluntary decision to waive reunification with his child in Guatemala and to allow his child to remain in the United States. Ms. Florinda Xol-Cholom, Mr. Xol-Cholom's wife and B          X          's mother, is in accord with this decision.

8. Mr. David Xol-Cholom intends to seek relief before this court allowing his reunification with his son B·          X·          in the United States, as Mr. Xol-Cholom was wrongfully removed to Guatemala shortly after his separation from his son, by coercion and threats, was not provided with an opportunity to seek protection and asylum as provided under law, which claims for asylum are meritorious, and because I

have determined after a careful investigation that B___ X___ would be placed at risk of harm if he were repatriated to Guatemala.

9.David Xol-Cholom and Florinda Xol-Cholom have designated the following sponsor family to take custody and control of their son B___ X___.

> Holly Erin Sewell
> Matthew Alexander Sewell
> 1273 Taylor Dr.
> Buda, Texas 78610

10.I declare under penalty of perjury that the foregoing is true and correct, based on my personal knowledge. Executed in Laredo, Webb County, Texas, on October 8, 2018.

Ricardo de Anda

# Exhibit 3

M Gmail                                      Ricardo de Anda <deandalaw@gmail.com>

B·       X

**Ricardo de Anda <deandalaw@gmail.com>**                    Fri, Nov 2, 2018 at 6:47 PM
To: "Fuentes-Kerr, Michelle (ACF)" <Michelle.Fuentes-Kerr@acf.hhs.gov>
Cc: castillasarahi87@gmail.com
Bcc: Sylvia Rodriguez <edrod1128@aol.com>

Dear Michelle,
I am enclosing the following documents:

Affidavits of David Xol Cholom and Florinda Xol, parents of B·      X·      , with accompanying exhibits,
sworn before a Guatemalan notary. I am attaching my English translation for your convenience.

A declaration by B·       's parents filed with the federal court in the Ms. L v. ICE litigation, which has
jurisdiction over B·      ; filed pursuant to the court ordered plan for reunification of the suits' class, of which
B·      is a member.

I will by next week provide you with specific information on Holly and Matthew Sewell, and their family, who
have been designated by B·      's parents before the federal court, and in the attached affidavits, as
sponsors for B·      .

Finally, I don't seem to find Edith Pérez's email address. Please be so kind as to forward this information to
her.

Thank you for your assistance in working to resolve this case.
Ricardo de Anda

# Exhibit 4

# ⋈ Gmail

**Ricardo de Anda <deandalaw@gmail.com>**

---

**B        X**

---

**Fuentes-Kerr, Michelle (ACF) <Michelle.Fuentes-Kerr@acf.hhs.gov>**        Mon, Nov 5, 2018 at 11:02 AM
To: Ricardo de Anda <deandalaw@gmail.com>
Cc: "castillasarahi87@gmail.com" <castillasarahi87@gmail.com>, "Vergara, Micaela (ACF)"
<Micaela.Vergara@acf.hhs.gov>

Hello Ricardo,


Per ORR policy, we can't pursue reunification with families that don't know the minor or his family.
 It is my understanding that this is a family that  you vetted and found for the family.  Per policy, this
family would not be eligible for sponsorship.


Thank you.



*Michelle Fuentes-Kerr, MA*

*Federal Field Specialist*

*Division of Unaccompanied Children's Operations*

*DHHS/ACF/ORR/DUCO*

*Houston Region*

*(202) 578-2993*

# Exhibit 5

 **Gmail**

Ricardo de Anda <deandalaw@gmail.com>

---

B        X

---

**Fuentes-Kerr, Michelle (ACF)** <Michelle.Fuentes-Kerr@acf.hhs.gov>        Tue, Nov 6, 2018 at 8:50 AM
To: Ricardo de Anda <deandalaw@gmail.com>
Cc: Sylvia Rodriguez <edrod1128@aol.com>, "Vergara, Micaela (ACF)" <Micaela.Vergara@acf.hhs.gov>,
sarahi castilla <castillasarahi87@gmail.com>, "Shaw, Katrina (ACF)" <Katrina.Shaw@acf.hhs.gov>

Hello Mr. De Anda,


It is not my function to decide this minor's immigration case, or whether he leaves or stays in the US. We, ORR, are responsible for finding the child's best placement option while he goes through the court system.  Per policy, we are not able to reunify any child with people that are not known by the family.   It is my understanding that these people were  known by you, but not by the family.   It is also my understanding that the program has had issues communicating with the family, as the family has disclosed that you told them not to speak with the case managers at the program.  At this point, I am going to defer this case to Federal Field Specialist Katrina Shaw, who is now the assigned specialist to B      's case.  She is aware of the previous concerns of this case, and is copied on this email.


Thank you.

.


*Michelle Fuentes-Kerr, MA*

*Federal Field Specialist*

*Division of Unaccompanied Children's Operations*

*DHHS/ACF/ORR/DUCO*

*Houston Region*

*(202) 578-2993*

# Exhibit 6

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES, et al, Plaintiffs

v.

JANET RENO, Attorney General of the United States, et al., Defendants

Case No. CV 85-4544-RJK(Px)

STIPULATED SETTLEMENT AGREEMENT

WHEREAS, Plaintiffs have filed this action against Defendants, challenging, *inter alia*, the constitutionality of Defendants' policies, practices and regulations regarding the detention and release of unaccompanied minors taken into the custody of the Immigration and Naturalization Service (INS) in the Western Region; and

WHEREAS, the district court has certified this case as a class action on behalf of all minors apprehended by the INS in the Western Region of the United States; and

WHEREAS, this litigation has been pending for nine (9) years, all parties have conducted extensive discovery, and the United States Supreme Court has upheld the constitutionality of the challenged INS regulations on their face and has remanded for further proceedings consistent with its opinion; and

WHEREAS, on November 30, 1987, the parties reached a settlement agreement requiring that minors in INS custody in the Western Region be housed in facilities meeting certain standards, including state standards for the housing and care of dependent children, and Plaintiffs' motion to enforce compliance with that settlement is currently pending before the court; and

WHEREAS, a trial in this case would be complex, lengthy and costly to all parties concerned, and the decision of the district court would be subject to appeal by the losing parties with the final outcome uncertain; and

WHEREAS, the parties believe that settlement of this action is in their best interests and best serves the interests of justice by avoiding a complex, lengthy and costly trial, and subsequent appeals which could last several more years;

NOW, THEREFORE, Plaintiffs and Defendants enter into this Stipulated Settlement Agreement (the Agreement), stipulate that it constitutes a full and complete resolution of the issues raised in this action, and agree to the following:

## I DEFINITIONS

As used throughout this Agreement the following definitions shall apply:

1. The term "party" or "parties" shall apply to Defendants and Plaintiffs. As the term applies to Defendants, it shall include their agents, employees, contractors and/or successors in office. As the term applies to Plaintiffs, it shall include all class members.

2. The term "Plaintiff" or "Plaintiffs" shall apply to the named plaintiffs and all class members.

3. The term "class member" or "class members" shall apply to the persons defined in Paragraph 10 below.

4. The term "minor" shall apply to any person under the age of eighteen (18) years who is detained in the legal custody of the INS. This Agreement shall cease to apply to any person who has reached the age of eighteen years. The term "minor" shall not include an emancipated minor or an individual who has been incarcerated due to a conviction for a criminal offense as an adult. The INS shall treat all persons who are under the age of eighteen but not included within the definition of "minor" as adults for all purposes, including release on bond or recognizance.

5. The term "emancipated minor" shall refer to any minor who has been determined to be emancipated in an appropriate state judicial proceeding.

6. The term "licensed program" shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors. A licensed program must also meet those standards for licensed programs set forth in Exhibit 1 attached hereto. All homes and facilities operated by licensed programs, including facilities for special needs minors, shall be non-secure as required under state law; provided, however, that a facility for special needs minors may maintain that level of security permitted under state law which is necessary for the protection of a minor or others in appropriate circumstances, *e.g.*, cases in which a minor has drug or alcohol problems or is mentally ill. The INS shall make reasonable efforts to provide licensed placements in those geographical areas where the majority of minors are apprehended, such as southern California, southeast Texas, southern Florida and the northeast corridor.

7. The term "special needs minor" shall refer to a minor whose mental and/or physical condition requires special services and treatment by staff. A minor may have special needs due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment. A minor who has suffered serious neglect or abuse may be considered a minor with special needs if the minor requires special services or treatment as a result of the neglect or abuse. The INS shall assess minors to determine if they have special needs and, if so, shall place such minors, whenever possible, in licensed programs in which the INS places children without special needs, but which provide services and treatment for such special needs.

8. The term "medium security facility" shall refer to a facility that is operated by a program, agency or organization licensed by an appropriate State agency and that meets those standards set forth in Exhibit 1 attached hereto. A medium security facility is designed for minors who require close supervision but do not need placement in juvenile correctional facilities. It provides 24-hour awake supervision, custody, care, and treatment. It maintains stricter security measures, such as intensive staff supervision, than a facility operated by a licensed program in order to control problem behavior and to prevent escape. Such a facility may have a secure perimeter but shall not be equipped internally with major restraining construction or procedures typically associated with correctional facilities.

## II SCOPE OF SETTLEMENT, EFFECTIVE DATE, AND PUBLICATION

9. This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS and shall supersede all previous INS policies that are inconsistent with the terms of this Agreement. This Agreement shall become effective upon final court approval, except that those terms of this Agreement regarding placement pursuant to Paragraph 19 shall not become effective until all contracts under the Program Announcement referenced in Paragraph 20 below are negotiated and implemented. The INS shall make its best efforts to execute these contracts within 120 days after the court's final approval of this Agreement. However, the INS will make reasonable efforts to comply with Paragraph 19 prior to full implementation of all such contracts. Once all contracts under the Program Announcement referenced in Paragraph 20 have been implemented, this Agreement shall supersede the agreement entitled Memorandum of Understanding Re Compromise of Class Action: Conditions of Detention (hereinafter "MOU"), entered into by and between the Plaintiffs and Defendants and filed with the United States District Court for the Central District of California on November 30, 1987, and the MOU shall thereafter be null and void. However, Plaintiffs shall not institute any legal action for enforcement of the MOU for a six (6) month period commencing with the final district court approval of this Agreement, except that Plaintiffs may institute enforcement proceedings if the Defendants have engaged in serious violations of the MOU that have caused irreparable harm to a class member for which injunctive relief would be appropriate. Within 120 days of the final district court approval of this Agreement, the INS shall

initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation. The final regulations shall not be inconsistent with the terms of this Agreement. Within 30 days of final court approval of this Agreement, the INS shall distribute to all INS field offices and sub-offices instructions regarding the processing, treatment, and placement of juveniles. Those instructions shall include, but may not be limited to, the provisions summarizing the terms of the Agreement attached hereto as Exhibit 2.

**III CLASS DEFINITION**

10. The certified class in this action shall be defined as follows: "All minors who are detained in the legal custody of the INS."

**IV STATEMENTS OF GENERAL APPLICABILITY**

11. The INS treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors. The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others. Nothing herein shall require the INS to release a minor to any person or agency whom the INS has reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

**V PROCEDURES AND TEMPORARY PLACEMENT FOLLOWING ARREST**

12. Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing if applicable. Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. The INS will segregate unaccompanied minors from unrelated adults. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours. If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the minor may be placed in an INS detention facility, or other INS-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility. However, minors shall be separated from delinquent offenders. Every effort must be taken to ensure that the safety and well-being of the minors detained in these facilities are satisfactorily provided for by the staff. The INS will transfer a minor from a placement under this paragraph to a placement under Paragraph 19 (i) within three (3) days, if the minor

was apprehended in an INS district in which a licensed program is located and has space available; or (ii) within five (5) days in all other cases; except:

> 1. as otherwise provided under Paragraph 13 or Paragraph 21;

> 2. as otherwise required by any court decree or court-approved settlement;

> 3. in the event of an emergency or influx of minors into the United States, in which case the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible; or

> 4. where individuals must be transported from remote areas for processing or speak unusual languages such that the INS must locate interpreters in order to complete processing, in which case the INS shall place all such minors pursuant to Paragraph 19 within five (5) business days.

B. For purposes of this Paragraph, the term "emergency" shall be defined as any act or event that prevents the placement of minors pursuant to Paragraph 19 within the time frame provided. Such emergencies include natural disasters (e.g., earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies (e.g., a chicken pox epidemic among a group of minors). The term "influx of minors into the United States" shall be defined as those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program under Paragraph 19, including those who have been so placed or are awaiting such placement.

C. In preparation for an "emergency" or "influx," as described in Subparagraph B, the INS shall have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible. This plan shall include the identification of 80 beds that are potentially available for INS placements and that are licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children. The plan, without identification of the additional beds available, is attached as Exhibit 3. The INS shall not be obligated to fund these additional beds on an ongoing basis. The INS shall update this listing of additional beds on a quarterly basis and provide Plaintiffs' counsel with a copy of this listing.

13. If a reasonable person would conclude that an alien detained by the INS is an adult despite his claims to be a minor, the INS shall treat the person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require the alien to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor in accordance with this Agreement for all purposes.

**VI GENERAL POLICY FAVORING RELEASE**

14. Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:

  A. a parent;

  B. a legal guardian;

  C. an adult relative (brother, sister, aunt, uncle, or grandparent);

  D. an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

  E. a licensed program willing to accept legal custody; or

  F. an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

15. Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

  A. provide for the minor's physical, mental, and financial well-being;

  B. ensure the minor's presence at all future proceedings before the INS and the immigration court;

  C. notify the INS of any change of address within five (5) days following a move;

  D. in the case of custodians other than parents or legal guardians, not transfer custody of the minor to another party without the prior written permission of the District Director;

  E. notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

  F. if dependency proceedings involving the minor are initiated, notify the INS of the initiation of a such proceedings and the dependency court of any immigration proceedings pending against the minor.

In the event of an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 72 hours. For purposes of this Paragraph, examples of an "emergency" shall include the serious illness of the custodian, destruction of the home, etc. In all cases where the custodian in writing seeks written permission for a transfer, the District Director shall promptly respond to the request.

16. The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement required under Paragraph 15. The INS, however, shall not terminate the custody arrangements for minor violations of that part of the custodial agreement outlined at Subparagraph 15.C above.

17. A positive suitability assessment may be required prior to release to any individual or program pursuant to Paragraph 14. A suitability assessment may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. Any such assessment should also take into consideration the wishes and concerns of the minor.

18. Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody.

**VII INS CUSTODY**

19. In any case in which the INS does not release a minor pursuant to Paragraph 14, the minor shall remain in INS legal custody. Except as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier. All minors placed in such a licensed program remain in the legal custody of the INS and may only be transferred or released under the authority of the INS; provided, however, that in the event of an emergency a licensed program may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 8 hours.

20. Within 60 days of final court approval of this Agreement, the INS shall authorize the United States Department of Justice Community Relations Service to publish in the Commerce Business Daily and/or

the Federal Register a Program Announcement to solicit proposals for the care of 100 minors in licensed programs.

21. A minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors whenever the District Director or Chief Patrol Agent determines that the minor:

> A. has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; provided, however, that this provision shall not apply to any minor whose offense(s) fall(s) within either of the following categories:

>> i. Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc. This list is not exhaustive.);

>> ii. Petty offenses, which are not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc. This list is not exhaustive.);

> As used in this paragraph, "chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense;

> B. has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;

> C. has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc. This list is not exhaustive.);

> D. is an escape-risk; or

> E. must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees.

22. The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether:

A. the minor is currently under a final order of deportation or exclusion;

B. the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion;

C. the minor has previously absconded or attempted to abscond from INS custody.

23. The INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program. All determinations to place a minor in a secure facility will be reviewed and approved by the regional juvenile coordinator.

24A. A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

B. Any minor who disagrees with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards set forth in Exhibit 1 attached hereto, may seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1. In such an action, the United States District Court shall be limited to entering an order solely affecting the individual claims of the minor bringing the action.

C. In order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility. With respect to placement decisions reviewed under this paragraph, the standard of review for the INS's exercise of its discretion shall be the abuse of discretion standard of review. With respect to all other matters for which this paragraph provides judicial review, the standard of review shall be *de novo* review.

D. The INS shall promptly provide each minor not released with (a) INS Form I-770; (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services providers compiled pursuant to INS regulation (unless previously given to the minor).

E. Exhausting the procedures established in Paragraph 37 of this Agreement shall not be a precondition to the bringing of an action under this paragraph in any United District Court. Prior to initiating any such action, however, the minor and/or the minors' attorney shall confer telephonically or in person with the United States Attorney's office in the judicial district where the action is to be filed, in an effort to informally resolve the minor's complaints without the need of federal court intervention.

## VIII TRANSPORTATION OF MINORS

25. Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults except

      A. when being transported from the place of arrest or apprehension to an INS office, or

      B. where separate transportation would be otherwise impractical.

When transported together pursuant to Clause (B) minors shall be separated from adults. The INS shall take necessary precautions for the protection of the well-being of such minors when transported with adults.

26. The INS shall assist without undue delay in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released pursuant to Paragraph 14. The INS may, in its discretion, provide transportation to minors.

## IX TRANSFER OF MINORS

27. Whenever a minor is transferred from one placement to another, the minor shall be transferred with all of his or her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions will be shipped to the minor in a timely manner. No minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived such notice, in which cases notice shall be provided to counsel within 24 hours following transfer.

## X MONITORING AND REPORTS

28A. An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date

record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours. Statistical information on such minors shall be collected weekly from all INS district offices and Border Patrol stations. Statistical information will include at least the following: (1) biographical information such as each minor's name, date of birth, and country of birth, (2) date placed in INS custody, (3) each date placed, removed or released, (4) to whom and where placed, transferred, removed or released, (5) immigration status, and (6) hearing dates. The INS, through the Juvenile Coordinator, shall also collect information regarding the reasons for every placement of a minor in a detention facility or medium security facility.

B. Should Plaintiffs' counsel have reasonable cause to believe that a minor in INS legal custody should have been released pursuant to Paragraph 14, Plaintiffs' counsel may contact the Juvenile Coordinator to request that the Coordinator investigate the case and inform Plaintiffs' counsel of the reasons why the minor has not been released.

29. On a semi-annual basis, until two years after the court determines, pursuant to Paragraph 31, that the INS has achieved substantial compliance with the terms of this Agreement, the INS shall provide to Plaintiffs' counsel the information collected pursuant to Paragraph 28, as permitted by law, and each INS policy or instruction issued to INS employees regarding the implementation of this Agreement. In addition, Plaintiffs' counsel shall have the opportunity to submit questions, on a semi-annual basis, to the Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation with regard to the implementation of this Agreement and the information provided to Plaintiffs' counsel during the preceding six-month period pursuant to Paragraph 28. Plaintiffs' counsel shall present such questions either orally or in writing, at the option of the Juvenile Coordinator. The Juvenile Coordinator shall furnish responses, either orally or in writing at the option of Plaintiffs' counsel, within 30 days of receipt.

30. On an annual basis, commencing one year after final court approval of this Agreement, the INS Juvenile Coordinator shall review, assess, and report to the court regarding compliance with the terms of this Agreement. The Coordinator shall file these reports with the court and provide copies to the parties, including the final report referenced in Paragraph 35, so that they can submit comments on the report to the court. In each report, the Coordinator shall state to the court whether or not the INS is in substantial compliance with the terms of this Agreement, and, if the INS is not in substantial compliance, explain the reasons for the lack of compliance. The Coordinator shall continue to report on an annual basis until three years after the court determines that the INS has achieved substantial compliance with the terms of this Agreement.

31. One year after the court's approval of this Agreement, the Defendants may ask the court to determine whether the INS has achieved substantial compliance with the terms of this Agreement.

## XI ATTORNEY-CLIENT VISITS

32. A. Plaintiffs' counsel are entitled to attorney-client visits with class members even though they may not have the names of class members who are housed at a particular location. All visits shall occur in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question. Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the facility staff shall provide Plaintiffs' counsel with a list of names and alien registration numbers for the minors housed at that facility. In all instances, in order to memorialize any visit to a minor by Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any attorney-client meeting. Plaintiffs' counsel may limit any such notice of appearance to representation of the minor in connection with this Agreement. Plaintiffs' counsel must submit a copy of the notice of appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of the facility.

B. Every six months, Plaintiffs' counsel shall provide the INS with a list of those attorneys who may make such attorney-client visits, as Plaintiffs' counsel, to minors during the following six month period. Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law in Los Angeles, California or the National Center for Youth Law in San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

C. Agreements for the placement of minor in non-INS facilities shall permit attorney-client visits, including by class counsel in this case.

D. Nothing in Paragraph 32 shall affect a minor's right to refuse to meet with Plaintiffs' counsel. Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

## XII FACILITY VISITS

33. In addition to the attorney-client visits permitted pursuant to Paragraph 32, Plaintiffs' counsel may request access to any licensed program's facility in which a minor has been placed pursuant to Paragraph 19 or to any medium security facility or detention facility in which a minor has been placed pursuant to Paragraphs 21 or 23. Plaintiffs' counsel shall submit a request to visit a facility under this paragraph to the INS district juvenile coordinator who will provide reasonable assistance to Plaintiffs' counsel by conveying the request to the facility's staff and coordinating the visit. The rules and procedures to be followed in connection with any visit approved by a facility under this paragraph are set forth in Exhibit 4 attached, except as may be otherwise agreed by Plaintiffs' counsel and the facility's staff. In all visits to any facility pursuant to this Agreement, Plaintiffs' counsel and their associated experts shall treat minors and staff with courtesy and dignity and shall not disrupt the normal functioning of the facility.

## XIII TRAINING

34. Within 120 days of final court approval of this Agreement, the INS shall provide appropriate guidance and training for designated INS employees regarding the terms of this Agreement. The INS shall develop written and/or audio or video materials for such training. Copies of such written and/or audio or video training materials shall be made available to Plaintiffs' counsel when such training materials are sent to the field, or to the extent practicable, prior to that time.

## XIV DISMISSAL

35. After the court has determined that the INS is in substantial compliance with this Agreement and the Coordinator has filed a final report, the court, without further notice, shall dismiss this action. Until such dismissal, the court shall retain jurisdiction over this action.

## XV RESERVATION OF RIGHTS

36. Nothing in this agreement shall limit the rights, if any, of individual class members to preserve issues for judicial review in the appeal of an individual case or for class members to exercise any independent rights they may otherwise have.

## XVI NOTICE AND DISPUTE RESOLUTION

37. This paragraph provides for the enforcement, in this District Court, of the provisions of this Agreement except for claims brought under Paragraph 24. The parties shall meet telephonically or in person to discuss a complete or partial repudiation of this Agreement or any alleged non-compliance with the terms of the Agreement, prior to bringing any individual or class action to enforce this Agreement. Notice of a claim that defendants have violated the terms of this Agreement shall be served on plaintiffs addressed to:

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA 90057

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA 94104

and on Defendants addressed to:

.

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA 90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

## XVII PUBLICITY

38. Plaintiffs and Defendants shall hold a joint press conference to announce this Agreement. The INS shall send copies of this Agreement to social service and voluntary agencies agreed upon by the parties, as set forth in Exhibit 5 attached. The parties shall pursue such other public dissemination of information regarding this Agreement as the parties shall agree.

## XVIII ATTORNEYS FEES AND COSTS

39. Within 60 days of final court approval of this Agreement, Defendants shall pay to Plaintiffs the total sum of $_____, in full settlement of all attorneys' fees and costs in this case.

## XIX TERMINATION

40. All terms of this Agreement shall terminate the earlier of five years from the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with the Agreement, except the following: the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors.

## XX REPRESENTATIONS AND WARRANTY

41. Counsel for the respective parties, on behalf of themselves and their clients, represent that they know of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law. Defendants' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Attorney General, the United States Department of Justice, and the Immigration and Naturalization Service, and acknowledge that Plaintiffs enter into this Agreement in reliance on such representation. Plaintiffs' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Plaintiffs, and acknowledge that Defendants enter into this Agreement in reliance on such representation. The undersigned, by their signatures on

behalf of the Plaintiffs and Defendants, warrant that upon execution of this Agreement in their representative capacities, their principals, agents, and successors of such principals and agents shall be fully and unequivocally bound hereunder to the full extent authorized by law.

### EXHIBIT 1
#### Minimum Standards for Licensed Programs

A. Licensed programs shall comply with all applicable state child welfare laws and regulations and all state and local building, fire, health and safety codes and shall provide or arrange for the following services for each minor in its care:

1. Proper physical care and maintenance, including suitable living accommodations, food, appropriate clothing, and personal grooming items.

2. Appropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the minor was recently examined at another facility; appropriate immunizations in accordance with the U.S. Public Health Service (PHS), Center for Disease Control; administration of prescribed medication and special diets; appropriate mental health interventions when necessary.

3. An individualized needs assessment which shall include: (a) various initial intake forms; (b) essential data relating to the identification and history of the minor and family; (c) identification of the minors' special needs including any specific problem(s) which appear to require immediate intervention; (d) an educational assessment and plan; (e) an assessment of family relationships and interaction with adults, peers and authority figures; (f) a statement of religious preference and practice; (g) an assessment of the minor's personal goals, strengths and weaknesses; and (h) identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States and may be able to assist in family reunification.

4. Educational services appropriate to the minor's level of development, and communication skills in a structured classroom setting, Monday through Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training (ELT). The educational program shall include instruction and educational and other reading materials in such languages as needed. Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education. The program shall provide minors with

appropriate reading materials in languages other than English for use during the minor's leisure time.

5. Activities according to a recreation and leisure time plan which shall include daily outdoor activity, weather permitting, at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (this should not include time spent watching television). Activities should be increased to a total of three hours on days when school is not in session.

6. At least one (1) individual counseling session per week conducted by trained social work staff with the specific objectives of reviewing the minor's progress, establishing new short term objectives, and addressing both the developmental and crisis-related needs of each minor.

7. Group counseling sessions at least twice a week. This is usually an informal process and takes place with all the minors present. It is a time when new minors are given the opportunity to get acquainted with the staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management is discussed and decisions are made about recreational activities, etc. It is a time for staff and minors to discuss whatever is on their minds and to resolve problems.

8. Acculturation and adaptation services which include information regarding the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly.

9. Upon admission, a comprehensive orientation regarding program intent, services, rules (written and verbal), expectations and the availability of legal assistance.

10. Whenever possible, access to religious services of the minor's choice.

11. Visitation and contact with family members (regardless of their immigration status) which is structured to encourage such visitation. The staff shall respect the minor's privacy while reasonably preventing the unauthorized release of the minor.

12. A reasonable right to privacy, which shall include the right to: (a) wear his or her own clothes, when available; (b) retain a private space in the residential facility, group or foster home for the storage of personal belongings; (c) talk privately on the phone, as permitted by the house rules and regulations; (d) visit privately with guests, as permitted by the house rules and regulations; and (e) receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

13. Family reunification services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of the minor.

14. Legal services information regarding the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a deportation or exclusion hearing before an immigration judge, the right to apply for political asylum or to request voluntary departure in lieu of deportation.

B. Service delivery is to be accomplished in a manner which is sensitive to the age, culture, native language and the complex needs of each minor.

C. Program rules and discipline standards shall be formulated with consideration for the range of ages and maturity in the program and shall be culturally sensitive to the needs of alien minors. Minors shall not be subjected to corporal punishment, humiliation, mental abuse, or punitive interference with the daily functions of living, such as eating or sleeping. Any sanctions employed shall not: (1) adversely affect either a minor's health, or physical or psychological well-being; or (2) deny minors regular meals, sufficient sleep, exercise, medical care, correspondence privileges, or legal assistance.

D. A comprehensive and realistic individual plan for the care of each minor must be developed in accordance with the minor's needs as determined by the individualized need assessment. Individual plans shall be implemented and closely coordinated through an operative case management system.

E. Programs shall develop, maintain and safeguard individual client case records. Agencies and organizations are required to develop a system of accountability which preserves the confidentiality of client information and protects the records from unauthorized use or disclosure.

F. Programs shall maintain adequate records and make regular reports as required by the INS that permit the INS to monitor and enforce this order and other requirements and standards as the INS may determine are in the best interests of the minors.

Exhibit 2
Instructions to Service Officers re:
Processing, Treatment, and Placement of Minors

These instructions are to advise Service officers of INS policy regarding the way in which minors in INS custody are processed, housed and released. These instructions are applicable nationwide and supersede all prior inconsistent instructions regarding minors.

**(a) Minors.** A minor is a person under the age of eighteen years. However, individuals who have been "emancipated" by a state court or convicted and incarcerated for a criminal offense as an adult are not considered minors. Such individuals must be treated as adults for all purposes, including confinement and release on bond.

Similarly, if a reasonable person would conclude that an individual is an adult despite his claims to be a minor, the INS shall treat such person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require such an individual to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor for all purposes.

**(b) General policy.** The INS treates and shall continued to treat minors with dignity, respect and special concern for their particular vulnerability. INS policy is to place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with the need to ensure the minor's timely appearance and to protect the minor's well-being and that of others. INS officers are not required to release a minor to any person or agency whom they have reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

**(c) Processing.** The INS will expeditiously process minors and will provide them a Form I-770 notice of rights, including the right to a bond redetermination hearing, if applicable.

Following arrest, the INS will hold minors in a facility that is safe and sanitary and that is consistent with the INS's concern for the particular vulnerability of minors. Such facilities will have access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor. The INS will separate unaccompanied minors from unrelated adults whenever possible. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours.

If the minor cannot be immediately released, and no licensed program (described below) is available to care for him, he should be placed in an INS or INS-contract facility that has separate accommodations for minors, or in a State or county juvenile detention facility that separates minors in INS custody from delinquent offenders. The INS will make every effort to ensure the safety and well-being of juveniles placed in these facilities.

(d) **Release.** The INS will release minors from its custody without unnecessary delay, unless detention of a juvenile is required to secure her timely appearance or to ensure the minor's safety or that of others. Minors shall be released in the following order of preference, to:

(i) a parent;

(ii) a legal guardian;

(iii) an adult relative (brother, sister, aunt, uncle, or grandparent);

(iv) an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer, or (ii) such other documentation that establishes to the satisfaction of the INS, in its discretion, that the individual designating the individual or entity as the minor's custodian is in fact the minor's parent or guardian;

(v) a state-licensed juvenile shelter, group home, or foster home willing to accept legal custody; or

(vi) an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

(e) **Certification of custodian.** Before a minor is released, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

(i) provide for the minor's physical, mental, and financial well-being;

(ii) ensure the minor's presence at all future proceedings before the INS and the immigration court;

(iii) notify the INS of any change of address within five (5) days following a move;

(iv) if the custodian is not a parent or legal guardian, not transfer custody of the minor to another party without the prior written permission of the District Director, except in the event of an emergency;

(v) notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

Case 5:18-cv-06741-NC   Document 1-2   Filed 11/04/18   Page 51 of 69

(vi) if dependency proceedings involving the minor are initiated, notify the INS of the initiation of a such proceedings and the dependency court of any deportation proceedings pending against the minor.

In an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS, but must notify the INS of the transfer as soon as is practicable, and in all cases within 72 hours. Examples of an "emergency" include the serious illness of the custodian, destruction of the home, etc. In all cases where the custodian seeks written permission for a transfer, the District Director shall promptly respond to the request.

The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement. However, custody arrangements will not be terminated for minor violations of the custodian's obligation to notify the INS of any change of address within five days following a move.

**(f) Suitability assessment.** An INS officer may require a positive suitability assessment prior to releasing a minor to any individual or program. A suitability assessment may include an investigation of the living conditions in which the minor is to be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. The assessment will also take into consideration the wishes and concerns of the minor.

**(g) Family reunification.** Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, will promptly attempt to reunite the minor with his or her family to permit the release of the minor under Paragraph (d) above. Such efforts at family reunification will continue so long as the minor is in INS or licensed program custody and will be recorded by the INS or the licensed program in which the minor is placed.

**(h) Placement in licensed programs.** A "licensed program" is any program, agency or organization licensed by an appropriate state agency to provide residential group, or foster care services for dependent children, including a program operating group homes, foster homes or facilities for special needs minors. Exhibit 1 of the Flores v. Reno Settlement Agreement describes the standards required of licensed programs. Juveniles who remain in INS custody must be placed in a licensed program within three days if the minor was apprehended in an INS district in which a licensed program is located and has space available, or within five days in all other cases, except when:

(i) the minor is an escape risk or delinquent, as defined in Paragraph (l) below;

(ii) a court decree or court-approved settlement requires otherwise;

(iii) an emergency or influx of minors into the United States prevents compliance, in which case all minors should be placed in licensed programs as expeditiously as possible; or

(iv) where the minor must be transported from remote areas for processing or speaks an unusual language such that a special interpreter is required to process the minor, in which case the minor must be placed in a licensed program within five business days.

**(i) Secure and supervised detention.** A minor may be held in or transferred to a State or county juvenile detention facility or in a secure INS facility or INS-contracted facility having separate accommodations for minors, whenever the District Director or Chief Patrol Agent determines that the minor -

(i) has been charged with, is chargeable, or has been convicted of a crime, or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act, unless the minor's offense is

(a) an isolated offense not within a pattern of criminal activity which did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc. ); or

(b) a petty offense, which is not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc.);

(ii) has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;

(iii) has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc.);

(iv) is an escape-risk; or

(v) must be held in a secure facility for his or her own safety, such as when the INS has reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees.

"Chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense.

The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether:

> (a) the minor is currently under a final order of deportation or exclusion;

> (b) the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion;

> (c) the minor has previously absconded or attempted to abscond from INS custody.

The INS will not place a minor in a State or county juvenile detention facility, secure INS detention facility, or secure INS-contracted facility if less restrictive alternatives are available and appropriate in the circumstances, such as transfer to a medium security facility that provides intensive staff supervision and counseling services or transfer to another licensed program. All determinations to place a minor in a secure facility must be reviewed and approved by the regional Juvenile Coordinator.

**(j) Notice of right to bond redetermination and judicial review of placement.** A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case in which he either affirmatively requests, or fails to request or refuse, such a hearing on the Notice of Custody Determination. A juvenile who is not released or placed in a licensed placement shall be provided (1) a written explanation of the right of judicial review in the form attached, and (2) the list of free legal services providers compiled pursuant to 8 C.F.R. § 292a.

**(k) Transportation and transfer.** Unaccompanied minors should not be transported in vehicles with detained adults except when being transported from the place of arrest or apprehension to an INS office or where separate transportation would be otherwise impractical, in which case minors shall be separated from adults. INS officers shall take all necessary precautions for the protection of minors during transportation with adults.

When a minor is to be released, the INS will assist him or her in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released. The Service may, in its discretion, provide transportation to such minors.

Whenever a minor is transferred from one placement to another, she shall be transferred with all of her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions must be shipped to the minor in a timely manner. No minor who is represented by counsel should be transferred without advance notice to counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived notice, in which cases notice must be provided to counsel within 24 hours following transfer.

(l) **Periodic reporting.** All INS district offices and Border Patrol stations must report to the Juvenile Coordinator statistical information on minors placed in proceedings who remain in INS custody for longer than 72 hours. Information will include: (a) biographical information, including the minor's name, date of birth, and country of birth, (b) date placed in INS custody, (c) each date placed, removed or released, (d) to whom and where placed, transferred, removed or released, (e) immigration status, and (f) hearing dates. The Juvenile Coordinator must also be informed of the reasons for placing a minor in a medium security facility or detention facility as described in paragraph (i).

(m) **Attorney-client visits by Plaintiffs' counsel.** The INS will permit lawyers for the *Reno v. Flores* plaintiff class to visit minors even though they may not have the names of minors who are housed at a particular location. A list of Plaintiffs' counsel entitled to make attorney-client visits with minors is available from the district Juvenile Coordinator. Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law of Los Angeles, California, or the National Center for Youth Law of San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

Visits must occur in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question. Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the facility staff must provide Plaintiffs' counsel with a list of names and alien registration numbers for the minors housed at that facility. In all instances, in order to memorialize any visit to a minor by Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any attorney-client meeting. Plaintiffs' counsel may limit the notice of appearance to representation of the minor in connection with his placement or treatment during INS custody. Plaintiffs' counsel must submit a copy of the notice of appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of the facility.

A minor may refuse to meet with Plaintiffs' counsel. Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

(n) **Visits to licensed facilities.** In addition to the attorney-client visits, Plaintiffs' counsel may request access to a licensed program's facility (described in paragraph (h)) or to a medium-security facility or detention facility (described in paragraph (i)) in which a minor has been placed. The district juvenile coordinator will convey the request to the facility's staff and coordinate the visit. The rules and procedures to be followed in connection with such visits are set out in Exhibit 4 of the *Flores v. Reno* Settlement Agreement,, unless Plaintiffs' counsel and the facility's staff agree otherwise. In all visits to any facility, Plaintiffs' counsel and their associated experts must treat minors and staff with courtesy and dignity and must not disrupt the normal functioning of the facility.

## EXHIBIT 3
### Contingency Plan

In the event of an emergency or influx that prevents the prompt placement of minors in licensed programs with which the Community Relations Service has contracted, INS policy is to make all reasonable efforts to place minors in licensed programs licensed by an appropriate state agency as expeditiously as possible. An emergency is an act or event, such as a natural disaster (e.g. earthquake, fire, hurricane), facility fire, civil disturbance, or medical emergency (e.g. a chicken pox epidemic among a group of minors) that prevents the prompt placement of minors in licensed facilities. An influx is defined as any situation in which there are more than 130 minors in the custody of the INS who are eligible for placement in licensed programs.

1. The Juvenile Coordinator will establish and maintain an Emergency Placement List of at least 80 beds at programs licensed by an appropriate state agency that are potentially available to accept emergency placements. These 80 placements would supplement the 130 placements that INS normally has available, and whenever possible, would meet all standards applicable to juvenile placements the INS normally uses. The Juvenile Coordinator may consult with child welfare specialists, group home operators, and others in developing the list. The Emergency Placement List will include the facility name; the number of beds at the facility; the name and telephone number of contact persons; the name and telephone number of contact persons for nights, holidays, and weekends if different; any restrictions on minors accepted (e.g. age); and any special services that are available.

2. The Juvenile Coordinator will maintain a list of minors affected by the emergency or influx, including (1) the minor's name, (2) date and country of birth, and (3) date placed in INS custody.

3. Within one business day of the emergency or influx the Juvenile Coordinator, or his or her designee will contact the programs on the Emergency Placement List to determine available placements. As soon as available placements are identified, the Juvenile Coordinator will advise appropriate INS staff of their

availability. To the extent practicable, the INS will attempt to locate emergency placements in geographic areas where culturally and linguistically appropriate community services are available.

4. In the event that the number of minors needing emergency placement exceeds the available appropriate placements on the Emergency Placement List, the Juvenile Coordinator will work with the Community Relations Service to locate additional placements through licensed programs, county social services departments, and foster family agencies.

5. Each year, the INS will reevaluate the number of regular placements needed for detained minors to determine whether the number of regular placements should be adjusted to accommodate an increased or decreased number of minors eligible for placement in licensed programs. However, any decision to increase the number of placements available shall be subject to the availability of INS resources. The Juvenile Coordinator shall promptly provide Plaintiffs' counsel with any reevaluation made by INS pursuant to this paragraph.

6. The Juvenile Coordinator shall provide to Plaintiffs' counsel copies of the Emergency Placement List within six months after the court's final approval of the Settlement Agreement.


### EXHIBIT 4
### Agreement Concerning Facility Visits Under Paragraph 33

The purpose of facility visits under paragraph 33 is to interview class members and staff and to observe conditions at the facility. Visits under paragraph 33 shall be conducted in accordance with the generally applicable policies and procedures of the facility to the extent that those policies and procedures are consistent with this Exhibit.

Visits authorized under paragraph 33 shall be scheduled no less than seven (7) business days in advance. The names, positions, credentials, and professional association (e.g., Center for Human Rights and Constitutional Law) of the visitors will be provided at that time.

All visits with class members shall take place during normal business hours.

No video recording equipment or cameras of any type shall be permitted. Audio recording equipment shall be limited to hand-held tape recorders.

The number of visitors will not exceed six (6) or, in the case of a family foster home, four (4), including interpreters, in any instance. Up to two (2) of the visitors may be non-attorney experts in juvenile justice and/or child welfare.

No visit will extend beyond three (3) hours per day in length. Visits shall minimize disruption to the routine that minors and staff follow.

Exhibit 5
List of Organizations to Receive Information re: Settlement Agreement

Eric Cohen, Immig. Legal Resource Center, 1663 Mission St. Suite 602, San Francisco, CA 94103

Cecilia Munoz, Nat'l Council Of La Raza, 810 1st St. NE Suite 300, Washington, D.C. 20002

Susan Alva, Immig. & Citiz. Proj Director, Coalition For Humane Immig Rights of LA, 1521 Wilshire Blvd., Los Angeles, CA 90017

Angela Cornell, Albuquerque Border Cities Proj., Box 35895, Albuquerque, NM 87176-5895

Beth Persky, Executive Director, Centro De Asuntos Migratorios, 1446 Front Street, Suite 305, San Diego, CA 92101

Dan, Kesselbrenner, , National Lawyers Guild, National Immigration Project, 14 Beacon St.,#503, Boston, MA 02108

Lynn Marcus , SWRRP, 64 E. Broadway, Tucson, AZ 85701-1720

Maria Jimenez, , American Friends Service Cmte., ILEMP, 3522 Polk Street, Houston, TX 77003-4844

Wendy Young, , U.S. Cath. Conf., 3211 4th St. NE, , Washington, DC, 20017-1194

Miriam Hayward , International Institute Of The East Bay, 297 Lee Street , Oakland, CA 94610

Emily Goldfarb, , Coalition For Immigrant & Refugee Rights, 995 Market Street, Suite 1108 , San Francisco, CA 94103

Jose De La Paz, Director, California Immigrant Workers Association, 515 S. Shatto Place , Los Angeles, CA, 90020

Annie Wilson, LIRS, 390 Park Avenue South, First Asylum Concerns, New York, NY 10016

Stewart Kwoh, Asian Pacific American Legal Center, 1010 S. Flower St., Suite 302, Los Angeles, CA 90015

Warren Leiden, Executive Director, AILA, 1400 Eye St., N.W., Ste. 1200, Washington, DC, 20005

Frank Sharry, Nat'l Immig Ref & Citiz Forum, 220 I Street N.E., Ste. 220, Washington, D.C. 20002

Reynaldo Guerrero, Executive Director, Center For Immigrant's Rights, 48 St. Marks Place , New York, NY 10003

Charles Wheeler , National Immigration Law Center, 1102 S. Crenshaw Blvd., Suite 101 , Los Angeles, CA 90019

Deborah A. Sanders, Asylum & Ref. Rts Law Project, Washington Lawyers Comm., 1300 19th Street, N.W., Suite 500 , Washington, D.C. 20036

Stanley Mark, Asian American Legal Def.& Ed.Fund, 99 Hudson St, 12th Floor, New York, NY 10013

Sid Mohn, Executive Director, Travelers & Immigrants Aid, 327 S. LaSalle Street, Suite 1500, Chicago, IL, 60604

Bruce Goldstein, Attornet At Law, Farmworker Justice Fund, Inc., 2001 S Street, N.W., Suite 210, Washington, DC 20009

Ninfa Krueger, Director, BARCA, 1701 N. 8th Street, Suite B-28, McAllen, TX 78501

John Goldstein, , Proyecto San Pablo, PO Box 4596,, Yuma, AZ 85364

Valerie Hink, Attorney At Law, Tucson Ecumenical Legal Assistance, P.O. Box 3007 , Tucson, AZ 85702

Pamela Mohr, Executive Director, Alliance For Children's Rights, 3708 Wilshire Blvd. Suite 720, Los Angeles, CA 90010

Pamela Day, Child Welfare League Of America, 440 1st St. N.W., , Washington, DC 20001

Susan Lydon, Esq., Immigrant Legal Resource Center, 1663 Mission St. Ste 602, San Francisco, CA 94103

Patrick Maher, Juvenile Project, Centro De Asuntos Migratorios, 1446 Front Street, # 305, San Diego, CA 92101

Lorena Munoz, Staff Attorney, Legal Aid Foundation of LA-IRO, 1102 Crenshaw Blvd., Los Angeles, CA 90019

Christina Zawisza, Staff Attorney, Legal Services of Greater Miami, 225 N.E. 34th Street, Suite 300, Miami, FL 33137

Miriam Wright Edelman, Executive Director, Children's Defense Fund, 122 C Street N.W. 4th Floor, Washington, DC 20001

Rogelio Nunez, Executive Director, Proyecto Libertad, 113 N. First St., Harlingen, TX 78550

Exhibit 6
Notice of Right to Judicial Review

"The INS usually houses persons under the age of 18 in an open setting, such as a foster or group home, and not in detention facilities. If you believe that you have not been properly placed or that you have been treated improperly, you may ask a federal judge to review your case. You may call a lawyer to help you do this. If you cannot afford a lawyer, you may call one from the list of free legal services given to you with this form."

# Exhibit 7



REPUBLIC OF GUATEMALA

CITY AND DEPARTMENT OF GUATEMALA

EMBASSY OF THE UNITES STATES OF AMERICA

> Republic of Guatemala
> City and Department of Guatemala
> Embassy of the United States
> of America
> )SS

### DECLARATION OF DAVID XOL CHOLOM

The undersigned, David Xol Cholom, after first having been duly sworn under oath, and after having the below translated to me by the undersigned Sylvia Rodriguez, do hereby state and affirm that the following is true and correct pursuant to my own personal knowledge.

1. My name is David Xol Cholom. I am over 18 years of age. I reside in San Miguel el Limon, Chisec, Alta Verapaz, Republic of Guatemala.

2. I am married to Florinda Bol Xicol. My wife and I are the biological mother and father of B      X      , a minor, who is currently held in detention in San Antonio, Texas, at the direction of the Department of Human Services (DHS), Office of Refugee Resettlement (ORR), of the United States government. We have both raised and provided for our son B since birth.

3. As the father of B      X      , I hereby designate Matthew Sewell and his wife Holly Sewell, who reside at 12703 Taylor Drive, Buda, Texas 78610, to take legal custody of B      from DHS and ORR, and provide for his care, and do hereby state that the said Matthew Sewell and Holly Sewell are capable and willing to care for B      's well-being. My wife and I have met the Sewell family and believe that they offer a safe and proper placement for B      . We have spoken to B      as to this placement, he has met Holly Sewell's family, and is in accord with our wishes.



4. I do hereby request that the U.S. government, specifically DHS and ORR, honor this request and place Bunder the custody and care of Matthew and Holly Sewell as soon as possible, and do hereby waive any claims or causes of action against the U.S. government, DHS or ORR, for proceeding with the placement of Bwith the Sewell family as requested herein.

Republic of Guatemala
City and Department of Guatemala   )SS
Embassy of the United States
of America

EXECUTED ON THIS 3ʳᵈ day of January, 2019.

Margarita I. Winton
Consular Associate

DAVID XOL CHOLOM

The undersigned being Sylvia Rodriguez state that I am fluent in both the English and Spanish languages, that I have translated the above Declaration of David Xol Cholom to the said David Xol Cholom and read same to him in the Spanish language, that he stated to me that he understood the Declaration in its entirety when read to him; and I further do declare under penalty of perjury that the foregoing is true and correct.

SYLVIA RODRIGUEZ

# Exhibit 8



REPUBLIC OF GUATEMALA

CITY AND DEPARTMENT OF GUATEMALA

EMBASSY OF THE UNITES STATES OF AMERICA

Republic of Guatemala
City and Department of Guatemala )SS
Embassy of the United States
of America

## DECLARATION OF FLORINDA BOL XICOL

The undersigned, Florinda Bol Xicol, after first having been duly sworn under oath, and after having the below translated to me by the undersigned Sylvia Rodriguez, do hereby state and affirm that the following is true and correct pursuant to my own personal knowledge.

1. My name is Florinda Bol Xicol. I am over 18 years of age. I reside in San Miguel el Limon, Chisec, Alta Verapaz, Republic of Guatemala.

2. I am married to David Xol Cholom. My husband and I are the biological mother and father of B      X      i, a minor, who is currently held in detention in San Antonio, Texas, at the direction of the Department of Human Services (DHS), Office of Refugee Resettlement (ORR), of the United States government. We have both raised and provided for our son B since birth.

3. As the mother of B      X, , I hereby designate Matthew Sewell and his wife Holly Sewell, who reside at 12703 Taylor Drive, Buda, Texas 78610, to take legal custody of B      from DHS and ORR, and provide for his care, and do hereby state that the said Matthew Sewell and Holly Sewell are capable and willing to care for B      's well-being. My husband and I have met the Sewell family and believe that they offer a safe and proper placement for B      . We have spoken to B      as to this placement, he has met Holly Sewell's family, and is in accord with our wishes.

4.  I do hereby request that the U.S. government, specifically DHS and ORR, honor this request and place B      under the custody and care of Matthew and Holly Sewell as soon as possible, and do hereby waive any claims or causes of action against the U.S. government, DHS or ORR, for proceeding with the placement of B      with the Sewell family as requested herein.

Republic of Guatemala
City and Department of Guatemala   )SS
Embassy of the United States
of America

EXECUTED ON THIS __3rd__ day of January, 2019.

MWinton
Margarita I. Winton
Consular Associate

FLORINDA BOL XICOL

The undersigned being Sylvia Rodriguez state that I am fluent in both the English and Spanish languages, that I have translated the above Declaration of Florinda Bol Xicol to the said Florinda Bol Xicol and read same to her in the Spanish language, that she stated to me that she understood the Declaration in its entirety when read to her; and I further do declare under penalty of perjury that the foregoing is true and correct.

Sylvia Rodriguez
SYLVIA RODRIGUEZ

# Exhibit 9

STATE OF TEXAS

COUNTY OF HAYES

**DECLARATION OF HOLLY SEWELL**

The undersigned being Holly Sewell, who, after first having been put under oath, does swear and affirm the below to be true and correct from my personal knowledge.

1. My name is Holly Sewell.  I am 41 years of age and reside at ███████████, Buda, Texas 78610.  I am married to Matthew Sewell.  I live with Matthew and our children ███████, 6 years of age, and ███████ 4 years of age, at the above address, in a home that we have owned for almost a year and a half.

2. I have 20 years of experience working in live theatre, both on and off the stage, and have worked as a music director and music teacher.  Today I am a stay at home mother devoting most of my time raising our family.

3. Matthew is a software engineer.  We are recent arrivals in Texas, having moved to the Austin area from California almost 2 years ago. My husband is employed by MineralSoft, a technology company in Austin which provides electronic mineral rights and royalty management services for the Oil and Gas industry. Matthew has been a computer engineer for 12 years.  Before MineralSoft, Matthew was employed for almost 5 years by Krummrich Engineering Corporation in Ventura, California.  Matthew currently earns a salary of $██████ per year plus bonus and benefits. We have no debt, other than the mortgage on our home, and two car payments.

4. I am a member of the Actors Equity Association, a labor union of professional actors.  I am also a commissioner on the Buda Parks and Recreation Commission as well as a

commissioner on the Keep Buda Beautiful Commission, which are public bodies servicing the City of Buda, Texas.

5. Our family lives in a two story 5-bedroom home on a half-acre lot situated in a tight-knit suburban community made up of many families with children, which is a home that is valued at $███████. We currently have approximately $███████ equity on our home. Our home has play areas for our children, including a fenced in swimming pool.

6. Neither, Matthew or I have ever been arrested.  We have been careful to pay our debts when due and have never declared bankruptcy.  Matthew's income is more than sufficient for our needs, with a surplus which we use for savings.

7. Matthew and I are part of a nurturing family.  Matthew has successfully raised two children into adulthood by a prior marriage, and successfully helped raise a child of a friend of Matthew's who died leaving his child behind.

8. We are members of the Austin YMCA. Our children participate in baseball and soccer leagues organized by the YMCA, and both Matthew and I devote much of our time in exposing our children to sports and outdoor activities, as well as music and art.

9. I was shocked by the separation of refugee families, and the incarceration of refugee children, beginning this past spring when the government commenced its zero-tolerance policy, and was distraught over the thought of innocent children being incarcerated and left behind by the government that was deporting their parents. I felt a need to open our home and provide care where we could for the children.

10. After much discussion, our family agreed to make ourselves, and our home, available to sponsor an incarcerated child. We made inquiries about how these cases were being handled and learned that, while some children are temporarily placed with family

members within the United Stated, children for whom this is not a possibility were left in detention or sent back to the countries they were fleeing. We learned that parents were having to make the horrible choice between leaving their children in detention centers pending asylum hearings or returning them to the circumstances from which they fled.

11. We assumed that there must be some mechanism by which these children could experience the normalcy of being a part of a family with the freedom of simply going to a park or visiting a neighbor but learned that such a mechanism does not currently exist.

12. Through a mutual acquaintance, we were finally put in touch with Ricardo de Anda because we want to assist him with finding a stable, albeit temporary, home for at least one of his clients.

13. Should the government place B.X. in our custody we will provide all of the care needed to provide B.X. with a safe and nurturing environment that safeguards his physical and emotional self. I have promised his mother that I will ensure he maintains contact with his family in Guatemala on a routine basis.

14. My family and B.X.'s family Florinda and David Xol, had an extensive videoconference where we met each other, and where we had a chance to show off our home and explain our intent in agreeing to sponsor B.X. We received full consent from B.X.'s parents to care for their child. We do not intend to interfere in any way with Florinda and David's parental rights and will endeavor to reunite B.X. with his family.

15. Our family also had the opportunity to videoconference with B.X. from his detention facility through his lawyer. We showed him our home and our family and, after much discussion, determined that B.X. was a good fit to stay with our family, and that he was excited and willing to do so.

16. We can, and we are willing to ensure B.X.'s presence at all future proceedings before the immigration courts, as well as to keep ORR appraised of our care of B.X. whenever called for, to make him available for any meetings before government officials, and to do all that is asked of us to guarantee the post-release supervision of B.X. by the government.

17. I declare under the penalty of perjury that the foregoing is true and correct based on my own personal knowledge.

EXECUTED ON THIS __4 th__, day of February, 2019.

Holly Sewell

The above was executed by **Holly Sewell**, after first having been duly sworn, and did swear and attest before me, a notary public, that the above is true and correct from her own personal knowledge.

SWORN AND SUBSCRIBED before me on this __4__ th day of FEBRUARY, 2019.

JO ANGELI MANALANG
Notary ID #131000414
My Commission Expires
February 9, 2021

Notary Public, State of Texas

# Exhibit 10

# OFFICE OF REFUGEE RESETTLEMENT
An Office of the Administration for Children & Families

## Children Entering the United States Unaccompanied: Section 2
Safe and Timely Release from ORR Care

Published: January 30, 2015

Categories: Unaccompanied Children's Services

## 2.1 Summary of the Safe and Timely Release Process

The Office of Refugee Resettlement (ORR) has policies and procedures in place to ensure the care and safety of children who are apprehended in the United States without a parent or legal guardian available to provide care and custody and without immigration status. These policies require the timely release of children and youth to qualified parents, guardians, relatives or other adults, referred to as "sponsors." Safe and timely release must occur within a setting that promotes public safety and ensures that sponsors are able to provide for the physical and mental well-being of children.

ORR evaluates potential sponsors' ability to provide for the child's physical and mental well-being, as the law requires ORR to protect children from smugglers, traffickers, or others who might seek to victimize or otherwise engage the child in criminal, harmful or exploitative activity. The process for the safe and timely release of an unaccompanied alien child from ORR custody involves many steps, including: the identification of sponsors; the submission by a sponsor of the application for release and supporting documentation; the evaluation of the suitability of the sponsor, including verification of the sponsor's identity and relationship to the child, background checks, and in some cases home studies; and planning for post-release.

*Posted 1/27/15*

## 2.2 Application for the Safe and Timely Release of an Unaccompanied Alien Child from ORR Care

ORR begins the process of finding family members and others who may be qualified to care for an unaccompanied alien child as soon as the child enters ORR's care. Parents, other relatives, or close family friends can apply to have the child released to their care.

*Posted 1/27/15*

### 2.2.1 Identification of Qualified Sponsors

The care provider (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Care Provider), the ORR funded facility that cares for the child, interviews the child as well as parents (see the section below on how ORR confirms relationship with child), legal guardians, and/or family members to identify qualified custodians ("sponsors"). If a child is either too young or there are other factors that prohibit the care provider from obtaining potential sponsor information from the unaccompanied alien child, the care provider may seek assistance from the child's home country consulate in collaboration with the ORR Federal Field Specialist (ORR/FFS) (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist) or from a reputable family tracing organization. Finding a sponsor for the child is an ongoing process that continues during the unaccompanied alien child's stay in ORR care and custody in the event that the primary potential sponsor or primary release plan is not approved.

ORR releases children to a sponsor in the following order of preference:[1] parent; legal guardian; an adult relative (brother, sister, aunt, uncle, grandparent or first cousin); an adult individual or entity designated by the parent or legal guardian (through a signed declaration or other document that ORR determines is sufficient to establish the signatory's parental/guardian relationship); a licensed program willing to accept legal custody; or an adult individual or entity seeking custody when it appears that there is no other likely alternative to long term ORR care and custody. ORR has grouped these release options into the following categories.[2]

- **Category 1:** Parent or legal guardian (This includes qualifying step-parents that have legal or joint custody of the child or teen)
- **Category 2:** An immediate relative—a brother, sister, aunt, uncle, grandparent or first cousin. (This includes biological relatives, relatives through legal marriage, and half-siblings)
- **Category 3:** Other sponsor, such as distant relatives and unrelated adult individuals
- **Category 4:** No sponsors identified

Although ORR gives preference to a parent or legal guardian when determining release plans, there are instances when ORR would not release an unaccompanied alien child to a parent or legal guardian. These include:

- There has been a court ordered termination of parental rights over the child.

- There is substantial evidence that the child would be at risk of harm if released to the parent or legal guardian.

In some cases, an unaccompanied alien child enters the United States with her biological child. In those cases, ORR will identify a sponsor for the unaccompanied alien child as well as for the infant or toddler. In most instances, it is in the best interest of the unaccompanied alien child and her biological child to be released to the same sponsor. When that occurs, the sponsor is assigned the same category for the infant as for the UAC mother. This is true even if the potential sponsor would be assigned a different category (based on their relationship status) if he or she were to sponsor the infant alone.

*Revised 4/11/16*

## 2.2.2 Contacting Potential Sponsors

The child's care provider (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Care Provider) is responsible for implementing safe screening methods when contacting and communicating with potential sponsors. These methods are to ensure that a potential sponsor does not pose a risk to the unaccompanied alien child, to other children in the care provider facility or to care provider staff.

These safe screening methods include:

- Use of appropriate interpreters
- Identity of the sponsor is obtained
- Verification of family relationships
- Coordination with the unaccompanied alien child's parents, legal guardians, or closest relatives prior to contacting non-relative adult potential sponsors
- Screening for exploitation, abuse, trafficking, or other safety concerns
- Engaging the child to communicate openly with care provider staff about his or her own sense of safety

*Posted 1/27/15*

## 2.2.3 The Application for Release

All potential sponsors must complete an application in order for a child to be released to them from ORR custody (the "Family Reunification Application").

Within 24 hours of identification of a potential sponsor for a child or youth, the care provider or the ORR National Call Center sends the sponsor a package with the application and related documents (called the Family Reunification Packet or FRP).

The application package includes the following documents:

- A flyer with contact information on organizations offering a Legal Orientation Program for Custodians (LOPC)
- Family Reunification Packet Cover Letter
- Authorization for Release of Information
- Family Reunification Application
- Sponsor Care Agreement
- Sponsor Declaration
- Fingerprint instructions
- Sponsor Handbook
- (If parent or legal guardian wishes to specify) Letter of Designation for Care of a Minor
- Privacy Notices

The care provider is available to help the potential sponsor complete the application. The care provider also informs potential sponsors that they may submit additional information to support the application and reminds potential sponsors of the deadlines for completing the forms. The sponsor may also receive assistance in completing the application at some fingerprinting locations.

*Revised 6/7/18*

## 2.2.4 Required Documents for Submission with the Application for Release

In addition to completing and signing the Family Reunification Application (FRA) and the *Authorization for Release of Information*, potential sponsors must provide documentation of identity, address, and relationship to the child they seek to sponsor (see also **The Family Reunification Checklist for Sponsors (https://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services#Family Reunification Packet for Sponsors)).**[3] Potential sponsors must also submit documentation verifying the identity of the children they seek to sponsor, and evidence verifying the identity of all adults residing with the sponsor and all adult care givers identified in a sponsor care plan. In addition to their use as evidence of the foregoing, all documentation submitted under this section is used as part of the overall sponsor assessment process. See **Section 2.4 Sponsor Assessment Criteria and Home Studies (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.4).** As a result, ORR may in its discretion require potential sponsors to submit additional documentation beyond the minimums specified below.

**Proof of Sponsor Identity**

To verify their identity, all potential sponsors must submit original versions or legible copies of government-issued identification documents. They may present either one selection from List A or two or more documents from List B. If a potential sponsor presents selections from list B, at least one selection must contain a legible photograph. Expired documents are acceptable for the purpose of establishing identity.

**LIST OF ACCEPTABLE DOCUMENTS**

**LIST A**

U.S. Passport or U.S. Passport Card

Permanent Resident Card or Alien Registration Receipt Card (Form I-551)

Foreign Passport that contains a photograph

Employment Authorization Document that contains a photograph (Form I-766)

U.S. Driver's License or Identification Card

**OR**

**LIST B**

U.S. Certificate of Naturalization

U.S. Military Identification Card

U.S. Social Security Card

Birth Certificate

Marriage Certificate

Court order for name change

Foreign national identification card

Consular passport renewal receipt that contains a photograph

Mexican consular identification card

Foreign driver's license that contains a photograph

Foreign voter registration card that contains a photograph

Canadian border crossing card that contains a photograph

Mexican border crossing card that contains a photograph with valid Form I-94

Refugee travel document that contains a photograph

Other similar documents

**Proof of Identify of adult household members and adult care givers identified in a sponsor care plan**

All potential sponsors must submit documentation verifying the identity of non-sponsor adults in their household or in a sponsor care plan. For all such adults, potential sponsors must submit at least one identification document that contains a photograph. The document may be from either List A or List B above, and may be an original version or a legible copy of the document. Expired documents are acceptable for the purpose of establishing identity. In addition, potential sponsors may submit an original version or legible copy of an ORR Verification of Release Form, but only to verify the identity of adults under the age of 21, and only if the form contains a photograph. ORR will not accept a Verification of Release as proof of identity if it does not contain a photograph, and/or is for anyone 21 and older.

**Proof of Address**

All potential sponsors must submit at least one form of documentation verifying their current address. Acceptable forms of documentation include original versions or legible copies of:

- A current lease or mortgage statement dated within the last two months before submission of the FRA;
- A utility bill, addressed in the sponsor's name and dated within the last two months before submission of the FRA;
- A bank statement dated within the last two months before submission of the FRA;
- A payroll check stub issued by an employer, dated within the last two months before submission of the FRA;
- A piece of mail from a county, state, or federal agency (with the exception of ORR) with the sponsor's name and residential address and dated within the last two months before submission of the FRA;
- A notarized letter from a landlord on the business stationary of the real property owner confirming the sponsor's address; and
- Other similar documents reliably indicating that the sponsor resides at the claimed address, dated within the last two months before submission of the FRA.

ORR may use alternative methods to verify address. For example, ORR may send a letter containing specific instructions to the address given by the sponsor, and provide a timeline by which the sponsor must comply with the instructions.

**Proof of Child's Identity**
The potential sponsor or child's family must provide the unaccompanied alien child's birth certificate or a legible copy of the child's birth certificate.

**Proof of Sponsor-Child Relationship**
The potential sponsor must provide at least one form of evidence verifying the relationship claimed with the child.[4] Acceptable documents include original versions or legible copies of:

- Birth certificates;
- Marriage certificates;
- Death certificates;
- Court records;
- Guardianship records;
- Hospital records;
- School records;
- Written affirmation of relationship from Consulate; and
- Other similar documents.

Category 3 potential sponsors who are unable to provide verifiable documentation of a familial relationship with the unaccompanied alien child must submit evidence that reliably and sufficiently demonstrates a bona fide social relationship with the child and/or the child's family that existed before the child migrated to the United States. Care providers must attain sufficient corroboration to be confident that they have received needed verification of the relationship between the potential sponsor and the child or child's family. In the absence of sufficient evidence of a bona fide social relationship with the child and/or the child's family that existed before the child migrated to the United States, the child will not be released to that individual.

If a potential sponsor has been charged with or convicted of any crime or investigated for the physical abuse, sexual abuse, neglect, or abandonment of a minor, he or she must provide related court records and police records, as well as governmental social service records or proof of rehabilitation related to the incident.

If a sponsor, household member, or adult caregiver provides any false information in the application of release and/or accompanying documents or submits fraudulent documents for the purposes of obtaining sponsorship of the child, ORR will report the incident to HHS/Office of the Inspector General (OIG) and to U.S. Immigration and Customs Enforcement's Homeland Security Investigations (HSI). Fraudulent documents include documents on which the address, identity, or other relevant information is false or documents that have been manufactured or altered without lawful authorization. ORR will deny release if it is determined that fraudulent documents were submitted during the application of release process.

*Revised 11/14/16*

## 2.2.5 Legal Orientation Program for Custodians

All potential sponsors of children and youth under the care of ORR should attend a presentation provided by the Legal Orientation Program for Custodians (LOPC). The purpose of this program is to inform potential sponsors of their responsibilities in ensuring the child's appearance at all immigration proceedings, as well as protecting the child from mistreatment, exploitation, and trafficking, as provided under the Trafficking Victims Protection Reauthorization Act of 2008. The program also provides information about possible free legal counsel (pro bono legal services) for the youth or child during the immigration court process.

The Office of Legal Access Programs (OLAP), within the Executive Office for Immigration Review (EOIR) at the U.S. Department of Justice, manages the LOPC and contracts with legal service organizations around the country to provide LOPC services to potential sponsors in their local communities or in metropolitan areas served by the program. EOIR is the entity in the federal government that is also responsible for adjudicating immigration cases by fairly, expeditiously, and uniformly interpreting and administering the nation's immigration laws.

The unaccompanied alien child's case manager (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Manager)is responsible for informing potential sponsors about all procedures related to the child's case--including attendance at an LOPC presentation. The Family Reunification Packet (FRP) that goes to each potential sponsor includes an *Authorization for Release of Information* that the sponsor must sign before the case manager may schedule an appointment for LOPC services. All potential sponsors should submit the *Authorization for Release of Information* immediately and prior to submitting the complete FRP to ensure timely scheduling of their LOPC session.

Upon receipt of the *Authorization*, the case manager schedules an appointment for a potential sponsor to attend a presentation with one of the LOPC providers around the country. Alternatively, the case manager contacts the **LOPC National Call Center at (888) 996-3848** and arranges for the Call Center to schedule an LOPC appointment for the potential sponsor or mail an LOPC Information Packet to the sponsor.

When evaluating family members and other potential sponsors, ORR considers whether they have attended an LOPC presentation. Attendance at an LOPC presentation is a factor in the release assessment.

*Revised 12/4/17*

**2.2.6 Additional Questions and Answers about this Topic**

Q: Will sponsors receive the Family Reunification Packet through the mail or electronically?
A: Case managers will work with sponsors to identify the best way to get the packets to them, whether electronically or by fax transmission or postage paid overnight mail.

Q: Do sponsors need assistance from an attorney or a paid representative to complete the packet?
A: No. The unaccompanied alien child's case manager will be able to help the potential sponsor complete the form and explain the process.

Q: Is it possible for an unaccompanied alien child's spouse to be a sponsor?
A: ORR considers release to an unaccompanied alien child's adult spouse on a case by case basis.

Q: Is it possible for family members in the United States to proactively contact ORR about children who may have entered the country unaccompanied?
A: Yes. Family members may call the ORR National Call Center, at (800) 203-7001.

*Posted 1/27/15*

## 2.3 Key Participants in the Release Process

ORR's sponsor assessment and release decision process requires coordination among care provider staff, nongovernmental third-party reviewers (Case Coordinators), ORR staff, other Federal agencies, stakeholders, and Child Advocates, where applicable.

Case Managers (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Manager) communicate with potential sponsors, gather necessary information and documentation, talk to any relevant stakeholders, and assess sponsors to formulate a recommendation to the Case Coordinator. Case Coordinators (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Coordinators) concurrently review all assessment information on an unaccompanied alien child and sponsor to also make a recommendation. Once Case Managers and Case Coordinators agree on a particular recommendation for release, the recommendation will be sent to the ORR/FFS (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist) for a final release decision. If the Case Manager and Case Coordinator cannot agree on a recommendation, the case is elevated to the ORR/FFS for further guidance.

*Revised 8/1/16*

### 2.3.1 ORR/Federal Field Specialists (ORR/FFS)

ORR/FFS are ORR's field staff located regionally throughout the country and are assigned to a group of care providers within a region. They have the authority to approve all unaccompanied alien children transfer and release decisions; oversee care providers to ensure all services, policies, and procedures are properly provided and implemented; and serve as a liaison to local stakeholders, including other Federal agencies, local legal service providers, local communities, Child Advocates, etc. ORR/FFS also provide guidance, direction, and technical assistance to care providers.

With regard to the release process, ORR/FFS oversee individual unaccompanied alien children cases and review Case Manager, Case Coordinator, and Child Advocate recommendations; and make final release and transfer decisions for ORR. ORR/FFS also make final decisions whether home studies are conducted and/or post-release services are provided.[6] ORR/FFS coordinate all aspects of a child's case with care provider staff, Case Coordinators, stakeholders, and other Federal agencies.

*Revised 8/1/16*

### 2.3.2 Case Managers

Care provider Case Managers perform a variety of duties, including coordinating the completion of assessments of unaccompanied alien children, completing individual service plans, assessing potential sponsors, making transfer and release recommendations, and coordinating the release of a child or youth from ORR care and custody. (The care provider provides a range of services through other trained staff that are described in Section 3: Services.)

The role of the Case Manager within the release process is to initiate and maintain ongoing communication with the potential sponsor, gather sponsor information, and assess whether the potential sponsor is a suitable sponsor who can safely provide for the physical and mental well-being of the child or youth. When communicating with the potential sponsor, the Case Manager may:

- Provide direct assistance on completing the sponsor application packet and ensuring provision of supporting documentation;
- Involve the sponsor in making a plan for individualized services for the unaccompanied alien child, as appropriate;
- Keep the sponsor informed of the child's progress and current functioning;
- Provide the sponsor with detailed information about the child's needs in order to fully assess the sponsor's ability to provide care and services, including completing a sponsor care plan, when necessary;
- Discuss services that are available in the sponsor's community for the child; and
- Share relevant information on the unaccompanied alien child in accordance with applicable privacy and information-sharing policies and in collaboration with the unaccompanied alien child and the child's clinician in a way that best serves the child's safety and well-being.

The Case Manager's role is also to ensure that information is gathered or shared with the appropriate staff and stakeholders during the sponsor assessment process. The Case Manager provides weekly status updates to the unaccompanied alien child's Case Coordinator and ORR/FFS on the progress in achieving a safe and timely release with family members as well as potential challenges that may delay a release. The Case Manager provides weekly status updates (monthly for children in LTFC) to the UAC on the child's case and provision of services, preferably in person. The Case Manager informs other stakeholders of the progress of a child's case, including notification that an unaccompanied alien child may not have a potential sponsor, and any final release decisions. Stakeholders may include local legal service providers and attorneys of record, other local service providers, Child Advocates, post-release and home study providers, and other Federal agencies. Case Managers, in collaboration with the ORR/FFS and Case Coordinator, will also work with law enforcement officials regarding an unaccompanied alien child's pending release if the minor has outstanding criminal charges or other issues.

*Revised 6/7/18*

### 2.3.3 Case Coordinators

Case Coordinators are non-governmental contractor field staff assigned to one or more care providers primarily to review unaccompanied alien children cases and provide transfer and release recommendations to ORR staff. The Case Coordinator is responsible for integrating all areas of assessment from the Case Manager, Child Advocates, where applicable, and other stakeholders into a release plan that will provide for the unaccompanied alien child's physical and mental well-being. After staffing and reviewing a case, Case Coordinators and Case Managers must agree on a release recommendation. If there is a disagreement or a particularly complex case, then the case will be elevated to the ORR/FFS for further guidance.

- Providing timely review and assessment of potential sponsors and unaccompanied alien children to make recommendations for release to ORR in conjunction with the Case Manager;
- Assisting ORR in ensuring that children are placed in the least restrictive setting while receiving all appropriate services;
- Meeting with individual unaccompanied alien children and care provider staff at designated ORR-funded care provider sites;
- Providing targeted child welfare-based assistance to care provider staff, as directed by ORR staff;
- Making recommendations for home study and post-release services for at-risk children;
- Making placement recommendations for children who require more specialized levels of care, such as long-term foster care and residential treatment centers;
- Participating in collaborative meetings with local stakeholders; and
- Participating in staffing of cases with care providers and designated ORR staff.

*Revised 8/1/16*

### 2.3.4 Child Advocates

ORR may appoint Child Advocates (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Child Advocate) for victims of trafficking and other vulnerable children. Child Advocates are third parties who make independent recommendations regarding the best interests of a child. Their recommendations are based on information that is obtained from the child and other sources (e.g., the child's parents, potential sponsors, government agencies, and other stakeholders). Child Advocates formally submit their recommendations to ORR and/or the immigration court in the form of Best Interest Determinations (BIDs). ORR considers BIDs when making decisions regarding the care, placement, and release of unaccompanied alien children, but it is not bound to follow BID recommendations.

As required by the TVPRA, ORR provides Child Advocates with access to information necessary to effectively advocate for the best interests of children with whom they are working. After providing proof of appointment, Child Advocates have access both to their clients and to their clients' records. Child Advocates may access their clients' entire original case files at care provider facilities, or request copies from care providers.⁸ Further, they may participate in case staffings.

Child Advocates and ORR maintain regular communication, informing each other of considerations or updates that impact service provision and release planning.

Child Advocates' duties include:

- Client Visits: The Child Advocate meets with the unaccompanied alien child regularly and speaks with the child's care provider staff in order to understand the child's background and current situation.
- Decision Making: The Child Advocate helps the unaccompanied alien child understand legal and care-related issues, explains the consequences of decisions made in response to those issues, and assists the child in making decisions when the child requests such help.
- Best Interests Advocacy: The Child Advocate develops a service plan containing best-interest recommendations with respect to the care, placement, and release options; and keeps the care provider, ORR, and the legal service provider or attorney of record apprised of the plan and advocacy efforts.
- Case updates: The Child Advocate collaborates and regularly communicates with the care provider, ORR, and other stakeholders in the planning and performance of advocacy efforts. For children who have been released from ORR care, Child Advocates provide timely updates as appropriate or as requested by ORR.

In most cases, ORR appoints Child Advocates while children are in its custody. However, in its discretion, ORR may appoint Child Advocates for unaccompanied alien children after their release from ORR care.

*Posted 8/1/16*

## 2.4 Sponsor Assessment Criteria and Home Studies

As noted in the Section 2.2 Application for Safe and Timely Release of an Unaccompanied Alien Child from ORR Care, the application process for release of an unaccompanied alien child involves a number of steps, including background checks (see Section 2.5 ORR Policies on Requesting Background Checks) and submission of the application by the sponsor. This section describes the criteria ORR uses to assess each potential sponsor's ability to provide for the physical and mental well-being of the unaccompanied alien child, and the role of home studies in the process.

The sponsor assessment reviews a sponsor's strengths, resources, risk factors and special concerns within the context of the unaccompanied alien child's needs, strengths, risk factors, and relationship to the sponsor. ORR also determines whether to conduct a home study, as required by the law or as necessary to ensure the welfare of the child

*Revised 3/15/16*

### 2.4.1 Assessment Criteria

ORR considers the following factors when evaluating family members and other potential sponsors:

- The nature and extent of the sponsor's previous and current relationship with the child or youth and the unaccompanied alien child's family, if a relationship exists.
- The sponsor's motivation for wanting to sponsor the child or youth.
- The unaccompanied alien child's parent or legal guardian's perspective on the release to the identified potential sponsor (for cases in which the parent or legal guardian has designated a sponsor).
- The child or youth's views on the release and whether he or she wants to be released to the individual.
- The sponsor's understanding of the unaccompanied alien child's needs, as identified by ORR and the care provider.
- The sponsor's plan to provide adequate care, supervision, access to community resources, and housing.
- The sponsor's understanding of the importance of ensuring the unaccompanied alien child's presence at all future hearings or proceedings, including immigration court proceedings, and the sponsor's attendance at a Legal Orientation Program for Custodians (LOPC) presentation. See section 2.2.5.
- The linguistic and cultural background of the child or youth and the sponsor, including cultural, social, and communal norms and practices for the care of children.
- The sponsor's strengths, resources, and mitigating factors in relation to any risks or special concerns of the child or sponsor, such as a criminal background, history of substance abuse, mental health issues, or domestic violence and child welfare concerns.
- The unaccompanied alien child's current functioning and strengths in relation to any risk factors or special concerns, such as children or youth who are victims of human trafficking; are a parent or are pregnant; have special needs, disabilities or medical or mental health issues; have a history of criminal, juvenile justice, or gang involvement; or a history of behavioral issues.

*Revised 12/4/17*

### 2.4.2 Home Study Requirement

The care provider screens each case to determine whether to conduct a home study of the potential sponsor as required under the **Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA) (http://www.gpo.gov/fdsys/pkg/BILLS-110hr7311enr/pdf/BILLS-110hr7311enr.pdf).** Information about the child is collected during initial placement into an ORR facility and throughout his or her stay. The care provider then uses the information collected about and from the child in conjunction with the sponsor assessment process to determine whether to conduct a home study **(https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Home Study).** The TVPRA requires home studies under the following circumstances:

1. The child is a victim of a severe form of trafficking in persons;
2. The child is a special needs child with a disability as defined by section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102);
3. The child has been a victim of physical or sexual abuse under circumstances that indicate that the child's health or welfare has been significantly harmed or threatened; or
4. The child's sponsor clearly presents a risk of abuse, maltreatment, exploitation or trafficking, to the child based on all available objective evidence.

ORR also requires a home study before releasing any child to a non-relative sponsor who is seeking to sponsor multiple children, or who has previously sponsored or sought to sponsor a child and is seeking to sponsor additional children. ORR requires a home study for children who are 12 years and under before releasing to a non-relative sponsor.

In circumstances in which a home study is not required by the TVPRA or ORR policy, the Case Manager and Case Coordinator may recommend that a home study be conducted if they agree that the home study will provide additional information required to determine that the sponsor is able to care for the health, safety and well-being of the child. See Footnote 5.

The care provider must inform the potential sponsor whenever a home study is conducted, explaining the scope and purpose of the study and answering the potential sponsor's questions about the process. In addition, the home study report will be provided to the potential sponsor if the release request is denied. See also Section 2.7.7.

**Home Study Report and Final Recommendation**

A home study consists of interviews, a home visit, and a written report containing the home study case worker's findings. A home study assesses the potential sponsor's ability to meet the child's needs, educates and prepares the sponsor for the child's release, and builds on the sponsor assessment conducted by the care provider staff to verify or corroborate information gathered during that process. The home study is conducted as a collaborative psycho-educational process in which the home study case worker identifies areas where additional support, resources, or information are needed to ensure a successful sponsorship, and provides corresponding psycho-educational assistance. The final recommendation must present a comprehensive and detailed assessment of the sponsor's ability to care for the needs of the child and address any additional information that emerges during the course of the home study regarding the sponsor, the sponsor's household or the child.

The home study provider must contact the care provider within 24 hours of home study referral acceptance, and must also contact the sponsor to schedule the home visit within 48 hours of referral acceptance. The home study provider makes a recommendation to ORR about release with the sponsor. The ORR Federal Field Specialist takes the home study provider's recommendation into consideration when making a release decision. ORR has final authority on release decisions.

The home study provider submits the written report within 10 business days of receipt of the referral. Any requests by the home study provider to extend beyond 10 business days or to cancel a home study must be submitted in writing to the ORR Federal Field Specialist for consideration.

All releases following home studies require post-release services.

**Must a child receive a Trafficking Eligibility or Interim Assistance Letter from HHS prior to being referred for a TVPRA-mandated home study under #1 above?**

No, a child does not need to receive a Trafficking Eligibility Letter from HHS prior to being referred for a home study. A care provider may refer a child for a home study under #1 above if, during the assessment for trafficking, the care provider determines the child is a victim of a severe form of trafficking in persons.

**In determining whether a TVPRA-mandated home study is required under #3 above, care providers consider the following questions:**

**What is physical abuse?**

Physical abuse is an act that results in physical injury, such as red marks, cuts, welts, bruises, broken bones, missing or broken teeth or muscle strains. Acts of physical abuse include but are not limited to punching, beating, kicking, biting, hitting (with a hand, stick, strap or other object), burning, strangling, whipping, or the unnecessary use of physical restraint.

**Is physical abuse intentional?**

Generally, physical abuse is intentional; however, physical abuse can occur when physical punishment goes too far. In other words, an accidental injury of a child may be considered physical abuse if the act that injured the child was done intentionally as a form of punishment.

**Must a child have physical injuries to meet the standard for physical abuse under #3?**

No, in some cases, a child may not have physical injuries at the time the care provider makes an assessment. Children may be in various stages of the healing process or thoroughly healed from the physical abuse by the time they arrive in ORR care.

**For the purposes of #3, who can physically or sexually abuse a child?**

A parent, legal guardian, caregiver or other adult with a special relationship to the child can physically or sexually abuse a child.

**Who is considered to be a caregiver or adult with a special relationship?**

A caregiver is defined as any person who is entrusted with the child's care and who lives with the child. Other adults with a special relationship to the child could include a teacher, priest, or health care provider.

**What is sexual abuse?**

Sexual abuse of a child by a parent, legal guardian, caregiver or other adult with a special relationship to the child includes any of the following acts, with or without the consent of the child or youth:

- Contact between the penis and the vulva or the penis and the anus, including penetration, however slight;
- Contact between the mouth and the penis, vulva, or anus;
- Contact between the mouth and any body part where the adult has the intent to abuse, arouse, or gratify sexual desire;
- Penetration of the anal or genital opening, however slight, by a hand, finger, object, or other instrument where the adult has the intent to abuse, arouse, or gratify sexual desire;
- Any other intentional contact, either directly or through the clothing, of or with the genitalia, anus, groin, breast, inner thigh, or the buttocks where the intent is to abuse, arouse, or gratify sexual desire;
- Any attempt, threat, or request by the adult to engage in the activities described above;
- Any display by the adult of his or her uncovered genitalia, buttocks, or breast in the presence of the child; and
- Voyeurism.

State laws on statutory rape are not the standard in assessing whether a youth has been sexually abused for the purposes of #3. Care providers use the definition from the ORR rule concerning sexual abuse and harassment; however, for the purposes of determining when a home study is required, the perpetrator is limited to a parent, legal guardian, caregiver or other adult with a special relationship to the child.

**Under what circumstances is a child's health or welfare considered to have been significantly harmed or threatened?**

Care providers assess the totality of the circumstances in determining whether a child's health or welfare has been significantly harmed or threatened. In evaluating a specific case, care providers take into consideration not only the definitions of physical and sexual abuse listed

above, but also the circumstances surrounding the incident and any behaviors that the child or youth exhibits as a result of the abuse. Circumstances to consider include but are not limited to: the amount of time that has passed since the abuse, the period of time in which the abuse occurred, the cultural context in which the abuse occurred, the age of the child or youth at the time of the abuse, and the relationship between the youth and the perpetrator.

Care providers take into consideration the situations and behaviors listed below, but do not make a determination based solely on the presence or absence of one of them.

- The child experiences on-going medical issues from physical injuries.
- The child exhibits negative or harmful behaviors, thoughts or emotions, such as, but not limited to, excessive hostility or aggression towards others, fire setting, cutting, depression, eating disorders suicidal ideation or substance abuse.

In evaluating difficult cases, the care provider should consult with their ORR/FFS.

*Revised 1/9/17*

## 2.4.3 Additional Questions and Answers on This Topic

Q: What happens if a new sponsor is identified during the sponsor assessment process?
A: If there are multiple potential sponsors, the ORR-funded care provider will exhaust all efforts to facilitate a release to a parent or legal guardian while also contacting and evaluating other potential sponsors concurrently. ORR has release order preferences and will evaluate sponsors concurrently in accordance with the preference orders to determine the best placement for the child.

*Posted 1/27/15*

## 2.5 ORR Policies on Requesting Background Checks of Sponsors

In order to ensure the safety of an unaccompanied alien child and consistent with the statutory requirements under the TVPRA of 2008, ORR requires a background check of all potential sponsors and household members. The background check takes place as soon as the potential sponsor and adult household members have completed the Authorization for Release of Information form, submitted fingerprints (when applicable), and provided a copy of a valid government issued photo identification. ORR transmits the fingerprints to the Department of Homeland Security to perform criminal and immigration status checks on ORR's behalf.  DHS then submits the results to ORR.

ORR also conducts additional background checks without going through DHS.  Depending on the circumstances, these checks may involve background checks on criminal history (including through the FBI) and child abuse/neglect checks (CA/N)

Adult care givers identified in a sponsor care plan also require background checks, as provided in the chart at section 2.5.1.

*Revised 12/18/18*

### 2.5.1 Criteria for Background Checks

All potential sponsors and some adult household members undergo a background check for criminal history and immigration status using fingerprints. These checks are conducted by the Department of Homeland Security on behalf of ORR and DHS then submits the results to ORR.

In addition, ORR independently conducts background checks without going through DHS. This independent background check process varies, depending in part on the relationship of the potential sponsor to the unaccompanied alien child:

- Parents and legal guardians (Category 1)
- Other immediate adult relatives, such as brother, sister, aunt, uncle, grandparent or first cousin (Category 2)
- Distant relatives and unrelated adults (Category 3)

As a part of this independent background check process, all potential sponsors and adult household members must undergo a public records check and sex offender registry check.

The following indicates the **minimum** requirements for the process for sponsors. ORR may require additional checks, verifications, or procedures for sponsors in any category if there are any unresolved issues or questions related to the well-being of the child.

The following table lists the types of background checks performed, and explains when they are performed, based on the potential sponsor's relationship to the unaccompanied alien child and other release considerations. The chart identifies when DHS performs the check on ORR's behalf. (See also Section 2.7.4 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.4), listing findings barring release).

| Type of Background Check | Purpose | Persons Checked | When Performed |
|---|---|---|---|
| Public Records Check | Identifies arrests or convictions of sponsors, adult household members, or others. If a check reveals a criminal record or safety issue, it will be used to evaluate the sponsor's ability to provide for a child's physical and mental well-being. | Potential Sponsors in Categories 1-3. <br><br> Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In all cases |
| Sex Offender Registry Check, conducted through the U.S. Department of Justice National Sex Offender Public Website | Identifies sponsors and others that have been adjudicated as sex offenders through a national search and, if available, a local public registry search. | Potential Sponsors in Categories 1-3. <br><br> Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In all cases |
| Immigration Status Check conducted by the Department of Homeland Security using fingerprints | Provides information about immigration court actions and immigration statuses, including information about orders of removal. The information is also used to determine whether a sponsor care plan is required for release (see Section 2.7.6). | Potential Sponsors in Categories 1-3. <br><br> Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In all cases. <br><br> Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied alien child, the child is especially vulnerable, and/or the case is being referred for a home study. |
| National (FBI) Criminal History Check, based on digital fingerprints or digitized paper prints | Determines whether a sponsor or adult household member (as applicable) has a criminal history, has been convicted of a sex crime, or has been convicted of other crimes that compromise the sponsor's ability to care for a child. | Potential Sponsors in Categories 1-3. <br><br> Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In all cases. <br><br> Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied alien child, the child is especially vulnerable, and/or the case is being referred for a home study |
| DHS criminal history check, based on digital fingerprints or digitized paper prints. | Determines whether a sponsor or adult household member (as applicable) has a criminal history, including: biographic criminal check of the national databases, a biographical check for wants and warrants. | Potential Sponsor in Categories 1-3. <br><br> Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In all cases. <br><br> Where a public records check reveals possible disqualifying factors under 2.7.4; or where there is a documented risk to the safety of the unaccompanied alien child, the child is especially vulnerable, and/or the case is being referred for a home study. |
| Child Abuse and Neglect (CA/N) Check, obtained on a state by state basis as no national CA/N check repository exists | Checks all localities in which the sponsor or household member has resided in the past 5 years. | Potential Sponsors in Categories 1-2. <br><br> Potential Sponsors in Category 3. | In cases that require a home study, and cases where a special concern is identified. <br><br> In all cases. |

| | | Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | In any case where a sponsor is required to undergo a CA/N check. |
| State Criminal History Repository Check and/or Local Police Check | Assists in locating police or arrest records, or other criminal offense details, as needed. | Potential Sponsors in Categories 1-3.

Non-sponsor adult household members and adult care givers identified in a sponsor care plan. | Used on a case-by-case basis when there is an unresolved criminal arrest or issue that is still in process. |

*Revised 12/18/18*

## 2.5.2 Results of Background Checks on Release Decisions

As an entity providing for the health and well-being of children and youth, ORR uses the results from background checks to determine whether release to a potential sponsor is safe. A potential sponsor may be denied a release request, based on the results of a background check, and a release decision may remain undecided until ORR obtains the results of a potential sponsor's criminal history, immigration background checks, or child abuse and neglect reports.

The biometric and biographical information, including fingerprints, is shared with Federal, state or local law enforcement agencies and may be used consistent with their authorities, including with the DHS to determine immigration status and criminal history, and with the DOJ to investigate criminal history through the National Criminal Information Center.

### Criminal History

In the event that a background check of a potential sponsor or, if applicable, adult household member, reveals criminal history or a safety risk, the care provider and ORR evaluate this information and request the potential sponsor to provide any additional  information that may demonstrate the potential sponsor's ability to provide for the child's physical and mental well-being.

If release is not barred by Section 2.7.4 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.4), the decision to release a child or youth to a sponsor in these circumstances is based on all the following considerations:

- The severity of the criminal and/or child abuse/neglect history;
- The length of time that has passed since the criminal act or child abuse/neglect allegation occurred;
- The relationship of the potential sponsor and other adult household members to the child or youth; and
- The evidence, if any, of rehabilitation since the criminal act or child abuse/neglect allegation occurred.

In cases where the proposed sponsor or other adult household member has been charged with, but not convicted of, a crime, ORR may postpone a final release decision until the legal issue is resolved.

If the sponsor has an outstanding order of removal, or a pending order of removal that is related to an underlying criminal act, the decision to release a child or youth to a sponsor in these circumstances is based on the considerations described above.

### Sponsor Immigration Status

ORR does not disqualify potential sponsors on the basis of their immigration status. ORR uses status information to determine whether a sponsor care plan is necessary in the event the sponsor is required to leave the United States. (See Section 2.6 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.6) Effect of Sponsor Immigration Status on Release of Unaccompanied Alien Children)

### Summary Table of Results of Background Checks and Next Steps

The following table shows procedures following the results of background checks.

| Background Check Results | Next Steps |
| --- | --- |
| No arrest record; check completed | Proceed with release decision-making process. See Section 2.7 Recommendations and Decisions on Release. |
| Criminal arrest record and/or substantiated adverse child welfare findings; check completed | Determine whether release is barred. See Section 2.7.4 Deny Release Request. If release is not barred, elevate safety issues for third party review. For any findings that could affect safe release, care provider and/or ORR will obtain additional documents to determine current situation (e.g. sponsor is on probation, criminal charges are resolved, etc.). Final release decision shall take into account the criminal records and all other relevant information that is available. |
| Immigration status concern (e.g. out of status, no legal status, prior order of removal, or no immigration record for non-citizen) | |

Review FBI record and DHS report, and/or Department of Justice/Executive Office of Immigration Review's case status hotline for information related to possible unresolved immigration issues.

Pending results; check not complete

ORR/FFS will provide instructions to care provider

*Revised 6/7/18*

## 2.5.3 Additional Questions and Answers on This Topic

**Q1: Where can a sponsor get his or her fingerprints taken?**
A1: ORR funds a network of digital fingerprint providers at locations that are not affiliated with law enforcement entities. Sponsors may also go to any local police department for paper fingerprinting services in the event a digital fingerprint provider is not conveniently located near a sponsor's location. Fingerprinting services are not available at ORR headquarters and offices.

**Q2: Is there a deadline for complying with a fingerprinting request?**
A2: Yes. When required, fingerprints should be provided within 3 business days of the request. Release may be delayed if fingerprints are not provided promptly.

**Q3: Are potential sponsors required to disclose to the care provider that they have a record of a criminal charge or child abuse?**
A3: Yes. The sponsor must immediately advise the care provider of this situation and gather detailed documentation of the charges, dispositions, police reports, and evidence of rehabilitation.

**Q4: What happens if a public records or sex offender registry check returns disqualifying findings for a sponsor, adult household member, or adult caregiver identified in the sponsor care plan?**
A4: The Case Manager informs the sponsor, and provides the sponsor with a copy of the results. The sponsor and household member/adult care giver may dispute the results, and provide further evidence or information that a check was not performed correctly (e.g., the wrong date of birth was used, the individual's name was spelled incorrectly, etc.). The Case Manager will rerun the check using the corrected information. If further information is required, such as additional background checks, the Case Manager will work with the sponsor and household member/adult caregiver to obtain the information, or make other arrangements so that the safety risk to the unaccompanied alien child is mitigated (e.g., taking steps so that the household member no longer resides in the sponsor's home, identifying a new adult care giver, etc.).

**Q5: What happens if an adult household member refuses to cooperate with a background check?**
A5: ORR denies release when an adult household member refuses to have a background check.

*Revised 6/7/18*

## 2.6 Sponsor Immigration Status and Release of Unaccompanied Alien Children

ORR does not disqualify potential sponsors on the basis of their immigration status. ORR does seek immigration status information, but this is used to determine if a sponsor care plan will be needed if the sponsor needs to leave the United States; it is not used as a reason to deny a family reunification application.

The biometric and biographical information, including fingerprints, is shared with Federal, state or local law enforcement agencies and may be used consistent with their authorities, including with the DHS to determine immigration status and criminal history, and with the DOJ to investigate criminal history through the National Criminal Information Center.

*Revised 6/7/18*

### 2.6.1 Application Process

**How does ORR obtain information about immigration status?**
ORR asks potential sponsors and adult household members for their Alien Registration Number on the Authorization for Release of Information form. In addition, as described below, ORR requires sponsors to provide fingerprints for background checks, and those checks may produce information about the individual's immigration status. During the sponsor assessment process, case managers also ask sponsors about their immigration status.

*Revised 6/7/18*

### 2.6.2 Fingerprints

**Who must provide fingerprints as part of the release process?**
All individuals seeking to sponsor a UAC and adults in their household are subject to fingerprinting requirements.

**What does ORR use the fingerprints for?**
Using digital fingerprints or digitized paper prints, the HHS PSC, on behalf of ORR, conducts a check of the FBI national criminal history and state

repository records. ORR also transmit fingerprints to the Department of Homeland Security to search criminal and immigration databases on ORR's behalf and transmit the results to ORR.

*Revised 6/7/18*

### 2.6.3 Other Background Checks Related to Immigration

Reserved.

*Revised 6/7/18*

### 2.6.4 Results of Immigration-Related Checks

**What does ORR do with the results of the FBI fingerprint and DHS checks?**

The information may be used to determine if a sponsor care plan will be needed in the event that the sponsor needs to leave the United States. In addition, if the basis for an immigration action is underlying criminal activity, ORR and its grantee will review the underlying criminal activity to determine if it is reason to disqualify the potential sponsor, as ORR does when evaluating other criminal activity uncovered during the fingerprint process, but unrelated to immigration actions.

**Who else may have access to the results of the FBI fingerprint checks?**

ORR does not release the results of the FBI fingerprints to outside organizations or individuals, other than ORR grantees that are caring for the children. The FBI and DHS databases contain overlapping records, and the FBI system automatically initiates a notification to the DHS system if a particular record has been searched.

**What is in a sponsor care plan?**

A sponsor care plan identifies the individual that will assume care of an unaccompanied alien child if the sponsor becomes unable to care for the child, see Section 2.7.6.

*Revised 6/7/18*

## 2.7 Recommendations and Decisions on Release

ORR care providers must make a recommendation to release a child to a potential sponsor after the care provider has evaluated the sponsor, completed the background checks, and collected necessary documentation to prove the sponsor's identity and relationship to the child or youth. The recommendation must take into consideration all relevant information, including the report and recommendations from a home study, if conducted; laws governing the process; and other factors in the case. The ORR care provider makes a recommendation for release if the care provider concludes that the release is safe and the sponsor can care for the physical and mental well-being of the child.

- The care provider Case Manager (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Manager)and the Case Coordinator (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#Case Coordinators)must make a recommendation to the ORR/FFS (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist) on the release of the unaccompanied alien child to a particular sponsor. If the Case Manager and Case Coordinator cannot agree on a particular recommendation, or if the case is particularly complicated, they may refer the case directly to an ORR/FFS for guidance on how to proceed.
- After receiving the recommendation, the ORR/FFS (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Federal Field Specialist)or other ORR/Headquarters staff (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-guide-to-terms#ORR/Headquarters Staff)reviews the recommendation.
- The ORR/FFS makes a release decision in consideration of the recommendations from the care provider, the Case Coordinator, and other stakeholders, including the home study provider and the Child Advocate, where applicable.

Only ORR (or ACF) has the authority to make the final decision on a release. The Case Manager, Case Coordinator, and other stakeholders have an important role in making recommendations. In some cases, the ORR/FFS may send a case back to the Case Coordinator and Case Manager to obtain additional information before he/she makes a release decision.

The ORR/FFS makes one of the following release decisions:

- Approve release to sponsor
- Approve release with post-release services
- Conduct a home study before a final release decision
- Deny release
- Remand for further information

*Revised 06/29/18*

### 2.7.1 Approve Release Decisions

A recommendation for a release without a home study or post-release services is made after a thorough assessment of the sponsor, the sponsor's family unit, and the needs of the child or youth are taken into consideration. The ORR/FFS makes this release decision when he/she determines that the release is a safe release, the sponsor can care for the health and well-being of the child, and the sponsor understands that the child is to appear for all immigration proceedings.

*Posted 1/27/15*

### 2.7.2 Approve Release with Post-Release Services

The ORR/FFS may approve a release with post-release services when the release is determined to be safe and appropriate, but the unaccompanied alien child and sponsor need additional assistance to connect them to appropriate resources in the community or to address other concerns, such as mental health or other needs that could benefit from ongoing assistance from a social welfare agency. The sponsor must consent before services may be provided and may withdraw his or her consent at any time after services have begun, since post-release services are a voluntary service. These services are provided for 6 months after the unaccompanied alien child is released to the sponsor, unless ORR determines that services should be provided for a shorter or longer period of time. Post- release services do not continue under any circumstances beyond an unaccompanied alien child's 18th birthday.

*Posted 1/27/15*

### 2.7.3 Conduct a Home Study Before a Final Release Decision Can Be Made

The Case Manager and Case Coordinator will recommend to the ORR/FFS that a home study be conducted prior to making a release recommendation. If the ORR/FFS agrees, he/she will approve that a home study be conducted before a final release decision can be made. The home study provider uses a standardized template to complete the review; however, the provider may include any additional supporting documentation regarding the sponsor or the child or youth, as applicable.

Once the Case Manager and Case Coordinator receive the home study results, they will review the case in light of the home study and make a release recommendation to the ORR/FFS. (See Section 2.4.2 Home Study Requirements. (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.4.2))

*Posted 1/27/15*

### 2.7.4 Deny Release Request

ORR *will* deny release to a potential sponsor if any one of the following conditions exists:

- The potential sponsor is not willing or able to provide for the child's physical or mental well-being;
- The physical environment of the home presents risks to the child's safety and well-being; or
- Release of the unaccompanied alien child would present a risk to him or herself, the sponsor, household, or the community.

ORR may deny release to a Category 1 potential sponsor, and will deny release to a Category 2 or Category 3 potential sponsor, if any one of the following conditions exists:[8]

- The potential sponsor or a member of the potential sponsor's household:
    - Has been convicted of (including plea of no contest to) a felony involving child abuse or neglect, spousal abuse; a crime against a child or children (including child pornography); or a crime involving violence, including rape, sexual assault or homicide;
    - Has been convicted within the last five years of a felony involving physical assault, battery, or drug-related offenses;
    - Has been convicted of a misdemeanor for a sex crime, an offense involving a child victim, or a drug offense that compromises the sponsor's ability to ensure the safety and well-being of the child;
    - Has been convicted of alien smuggling or a crime related to trafficking in persons; or
    - Has other criminal history or pending criminal charges or child welfare adverse findings from which one could reasonably infer that the sponsor's ability to ensure the safety and well-being of the child is compromised;

or

- A potential sponsor or a member of the potential sponsor's household has one of the following substantiated adverse child welfare findings:[9]
    - Severe or chronic abuse or neglect;
    - Sexual Abuse or other sexual offenses;
    - Abuse or neglect of other children in the household;
    - Long-term mental illness or deficiency;
    - Long-term alcohol or drug induced incapacity; or
    - Involuntary termination of the parental rights to another child.

*Revised 3/15/16*

**2.7.5 Remand Release Request – Decision Pending**

The ORR/FFS may remand the release request, which means that the ORR/FFS is sending the recommendation back to the Case Manager for additional information or additional actions before a final release decision can be made. ORR records the date of the remand and the decision will be pending further review until the documentation is provided or actions are taken.

*Posted 1/27/15*

**2.7.6 Issues Related to Recommendations and Decisions**

**Safety Plan**

Case managers, in consultation with Case Coordinators, will prepare a safety plan, as needed, to address any outstanding needs the child may have after he/she is released and to ensure the child's safe and successful integration into the sponsor family unit and community. The goal of the safety plan is to ensure the child's safety. The safety plan also has guidance for sponsors on participating in post-release services and on other areas of care critical to the child's adjustment in the family and the community, such as maintaining mental health services for the unaccompanied alien child, accessing any needed special education, helping the child avoid drugs and alcohol, and using appropriate parenting techniques.

**Sponsor Care Plan**

A sponsor care plan identifies an adult care giver who will assume care of an unaccompanied alien child if the sponsor becomes unable to care for the child. ORR requires a sponsor care plan for sponsors who may leave the United States, including all sponsors who are not U.S. citizens or lawful permanent residents (green card holders). The goal is to ensure an unaccompanied alien child has a caregiver, despite any complications resulting from the sponsor's immigration situation.

The plan:

- Identifies an adult care giver, and their relationship to the UAC and sponsor, if any;
- Includes copies of the adult care giver's vetting information (background check results, identifying documentation, etc.);
- Includes the adult care giver's contact information;
- Discusses how the adult care giver is notified that a transfer of care is required, if required;
- Provides that the adult care giver will abide by the terms of the *Sponsor Care Agreement*;
- Includes the date the UAC's Case Manager discusses the plan with the child's sponsor and the adult care giver identified in the plan; and,
- Includes additional information and materials (e.g., a Safety Plan), as appropriate or when required by ORR.

A copy of the sponsor care plan is maintained in the UAC's case file, provided to the sponsor, and to the adult care giver identified in the plan.

*Revised 6/7/18*

**2.7.7 Notification of Denial**

If the ORR Director denies the reunification application of an unaccompanied alien child's parent or legal guardian, the ORR Director notifies the parent/legal guardian by sending a denial letter to the parent/legal guardian within 30 business days of receiving all the required information and documentation in a specific case. If the sole reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community, the ORR Director sends a copy of the denial letter to the child.

The denial letter includes:

- An explanation of the reason(s) for the denial;
- Instructions on how to obtain the child's case file;
- The supporting materials and information that formed the basis for ORR's decision; and
- An explanation of the process for requesting an appeal of the denial (see Section 2.7.8 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.8)). The explanation also informs the prospective sponsor that he or she may submit additional information to support an appeal request.

If ORR denies sponsorship to a potential sponsor who is not the parent or legal guardian of the child, the care provider notifies the potential sponsor, providing the reasons for the denial verbally. If the sole reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community, the Director notifies the child in writing of the reason for denial as described above.

*Revised 5/2/17*

**2.7.8 Appeal of Release Denial**

The parent/legal guardian may seek an appeal of the ORR Director's denial decision by submitting a written request to the Assistant Secretary for Children and Families within 30 business days of receipt of the final decision from the ORR Director. The appeal request must state the basis for seeking the appeal, and may include any additional information that the requester believes is relevant to consideration of the request. The request may seek an appeal without a hearing or may seek a hearing.

Without a Hearing: If the requester seeks an appeal without a hearing, the Assistant Secretary will consider only the denial letter and the information referenced therein, as well as the appeal request and any additional supporting materials or information submitted by the requester. The Assistant Secretary will notify the requester of a decision within 30 business days of receiving the request. If more information is needed to make a decision, or for good cause, the Assistant Secretary may stay the request until he or she has the information needed. In these cases, the Assistant Secretary will send a written explanation to the parent/legal guardian, communicating a reasonable process and timeframe for addressing the situation and making a determination.

With a Hearing: If the requester seeks a hearing, the Assistant Secretary will schedule a teleconference or video conference, per the requester's preference, at which time the requester (or the requester's representative) may explain the reasons why he or she believes the denial was erroneous. The Assistant Secretary will consider the testimony and evidence presented at the hearing, in addition to the original denial letter and information referenced therein, to make a determination. The Assistant Secretary will notify the requester of the decision in writing within 30 business days following the hearing.

The Assistant Secretary makes a determination based on the relevant law, regulations, and policies concerning release decisions (see Section 2.7.4 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.7.4) for the basis of a release denial). Any evidence submitted to the Assistant Secretary by ORR is shared with the requester in compliance with privacy protections. The Assistant Secretary conducts a de novo review and may affirm or overturn the ORR Director's decision, or send the case back to ORR for further action. Appeals are recorded, and the requester may request a copy of the recording. The Assistant Secretary's decision to affirm or overrule the ORR Director's decision to deny release to a parent/legal guardian is the final administrative decision of the agency on the application that had been under consideration. However, if there is new information or a change in circumstances regarding the reunification application of a parent/legal guardian, or regarding the unaccompanied alien child's circumstances, a new reunification application may be submitted that highlights the change(s) and explains why such changes should alter the initial decision. Similarly, if ORR discovers new information or becomes aware of a change in the circumstances of the parent/legal guardian and/or the unaccompanied alien child, ORR may assess the case anew.

**Denial for sole reason that the unaccompanied alien child is a danger to himself/herself or the community**

If the sole reason for denial of release is concern that the unaccompanied alien child is a danger to himself/herself or the community, the unaccompanied alien child may seek an appeal of the denial as described above, provided the parent/legal guardian is not seeking an appeal. If the child expresses a desire to seek an appeal, ORR appoints a child advocate to assist the unaccompanied alien child in seeking the appeal. The unaccompanied alien child may seek such appeal at any time after denial of release while the child is in ORR custody.

*Revised 5/2/17*

## 2.8 Release from Office of Refugee Resettlement (ORR) Custody

Release from the ORR custody is a three-step process:

- After care planning, which occurs during the entire safe and timely release process.
- Transfer of physical custody of the child, which occurs as soon as possible once an unaccompanied alien child is approved for release.
- Closing the case file, which occurs within 24 hours of the unaccompanied alien child's discharge.

*Posted 1/27/15*

### 2.8.1 After Care Planning

Throughout the release process, care providers work with the child and sponsor so that they can plan for the child's after care needs. This involves working with the sponsor and the unaccompanied alien child to:

- Prepare them for post-ORR custody
- Assess the sponsor's ability to access community resources
- Provide guidance regarding safety planning, sponsor care plans, and accessing services for the child

Once the sponsor assessment is complete and a sponsor has been approved, the sponsor enters into an agreement with the Federal government in which he or she agrees to comply with the following provisions (see *Sponsor Care Agreement* (https://www.acf.hhs.gov/programs/orr/resource/unaccompanied-childrens-services#Family Reunification Packet for Sponsors):

- Provide for the physical and mental well-being of the child, including but not limited to, food, shelter, clothing, education, medical care and other services as needed.
- For those who are not the child's parent or legal guardian, make best efforts to establish legal guardianship with the local court within a reasonable time.
- Attend a legal orientation program provided under the Department of Justice/Executive Office for Immigration Review's (EOIR) Legal Orientation Program for Custodians (Sponsors), if available where he or she resides.
- Depending on where the unaccompanied alien child's immigration case is pending, notify the local Immigration Court or the Board of Immigration Appeals within 5 days of any change of address or phone number of the child (Form EOIR-33). (If applicable, file a Change of Venue motion on the

child's behalf.10 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2#foot10) A "change of venue" is a legal term for moving an immigration hearing to a new location.)

- Notify the DHS/U.S. Citizenship and Immigration Services within 10 days of any change of address by filing an Alien's Change of Address Card (AR-11) or electronically at http://www.uscis.gov/ (http://www.uscis.gov/ar-11)ar-11 (http://www.uscis.gov/ar-11)Visit (https://www.acf.hhs.gov/disclaimers) disclaimer page (https://www.acf.hhs.gov/disclaimers.)
- Ensure the unaccompanied alien child's presence at all future proceedings before the DHS/Immigration and Customs Enforcement (ICE) and the DOJ/EOIR.
- Ensure the unaccompanied alien child reports to ICE for removal from the United States if an immigration judge issues a removal order or voluntary departure order.
- Notify local law enforcement or state or local Child Protective Services if the child has been or is at risk of being subjected to abuse, abandonment, neglect or maltreatment or if the sponsor learns that the child has been threatened, has been sexually or physically abused or assaulted, or has disappeared. (Notice should be given as soon as it is practicable or no later than 24 hours after the event or after becoming aware of the risk or threat.)
- Notify the National Center for Missing and Exploited Children at 1-800-843-5678 if the unaccompanied alien child disappears, has been kidnapped, or runs away. (Notice should be given as soon as it becomes practicable or no later than 24 hours after learning of the child's disappearance.)
- Notify ICE at 1-866-347-2423 if the unaccompanied alien child is contacted in any way by an individual(s) believed to represent an alien smuggling syndicate, organized crime, or a human trafficking organization. (Notice should be provided as soon as possible or no later than 24 hours after becoming aware of the information.)
- In case of an emergency, such as serious illness, destruction of home, etc., temporarily transfer physical custody of the child to another person who will comply with the terms of the *Sponsor Care Agreement*.
- In the event that a sponsor who is not the child's parent or legal guardian is no longer able and willing to care for the unaccompanied alien child and is unable to temporarily transfer physical custody, notify ORR using the ORR National Call Center, at 1-800-203-7001.

The agreement includes the notice that the release of the unaccompanied alien child to the sponsor's care does not grant the child any legal immigration status and that the child must present himself or herself for immigration court proceedings.

The care provider also provides the sponsor with a Sponsor Handbook that outlines the responsibilities in caring for the unaccompanied alien child's needs for education, health, obtaining legal guardianship, finding support to address traumatic stress, keeping children safe from child abuse and neglect and from trafficking and exploitation. The handbook reiterates the importance of continuing with immigration proceedings and includes links to EOIR's website and forms. The handbook discusses laws related to employment, such as the Federal law prohibiting minors under the age of 18 from working in hazardous occupations.

After care planning includes the care provider explaining the following to the unaccompanied alien child and the sponsor:

- The U.S. child abuse and neglect standards and child protective services that are explained on the Administration for Children and Families Child Welfare Information Gateway (https://www.childwelfare.gov/) website.
- Human trafficking indicators and resources
- Basic safety and how to use the 9-1-1 number in emergency situations.

The care provider notifies all stakeholders of the child's discharge date and change of address and venue, as applicable. Where applicable, ORR also provides Child Advocates with access to their clients' documents and forms, and helps child advocates to remain informed about their clients' after-care plans and legal proceedings. The care provider coordinates with the legal service provider or attorney of record to help complete the necessary legal forms. Stakeholders notified of the change of address and, if applicable, request for change of venue for the immigration case include the U.S. Immigration and Customs Enforcement (ICE) Office of Chief Counsel and the U.S. Executive Office for Immigration Review (EOIR) Immigration Court Administrator.

*Revised 6/7/18*

## 2.8.2 Transfer of Physical Custody

Once ORR approves an unaccompanied alien child for release, the care provider collaborates with the sponsor to ensure physical discharge happens as quickly as possible (within 3 calendar days after ORR approves the release). The care provider notifies DHS prior to the physical release to allow DHS an opportunity to comment on the imminent release as well as time to prepare any DHS paperwork for the ICE Chief Counsel's office.

The care provider ensures that all the child's belongings—including those he or she had at the time they entered ORR custody and any they acquired during their stay—are given to the child and sponsor at time of release. The care provider also makes sure that the child and sponsor have copies of files or papers needed for the child to obtain medical, educational, legal or other services following release.

Whenever possible, sponsors are expected to come to the care provider or to an offsite location designated by the care provider for the transfer of physical custody of the child.

Under extenuating circumstances (e.g., a sponsor cannot travel due to a medical condition), ORR may approve an unaccompanied alien child to be escorted to a sponsor. Similarly, if a sponsor pick-up would result in delay of a timely release of the child, ORR may approve an escort for an unaccompanied alien child.

If an unaccompanied alien child's final destination involves air travel and the sponsor will not be traveling with the child, the care provider must follow the procedures in the table below concerning care provider escorts and airline escorts.

Unaccompanied alien children who are under the age of 14 years old traveling via air may only be escorted by care provider staff, unless an ORR/FFS Supervisor has approved the use of an airline escort in advance.

The sponsor is responsible for the unaccompanied alien child's transportation costs and, if the care provider is escorting the child, for the care provider's transportation or airfare. If an airline escort is used, the sponsor is responsible for paying the airline's unaccompanied alien minor service fee.

Under no circumstances will ORR pay for the sponsor's airfare.

The following table summarizes procedures for each method of transfer.

| Method of Transfer | Pre-transfer Steps | At point of Transfer |
|---|---|---|
| Sponsor pick-up at care provider facility | • Case manager collaborates with the sponsor on selecting a date and time for the sponsor to pick-up the child<br>• Case manager notifies the sponsor that he/she is required to bring the same valid government issued photo identification previously submitted by the sponsor in the FRP (see Section 2.2.4) | • Care provider checks the sponsor's identification upon arrival by comparing it to the identification previously submitted by the sponsor in the FRP (see Section 2.2.4)<br>• If the sponsor's identification matches the identification previously submitted, care provider gives the sponsor the unaccompanied alien child's release documents and personal possessions<br>• Care provider advises the sponsor, if traveling by airplane, to check in the child at the ticket counter with a copy of the child's DHS form I-862, Notice to Appear<br>• Care provider may not release the child unless the sponsor presents the same valid government issued photo identification he or she submitted in the FRP. |
| Care provider escort to offsite transfer location | • Case manager collaborates with the sponsor in selecting a time and location for transfer, and flights for the child and care provider escort<br>• Case manager notifies the sponsor that he/she is required to bring the same valid government issued photo identification previously submitted by the sponsor in the FRP to the transfer location<br>• Case manager arranges for the sponsor to pay for the child and care provider escort's transportation costs, including airline tickets where applicable<br>• Case manager prepares a copy of the sponsor's identification that was submitted in the FRP, for the care provider escort to take to the transfer location | • If traveling by air, at the departure airport, care provider escort checks in the child at the ticket counter with a copy of the child's DHS form I-862, Notice to Appear<br>• At the transfer location, care provider escort compares the sponsor's identification with the copy previously submitted by the sponsor in the FRP. If the identification documents correspond, care provider escort releases the child to the sponsor and provides the sponsor with the release documents and the child's personal effects and papers<br>• Care provider escort may not release the child unless the sponsor presents the same valid government issued photo identification he or she submitted in the FRP. If the sponsor does not produce valid identification, if the care provider escort has concerns regarding the sponsor's identity, or if the care provider escort has concerns regarding the safety of the situation upon meeting the sponsor, the care provider escort will return with the child to the care provider facility |
| Travel via airline's unaccompanied alien minor escort policy (only for youth 14 years of age and older) | • Case manager contacts the airline to obtain information on airline escort requirements, in order to ensure that they are adequate to protect the safety of the child, and to ensure that both the sponsor and the care provider can meet the requirements<br>• Case manager arranges for the sponsor to pay for the child's airplane ticket and for the airline unaccompanied alien minor escort fee<br>• Case manager ensures that the government issued photo identification submitted by the sponsor in the FRP will be acceptable to the airline to complete custody transfer<br>• The care provider instructs the sponsor to meet the unaccompanied alien child and escort at the airport with the identification they submitted in the FRP, and to follow the | • At the departure airport, care provider checks in the unaccompanied alien child at the ticket counter with a copy of the DHS form I-862, Notice to Appear, and a copy of the approved identification of the sponsor picking up the child<br>• At the departure airport, care provider gives the child their personal possessions and documents and a copy of the sponsor's approved identification, and mails an additional copy of the release documents to the sponsor<br>• At the destination airport, the sponsor arrives two hours before the child's arrival time, and contacts the care provider immediately to check in.<br>• The airline follows its standard procedures for escorting a child traveling alone to the designated parent or guardian<br>• The care provider contacts the sponsor shortly after the child's scheduled arrival time to confirm the child's transfer from the airline representative to the sponsor<br>• If the sponsor fails to arrive at the airport or fails to contact the care provider upon arrival at the airport, the care provider will notify the ORR/FFS and the Project Officer, and the child will either be returned to the care provider or taken to another nearby care provider facility. |

requirements of the airline's unaccompanied
alien minors escort policy

When arranging for children to travel with airline escorts, care providers should also refer to the U.S. Department of Transportation recommendations for unaccompanied alien minors traveling by air ("When Kids Fly Alone").

*Revised 3/14/16*

## 2.8.3 Closing the Case File

The care provider completes a Discharge Notification form within 24 hours of the physical discharge of a youth, and then emails the form to DHS and other stakeholders. Once a child is released to a sponsor, ORR's custodial relationship with the child terminates.

Although the custodial relationship ends, the care provider keeps the case file open for 30 days after the release date in order to conduct the Safety and Well Being Follow Up Call (see Section 2.8.4) and document the results of the call in the case file. The care provider closes the case file record after completing the Safety and Well Being Follow Up Call.

*Revised 3/14/16*

## Section 2.8.4 Safety and Well Being Follow Up Call

Care providers must conduct a Safety and Well Being Follow Up Call with an unaccompanied alien child and his or her sponsor 30 days after the release date. The purpose of the follow up call is to determine whether the child is still residing with the sponsor, is enrolled in or attending school, is aware of upcoming court dates, and is safe. The care provider must document the outcome of the follow up call in the child's case file, including if the care provider is unable to contact the sponsor or child after reasonable efforts have been exhausted. If the follow up call indicates that the sponsor and/or child would benefit from additional support or services, the care provider must refer the sponsor or child to the ORR National Call Center and provide the sponsor or child the Call Center contact information. If the care provider believes that the child is unsafe, the care provider must comply with mandatory reporting laws, State licensing requirements, and Federal laws and regulations for reporting to local child protective agencies and/or law enforcement.

*Revised 3/14/16*

## 2.8.5 Post-Release Services for UAC with Zika Virus Disease or Infection

**Testing**

ORR follows CDC guidance and recommendations for Zika virus laboratory testing. CDC recommends testing for all pregnant UAC without symptoms, but who are from or traveled through areas with ongoing Zika virus transmission and are within 2–12 weeks of arrival in the United States. Other UAC who develop two or more symptoms consistent with Zika may be tested for Zika virus upon consultation with a healthcare provider.

**Post-Release Referrals**

Pregnant UAC who are diagnosed with Zika virus disease, have laboratory results compatible with Zika virus infection, or have laboratory results that cannot rule out Zika virus infection will be referred for post-release services. Similarly, UAC who delivered while in ORR care will be referred for post-release services if they were diagnosed with Zika virus disease, had laboratory results compatible with Zika virus infection, or had laboratory results that cannot rule out Zika virus infection while pregnant.

In some cases, asymptomatic pregnant UAC are released pending lab results. In those cases, ORR will communicate their test results to them and their new healthcare provider. If their results are compatible with Zika virus infection or if Zika virus infection cannot be ruled out, ORR will refer them for post-release services.

**Post-Release Services**

Post-release services for eligible UAC described above include the full range of post-release services with a focus on connecting the UAC to prenatal care and maternal-child resources.

For more information about the Zika virus, please go to the CDC website at: www.cdc.gov/zika/index.html (http://www.cdc.gov/zika/index.html)

*Posted 5/2/16*

## 2.8.6 Release for Children with Legal Immigration Status

Some unaccompanied alien children may obtain legal immigration status while in ORR care.  ORR may also discover during the process of placing and providing services to a child that he or she already has legal immigration status or is a U.S. citizen. By law, ORR is not authorized to have custody of children with legal immigration status or U.S. citizenship. Therefore, these children cannot remain in ORR's care, and ORR must release them from ORR-funded care provider facilities.

As soon as ORR determines that an unaccompanied alien child may be eligible for legal status, ORR begins development of a Post Legal Status Plan. The case manager develops the plan, and ORR approves it, tailoring it to the needs and pending immigration status of the child.

As is the case for all UAC, ORR continually makes efforts to reunify children who have promising immigration cases with family members. However, if no parent, legal guardian, relative, or other suitable adult is available, ORR and the care provider, as part of the development of the Post Legal Status Plan, identify alternative placements for the child, including specialized programs, state or county entities or licensed nonprofit organizations that will take custody of the child. In limited circumstances, children with certain types of immigration status may be eligible for release into ORR's Unaccompanied Refugee Minors (URM) Program. Placement in the URM Program is limited by type of immigration status and the availability of appropriate placement options. ORR will not release children on their own recognizance under any circumstances.

*Posted 5/8/17*

## 2.9 Bond Hearings for Unaccompanied Alien Children

Consistent with the Ninth Circuit Court of Appeals decision in Flores v. Sessions, unaccompanied alien children have the opportunity to seek a bond hearing with an immigration judge.

In a bond hearing, an immigration judge decides whether the child poses a danger to the community.[11] For the majority of children in ORR custody, ORR has determined they are not a danger and therefore has placed them in shelters, group homes, and in some cases, staff secure facilities. For these children, a bond hearing is not beneficial.

The burden is on the requestor to demonstrate that the child can be released because he or she is not a danger to the community. An immigration judge's decision that the unaccompanied alien child is not a danger to the community supersedes an ORR determination on that question, unless the immigration judge's decision is overturned by the Board of Immigration Appeals (BIA). However, even if an immigration judge decides the child is eligible for bond (meaning the child does not pose a danger to the community and need not remain in an ORR facility for that reason), in all cases release from ORR custody cannot occur until ORR has identified, evaluated and approved an appropriate sponsor in accordance with Section 2 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2) of this policy guide. An immigration judge does not rule on any of the following:

* release to a sponsor;
* the unaccompanied alien child's placement or conditions of placement while in ORR custody; or,
* releasing the child on his or her own recognizance.

ORR also takes into consideration the immigration judge's decision in the bond hearing about the youth's level of danger when assessing the youth's placement and conditions of placement.[12]

Although these hearings are known as "bond hearings," ORR does not require payment of any money in the event a court grants bond.

### Requesting a Bond Hearing

A request for a bond hearing may be made by the child in ORR care, by a legal representative of the child, or by parents/legal guardians on their children's behalf. These parties may submit a written request for a bond hearing to the care provider using the ORR form, *Notice of Right to Request a Bond Hearing*, or through a separate written request that provides the information requested in the form. ORR provides the *Notice of Right to Request a Bond Hearing* to UAC in secure and staff secure facilities.

A request for a bond hearing must minimally include:

* The full name and alien registration number ("A number") of the child;
* If a parent or legal guardian, or an appointed legal representative, is making the request, the parent/legal guardian's or legal representative's name;
* The location of the care provider facility;
* The date of the request; and
* The signature(s) of the requesting child, the parent/legal guardian, and/or legal representative.

There is no filing fee to submit a request for a bond hearing to the care provider.

A child (or his or her legal representative) may also request a bond hearing by making an oral request in immigration court.

### Bond Hearings Proceedings

Bond hearings are usually held at the immigration court where the request for a bond hearing is filed.

If the immigration judge finds an unaccompanied alien child eligible for bond, and ORR does not appeal, then ORR follows its sponsor assessment and release procedures as described in Section 2 (https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section-2) of this policy guide.

### Appeals

Either party may appeal the immigration judge's decision to the BIA. Because ORR cannot release a child until it identifies a suitable sponsor, an immigration judge's finding that the unaccompanied alien child is not a danger to the community does not necessarily result in a release of the child while an appeal is pending.

**Age Outs**

If an unaccompanied alien child becomes 18 years old during the pendency of a bond hearing or bond hearing appeal, ORR forwards the request for a bond hearing and any relevant information to the local DHS/ICE Office of Chief Counsel's office.

**Further Requests for Bond Hearing**

If an immigration judge (or BIA, when appealed) determines that an unaccompanied alien child is ineligible for bond, such decision is final unless the child can demonstrate a material change in circumstance to support a second request for a bond hearing.

*Revised 7/19/17*

**Footnotes**

1. As per the release order preference outlined in Flores v. Reno Stipulated Settlement Agreement, No. 85-4544-RJK (Px) (C.D. Cal., Jan 17, 1997).

2. These categories were created for program use, to help identify potential sponsors. They are not intended to replace the legal order of preference established in Flores.

3. The care provider may offer assistance to potential sponsors in securing necessary documentation, but it is ultimately the potential sponsor's responsibility to find and submit them.

4. Verification of the potential sponsor's relationship to the child is a minimum step required by the TVPRA to determine a potential sponsor's suitability and capability of providing for the child's physical and mental well-being. See 8 U.S.C. § 1232. As a result, as stated above, ORR may in its discretion require the submission of multiple forms of evidence.

5. ORR/FFS Supervisors are the final authority for approving discretionary home studies (See Section 2.4.2)

6. Child advocates must keep the information in the case file, and information about the child's case, confidential from non-ORR grantees, contractors, and Federal staff.

7. An *Authorization for Release of Information* is not required for sponsors, adult household members, or adult care givers identified in a sex offender registry check. An *Authorization for Request of Information* also is not required for sponsors, adult household members and adult caregivers identified in a sponsor care plan undergoing a public records check. However, sponsors will receive notice that public records and sex offender registry checks will be performed, and will have an opportunity to explain the results of these checks to ORR. ORR will also provide a method for disputing the results of checks.(See Section 2.5.3 (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-2#2.5.3), Q4).

8. ORR will also reject any sponsor care plans that identify an adult care giver who has any of the disqualifying criteria.

9. See U.S. Dept. of Health and Human Services, Children's Bureau. *Grounds for involuntary termination of parental rights,* at 2. Washington, DC: Child Welfare Information Gateway, Jan. 2013.

10. The Change of Venue motion must contain information specified by the Immigration Court. A Change of Venue motion may require the assistance of an attorney. For guidance on the "motion to change venue," see the Immigration Court Practice Manual at www.justice.gov/eoir/vll/OCIJPracManual/ocij_page1.htm (http://www.justice.gov/eoir/vll/OCIJPracManual/ocij_page1.htm). For immigration case information please contact EOIR's immigration case information system at 1-800-898-7180. Visit EOIR's website for additional information at: www.justice.gov/eoir/formslist.htm (http://www.justice.gov/eoir/formslist.htm).

11. Immigration judges also consider risk of flight. However, ORR does not make a determination of flight risk for the purpose of deciding whether a child is released. If an immigration judge offers an opinion about a youth's risk of flight, ORR takes the judge's opinion into consideration when assessing the child's placement and conditions of placement, but the decision does not affect release.

12. Please see footnote above concerning risk of flight.

<Back (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-1) - Next (https://www.acf.hhs.gov/programs/orr/resource/children-entering-the-united-states-unaccompanied-section-3)>

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| B.X., a minor, | § | |
| | § | |
| Petitioner/Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| JONATHAN HAYES, in his official ca- | § | CIVIL ACTION NO. 1:19-cv-00017 |
| pacity as Interim Director of the Office of | § | |
| Refugee Resettlement, and SERVANDO | § | |
| BARRERA, in his official capacity as | § | |
| Federal Field Specialist, Office of Refu- | § | |
| gee Resettlement, | § | |
| | § | |
| Respondent/Defendant. | § | |

**DECLARATION OF AMY COHEN M.D.**

1.   I, Amy Cohen M.D., make the following declaration based on my personal knowledge and

declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true

and correct.

2.   My name is Dr. Amy J. Cohen.  I am licensed to practice medicine in the state of California.

I am a Child Psychiatrist with over 30 years of experience working with traumatized pop-

ulations of children and adults, most recently with the asylum-seeking population who have

been affected by separation policies. I have published articles on the impact of trauma on

children separated from parents.  I have also reviewed the scholarly and research literature

1

on the impact of both separation and detention/institutionalization on the mental and physical health of asylum-seeking children.

3.    I received my medical degree from the Perelman University of Pennsylvania School of Medicine where I graduated with honors, receiving the Apfel Award for excellence in Psychiatry. I served as assistant to Dr. Albert Solnit, then Director of the Yale Child Study Center and author (with Anna Freud and Donald Goldstein) of "Beyond the Best Interests of the Child". I received my internship, residency and child fellowship training at Harvard Medical School programs and completed my training in 1989.

4.    I have been asked to consult on the case of B.X. by his attorney, Mr. Ricardo de Anda. In that capacity, I conducted a two-hour interview with B.X. on February 14, 2019 at the BCFS Shelter in Raymondville, Texas where he is currently confined. I subsequently conducted additional two-hour interviews with his father, David, by telephone (with use of an interpreter) and with Holly Sewell, who - with her husband - has been requested and authorized by B.X.'s family to serve as sponsor to B.X while his father is appealing his deportation.

5.    I am submitting this declaration in support of Mr. de Anda's request that B.X. be released to Holly and Matthew Sewell in an expedited manner. It is my opinion that any delay in releasing B.X. will more likely than not result in protracted if not irreparable harm to B.X's mental and physical health.

6.    As per B.X.'s father (David), he and B.X. fled Guatemala in May of 2018, following death threats by cartel members in which they declared their intention to kill both David and B.X. A near-fatal attack on David because of his evangelical preaching in November of 2017 and, following a 10-day hospitalization for knife wounds, David returned home only to be told that his family would now be targeted as well, B.X., then 8 years old, was singled out.

2

7.      B.X. recalls his father's injuries and his extreme fear during his father's recovery.  Terrified for the safety of their son, David and his wife worked to raise the money for an escape to asylum in the United States. B.X was deeply distressed by the departure from his mother, his siblings and his home but was told that David needed to seek work elsewhere and that the family would quickly follow.

8.      David reports that the journey through Mexico was terrifying for both him and B.X.  Father and son were given little food and water and were transported in a sweltering trailer-truck crammed with many others fleeing violence in Honduras. David often gave his meagre rations to his son and would stand for hours so that his small child might have the room to lie down and sleep in the crowded vehicle. After days of this, father and son were locked into a house uncertain of why or when they would get out. Finally, they were transported to the Rio Grande where, in the middle of the night, they were packed onto a small raft and sent across to Texas.

9.      Once in the United States, B.X. and his father were picked up by CBP officials and taken to the McAllen, Texas detention facility where they were initially placed together in a fenced-in and freezing enclosure where lights remained through day and night. They were compelled to sleep on the cold floor insufficiently warmed only by thin mylar blankets.

10.     Four days after their arrival, David reports that they were taken into a small office-type room where he was shackled hands and feet in front of his son and told that B.X. would be taken from him. He states that his child began to scream and cry and clung to his father. David reports that B.X. was abruptly and roughly pulled away and "dragged across the room like he was a dog".

11.     B.X. has now spent more than 1/10 of his young life in government institutions. Since being taken from his father and placed in ORR custody, B.X. has been placed in 4 different shelters. He was moved in November of 2018, again in December of 2018 and finally in January of 2019 to the Raymondville facility where he currently resides. In none of these institutions have staff spoken his native, indigenous language. In one of the shelters, the other children spoke only English.

12.     These moves have meant that B.X. has had to adapt to new staff, new rules and new children and has not been able to maintain any of the relationships which he may have built, and which may have helped him to counterbalance the terrible losses and isolation he suffers. His father reports that he is limited to 1 brief ten-minute call per week with his family. This may be less frequent, as David states that a call which fails to go through is not re-attempted and B.X. must wait another week before the facility attempts to contact his family again. As a consequence, B.X. may go for 2 weeks or longer with no family contact at all. During our interview he was most anxious to see if he could possibly have a video call with his father

13.     His father reports that B.X. expresses distress and frustration over his protracted confinement and has been chronically upset about and fixated on when he will get out. He expresses feelings of betrayal that so many weeks and months pass without his release. At times, he ex- presses hopelessness that it will ever happen at all.

14.     B.X. has "met" by video conference the Sewell family who his parents would like to sponsor him while they await the results of David's deportation appeal. He has been taken on a virtual tour of their home, met their children and been invited to ask questions. B.X. is aware that he would temporarily live with the Sewells and describes his eagerness to do so.

15.   Many scholarly articles and research address the fact that institutionalized asylum-seeking children often suffer what is likely irreversible and certainly protracted psychological as well as medical/developmental damage as a consequence of their institutional confinement and that children who are instead released into the community fare far better. A number of factors place children at especially high risk, including:

- Pre-confinement trauma

- Young age and developmental stage

- Long duration of confinement

Indeed, the longer the confinement, the greater the likelihood that the child will suffer more severe medical consequences of a longer duration.

16.   B.X.'s age, the trauma he has suffered - particularly in the fact and nature of his separation from his father - and especially the duration of his confinement place him at extremely high risk of irreversible damage due to toxic stress. Children experience time differently than do adults. For B.X., these months are experienced as years and every day of delay in his release feels more a week.

17.   Given all of these factors, there is no doubt that further delay of B.X.'s release is increasingly likely to result in long-term and possibly irreversible, physiological and developmental impairment due to, among factors, toxic stress.

18.   I have reviewed background reports from the FBI and the Texas Department of Public Safety, on Holly and Matthew Sewell and have interviewed Holly Sewell at length. I have found her to be a deeply caring and intelligent woman who, with her husband, has made this commitment

to caring for B.X. thoughtfully and with healthy motives. Holly and Matthew's dedication to caring for B.X. has been exemplified through the lengths to which they have been willing to go in order to be vetted and approved, including contacting 5 different ORR-contracted fostering facili- ties to which they were willing to apply.  Ms. Sewell expresses an acute awareness of B.X's unique needs and appears willing to do all that might be required to meet those needs. For example, as I described potential issues with a child who has undergone the sort of trauma that B.X. has endured she asked me detailed and appropriate questions including whether I might refer them to a suitable therapist and whether this was a service which they should set up right away. They have expressed the wish to sustain an ongoing and close relationship with B.X's parents so that they might mini- mize the impact of the family separation and offer him as much continuity with the parenting style of his parents as possible. They have demonstrated the sincerity of this wish by sustaining contact with David through these many months of seeking to sponsor B.X.

19. I believe that any alternative to placement with the Sewells - including placement in another foster home - would not only fail to serve B.X.'s best interests but would likely result in an additional traumatic burden for him. The Sewell's are now a family who B.X. has not only met at length but has identified as surrogates for his parents. To some degree, B.X. has been sustained and soothed over these long months by the image of the Sewells and their home as the place where he will stay while awaiting his father's return. As people who his parents now know and to whom they have conveyed all that is needed to care for him, for B.X., the Sewell's are now true surrogates for his family and his placement with them would serve as the very best mitigator against further pain and injury from the separation from his family. Based on all of these factors I can unequivocally state that Matthew and Holly Sewell are extraordinarily well suited to provide for the emotional and other needs of B.X. to an extent

rarely found in foster families.

20.    As of March 14, 2019, I have been informed that ORR plans to transfer B.X to a foster care center in San Antonio. It is my professional opinion that this is a very dangerous plan which is likely to only compound B.X.'s trauma and pain, negatively impacting his psychiatric, develop- mental and physiologic prognosis. This would be his fifth transfer by ORR to placement with another set of strangers and would, I believe, represent a serious blow to B.X.'s already fragile mental health. Placement in a foster home program would be experienced by this small child as yet another damaging, frightening and discouraging trauma. Further, such a placement would run contrary to the very rule which ORR has put forth as a reason for rejecting the Sewells; Refusal to place children with adults which whom he and his family have no pre-existing relationship.  For 10 months, B.X. has endured these paradoxical placements, being moved again and again, always in the charge of complete strangers. Another foster family would represent yet another set of strangers. As B.X.'s anticipation of placement in the happy home of the Sewells has sustained him through these last months of misery and isolation, moving him yet again to yet another set of strangers would only deepen B.X.'s despair and mistrust of adults, compounding his traumatic experience and rendering any recovery from his past trauma infinitely more difficult and likely to increase his risk of permanent psychological and physiological impairment. Further, it is unlikely that any foster family in which B.X. was placed would be able to match the unique qualities which make the Sewell household such an ideal one for this young, traumatized child who has already suffered nearly a year of separation from his family, institutionalization and placement with strangers.

21.   It is for these reasons that I strongly urge the expedited release of B.X. to the care of the Sewells. Further, I believe - as stated above - that any delay in B.X.'s release or alternative placement is very likely to add to his suffering and increase the long-term risk to his physical and psychological health. I believe that the urgency of the risks to his well-being mandate resolution to his confinement as soon as possible.

22.   I declare under the penalty of perjury that the foregoing is true and correct based on my own personal knowledge.

EXECUTED ON THIS____14th____, day of __March__ 2019

_____
Amy Cohen, M.D.