United States District Court
Southern District of Texas
**ENTERED**
April 10, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| B.X., a minor, | § | |
| | § | |
| Petitioner/Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 1:19-CV-17 |
| | § | |
| JONATHAN HAYES, *et al.*, | § | |
| | § | |
| Respondents/Defendants. | § | |

## ORDER GRANTING PRELIMINARY INJUNCTION

This matter concerns the placement of an eight-year old Guatemalan boy, B.X., who is currently in the custody and care of the Office of Refugee Resettlement, a component of the United States Department of Health and Human Services. He has been in ORR's custody and care for the past ten months. His parents remain in Guatemala, but they have identified Matthew and Holly Sewell, a family in Texas, who they claim are willing and able to care for him during the pendency of his immigration proceedings. ORR declined to place B.X. with the Sewells because they did not meet a requirement for potential sponsors – specifically, they had no bona fide social relationship with B.X. or his family before B.X. arrived in the United States. B.X. challenges this requirement on a number of legal theories, and requests that the Court order ORR to place him with the Sewells.

### I.  Procedural History

In February 2019, B.X. filed his First Amended Petition for Writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief; Exhibits 1-10 (Doc. 4). He brought action against (1) Jonathan Hayes in his official capacity as Interim Director of ORR, and (2) Servando Barrera in his official capacity as a Field Specialist for ORR.[1] In his initial filing, B.X. did not seek emergency relief.

---

[1] A suit against government employees in their official capacities is "to be treated as a suit against the entity" that employs the employees. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

1

In mid-March, ORR decided to place B.X. with a family in San Antonio, under its transitional foster care program. On March 15, before ORR could effectuate this placement, B.X. filed an Emergency Motion for Temporary Restraining Order and Preliminary Injunction and Issuance of a Writ of Habeas Corpus (Doc. 11), requesting that the Court enjoin ORR from placing him with the foster family, and instead place him with the Sewells. The same day as the filing, the Court held a telephonic hearing, after which the Court granted a Temporary Restraining Order (Doc. 13) requiring ORR to maintain B.X. in his current placement in Raymondville, Texas.

The Court established an expedited briefing schedule and held a hearing on March 25 as to the Motion for Preliminary Injunction.

On March 28, the Court extended the Temporary Restraining Order to April 5. (Doc. 21) The day before the expiration of the Order, at the parties' joint request, the Court extended the Temporary Restraining Order to April 12, 2019. (Doc. 23)

The Court in this Order considers B.X.'s request for a preliminary injunction. Based on the record before the Court and the applicable law, the Court find the Motion well taken, but modifies the relief that he requests.

## II. Factual Findings[2]

### A. Relevant History regarding the Care and Custody of Unaccompanied Alien Children

Each year, thousands of children arrive in the United States with no lawful immigration status. A child who has no parent or legal guardian in the United States is deemed an unaccompanied alien child ("UAC" (singular); "UACs" (plural)). *See* 6 U.S.C. § 279(g). The United States Government has responsibility for the custody, care, and placement of UACs, and for many years, the Immigration and Naturalization Services shouldered this responsibility. In

---

[2] The Court bases the following findings on the information contained in declarations and affidavits submitted by David Xol Cholom (Doc. 4-2), Florinda Bol Xicol (Doc. 4-8), Holly Sewell (Doc. 4-9), Dr. Amy Cohen (Doc. 11-1), Servando Barrera (Doc. 14-1), and Jallyn Sualong (Doc. 14-2), as well as the testimony provided at the Preliminary Injunction Hearing by Dr. Cohen, Mrs. Sewell, and Mr. Barrera, and documents submitted at the hearing or with the parties' briefs. The Court accepts the declarations and affidavits as evidence based on the weighing of all the attendant factors, including the need for expedition, and the character and objectives of the injunctive proceeding.

2002, a new law transferred the duty to the Department of Health and Human Services. The following section provides a brief summary of the relevant developments related to these agencies' care, custody, and placement of UACs.

### 1. The *Flores* Settlement

In 1997, a federal court approved a settlement agreement between a certified class of UACs and the United States. (*Flores* Settlement, Doc. 11-1, Ex. 6)  The *Flores* Settlement, which the parties agree remains in effect, requires the government agency to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others." (*Id.* at ¶ 11)  If the agency determines that it need not detain a minor to secure the child's timely appearance before the relevant tribunal or to ensure the safety of the minor and others, the agency "shall release [the] minor from its custody without unnecessary delay." (*Id.* at ¶ 14)  The *Flores* Settlement establishes a priority for placement, requiring that the government place the child with an individual in the following order of preference:

A.  a parent;

B.  a legal guardian;

C.  an adult relative (brother, sister, aunt, uncle, or grandparents);

D.  an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of INS, in its discretion, the affiant's paternity or guardianship;

E.  a licensed program willing to accept legal custody; or

F.  an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

(*Id.* at ¶ 14)  The agency may require a "positive suitability assessment" before releasing a child to any individual or program under Paragraph 14. (*Id.* at ¶ 17)

Under the *Flores* Settlement, "[a]ny minor who disagrees with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards set forth [in the *Flores* Settlement], may seek judicial review in any United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards . . . ." (*Id.* at ¶ 24B)  All other challenges under the *Flores* Settlement must be brought in the court that approved the agreement – i.e., the United States District Court for the Central District of California. (*Id.* at ¶ 37)

### 2.  Homeland Security Act

In 2002, the Homeland Security Act ("HSA") became law.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002).  The HSA abolished the INS and transferred most of its functions to agencies within the newly-created Department of Homeland Security.  One exception, however, concerned the care and custody of UACs.  This responsibility passed to the Department of Health and Human Services ("DHHS").  *See id.*

Under the HSA, the DHHS placed the responsibility for the care and custody of UACs with the Office of Refugee Resettlement.  *See* 6 U.S.C. § 279.

### 3.  The TVPRA

In 2008, Congress and the President enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110–457, 122 Stat. 5044 (2008). This statute confirmed that the DHHS held the responsibility for the care and custody of all UACs. The TVPRA requires DHHS to "promptly" place an UAC "in the least restrictive setting that is in the best interest of the child." *See* 8 U.S.C. § 1232(c)(2)(A).  But the TVPRA also prohibits the DHHS from placing a child with a third party unless the DHHS first makes "a determination that the proposed custodian is capable of providing for the [child's] physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A).  The DHHS may conduct a home study for this determination.  *Id.*

The TVPRA extended the scope of Title 18, United States Code, § 1595, which permits civil actions against human traffickers.  Victims can now bring civil actions not only against perpetrators, but against "whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter . . ."  TVPRA, Pub. L. No. 110–457, § 221, 122 Stat. 5044 (2008) (amending 18 U.S.C. § 1595(a)).

ORR continued to carry out DHHS's statutory obligations as to UACs.

### 4.  ORR's Care, Custody, and Placement of UACs

As soon as ORR receives an UAC into its custody and care, the agency initiates the process to find family members or others who may be qualified to care for the child.  ORR designates these potential caregivers as "sponsors".  The process to identify and properly vet a potential sponsor can take many weeks and, at times, months.  Once ORR places an UAC with a sponsor, ORR no longer maintains legal custody over the minor.

While ORR searches for a suitable sponsor, it places an UAC into one of three types of state licensed, ORR-funded, caretaker facilities.  Secure facilities represent the most restrictive environment.  Staff-secure facilities permit children some movement, but remain substantially controlled.  Shelter care facilities are the least restrictive custodial setting.[3]

If ORR determines that an UAC will remain in ORR's custody for an extended period, and no suitable sponsor has been identified, ORR can move the child into transitional or long-term foster care placement.  In doing so, ORR places the UAC with a family that state authorities already have vetted and licensed, ensuring that the family can care for and presents no risk of harm with respect to the child.

In January 2015, ORR established the "ORR Guide: Children Entering the United States Unaccompanied", which is available online and which provides "a summary of ORR policies for

---

[3] The facility in which ORR currently maintains B.X. is a shelter care facility.

the placement, release and care of UAC in ORR custody." (ORR GUIDE, DOC. 4-10)[4]  The agency considers the ORR Guide a "living document that may be updated as new policies are updated or incorporated into the program." (Resp., Doc. 14, 17)  The ORR Guide reflects the modification dates to numerous specific provisions, demonstrating that ORR regularly updates the document.

Section 2 governs the placement of UACs with sponsors.  When ORR takes custody of an UAC, ORR interviews the child and the child's parents to identify potential sponsors.  "Within 24 hours of identification of a potential sponsor . . . , the care provider or the ORR National Call Center sends the sponsor a package with the application and related documents . . . ." (ORR Guide, Doc. 4-10, § 2.2.3)  All potential sponsors must complete the application and provide ORR with substantial information.  The vetting of a potential sponsor involves several steps, as ORR assesses "a sponsor's strengths, resources, risk factors and special concerns within the context of the [UAC's] needs, strengths, risk factors, and relationship to the sponsor."  (*Id.* at § 2.4)  ORR considers numerous factors as part of the assessment.  (*Id.* at § 2.4.1 (listing ten factors, several of which are multi-faceted))

The ORR Guide sets out the following order of preference for sponsor placement, expressly noting that the prioritization stems from the *Flores* Settlement:

> Category 1: Parent or legal guardian (This includes qualifying step-parents that have legal or joint custody of the child or teen)
>
> Category 2: An immediate relative–a brother, sister, aunt, uncle, grandparent or first cousin. (This includes biological relatives, relatives through legal marriage, and half-siblings)
>
> Category 3: Other sponsor, such as distant relatives and unrelated adult individuals
>
> Category 4: No sponsors identified

(*Id.* at § 2.2.1)  ORR places most UACs with sponsors in Categories 1 and 2 – i.e., with parents, legal guardians, or immediate relatives.

---

[4] The entire ORR Guide can be accessed at https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied.

For potential sponsors in Category 3, ORR requires that they provide verifiable documentation of a familial relationship with the UAC or "evidence that reliably and sufficiently demonstrates a bona fide social relationship with the child and/or the child's family *that existed before the child migrated to the United States*." (*Id.* at § 2.2.4 (emphasis added)) "In the absence of sufficient evidence of a bona fide social relationship with the child and/or the child's family that existed before the child migrated to the United States, the child will not be released to that individual." (*Id.*) These two sentences in the ORR Guide form the crux of the present controversy. For convenience, the Court will refer to these provisions as the "Pre-Existing Relationship Requirement". The requirement applies only to potential non-familial sponsors in Category 3. Thus, immediate relatives in Category 2 do not have to meet this requirement, even if they have never met the UAC.

Respondents provide two reasons to support the implementation of the Pre-Existing Relationship Requirement. First, the policy "is meant to encourage genuine sponsorships, and to mitigate the risk of releasing UACs to human traffickers." (Sualog Aff., Doc. 14-2, ¶ 14) Second, the requirement stems from the need to ensure a strong connection "between the UAC and the sponsor before releasing the child to the sponsor". (Sualog Aff., Doc. 14-2, ¶ 15) The child's integration with a sponsor "can be especially complicated where there is no preexisting relationship." (*Id.*) As a result, ORR has excluded as potential non-familial Category 3 sponsors those individuals who do not have the requisite pre-existing relationship with an UAC.

The ORR Guide provides limited review of ORR's decisions regarding placement. When a parent or legal guardian has requested reunification with an UAC, and ORR denies the request, the parent or legal guardian can submit a written appeal to the Assistant Secretary for Children and Families. (ORR Guide, Doc. 11-1, § 2.7.8) Based on the text of Section 2.7.8, this right to appeal does not extend to potential sponsors in Categories 2 and 3.

### B.  History of B.X.

B.X.'s father is an evangelical Christian in Guatemala.  In 2017, he incurred the wrath of gang members by speaking with them about his faith and refusing to join their criminal activity. He claims that they beat him severely, threatening to kill him and his oldest son, B.X.

When he recovered from his injuries, B.X.'s father decided to travel with B.X. to the United States and seek asylum.  They made the journey in May 2018, crossing the border near McAllen, Texas, and almost immediately turning themselves in to border officials.  B.X.'s father applied for asylum for both himself and his son.

B.X.'s father claims that officials told him that unless he signed a document that would allow his and his son's deportation, he would remain in custody for an extended period awaiting his asylum proceeding, and B.X. would be placed in the system for adoption.  Not wanting to give his son up for adoption, B.X.'s father signed the document.  He was deported in late May 2018. But contrary to his expectations, B.X. remained in the United States and was placed in ORR's custody.[5]  Over these past ten months, ORR has transferred B.X. to different facilities in Texas, including in Baytown, Driscoll, San Antonio, and in his current placement in the Baptist Child and Family Services facility in Raymondville, Texas.

In September and October of 2018, B.X.'s attorney communicated with ORR concerning B.X.'s placement.  The record suggests that B.X.'s attorney at times informed ORR that B.X.'s parents desired reunification with their son in Guatemala, and at other times indicated that B.X.'s father would return to the United States to seek reunification in this country.   ORR also communicated directly with B.X.'s parents.  B.X.'s father at times expressed that he wanted B.X. to return to Guatemala, and at times indicated otherwise.  ORR contends that these changing preferences delayed ORR's consideration of transitional or long-term foster placement for B.X.[6]

---

[5] The Court makes no findings regarding the circumstances under which B.X.'s father was deported, and recounts his claim only to provide his explanation of the events that led to B.X. entering ORR's custody and care as an UAC.

[6] The record also reflects ORR's concerns about the conduct of B.X.'s attorney, and whether he was adequately representing the family's interests in connection with B.X.'s placement and possible reunification with his family in Guatemala.  B.X.'s attorney contests the validity of these concerns.

On November 2, 2018, B.X.'s attorney formally told ORR that B.X.'s parents designated Matthew and Holly Sewell from Buda, Texas, as sponsors for B.X.  In the spring and summer of 2018, the Sewells had read news coverage of UACs and separated children, and ultimately decided they wished to provide care for such a child.  They reached out to several agencies, but without success.  Through a mutual friend, the Sewells met B.X.'s attorney, who then introduced them to B.X.'s parents.  They conducted videoconferences and phone calls.  Ultimately, B.X.'s parents signed affidavits at the Embassy of the United States in Guatemala City, Guatemala, expressing that they designated the Sewells to care for their son.  (David Cholom Decl., Doc 4-7; Florinda Bol Xicol, Decl., Doc. 4-8)  B.X.'s attorney submitted those affidavits in his November 2 request to ORR.[7]

On November 5, 2018, ORR responded by email that it could not consider the Sewells as sponsors: "Per ORR policy, we can't pursue reunification with families that don't know the minor or his family.  It is my understanding that this is a family that you vetted and found for the family.  Per policy, this family would not be eligible for sponsorship." (ORR Email, Doc. 4-4)  The next day, ORR re-confirmed its decision in another email.  (ORR Email, Doc. 4-5)

B.X.'s attorney persisted and continued to communicate with ORR about placing B.X. with the Sewells.  Although the record does not reflect that ORR ever sent the Sewells an application – as it would do under Section 2.2.3 of the ORR Guide for potential sponsors – ORR continued to receive information about the family.  It appears that B.X.'s attorney may have represented that the Sewells were relatives of B.X., which is not true.  In any event, in mid-December, ORR again "determined that the Sewells were not viable sponsors," based on the Pre-Existing Relationship Requirement, as well as "a review of all records, statements from B.X.'s parents, [B.X.'s attorneys']

---

[7] B.X. submits considerable evidence regarding the Sewell's suitability to serve as his custodians.  (*See, e.g.*, Dr. Cohen Decl., Doc. 11-1).  Dr. Cohen opined that any delay in releasing B.X. would "more likely than not result in protracted if not irreparable harm to B.X's mental and physical health."  (*Id.*)  She also concluded that after reviewing reports on the Sewells, and after interviewing Mrs. Sewell at length, she found placement with the Sewells to be in the best interest of B.X., and that "any alternative to placement with the Sewells" would likely result in an "additional traumatic burden for [B.X.]."  (*Id.*)  For the reasons discussed later in this Order, the Court makes no findings regarding the suitability of the Sewell family as B.X.'s custodians, and does not recount all of the evidence related to this issue.

misleading statements about the Sewells' relationship to B.X., and [the attorneys'] attempts to circumvent program rules and ORR policies." (Barrera Decl., Doc. 14-1, ¶ 15)

On February 12, 2019, B.X. filed this lawsuit.

### III. Analysis

B.X. seeks a preliminary injunction predicated on ORR's alleged violations of the *Flores* Settlement, the TVPRA, the right to procedural due process under the Fifth Amendment of the United States Constitution, and the Administrative Procedure Act. Although B.X.'s pleading also includes a petition for writ of habeas corpus and a cause of action for violations of the Fifth Amendment right to substantive due process, he does not rely on these two claims for purposes of the request for a preliminary injunction. (Memo., Doc. 11-1, 4 ("Petitioner does not rely on these claims for purposes of the instant motion."))

To obtain a preliminary injunction, a movant must establish: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018).

### A. Substantial Likelihood of Success on the Merits

#### 1. Alleged Violations of the *Flores* Settlement

B.X. alleges that Respondents violated the *Flores* Settlement by disqualifying the Sewell family, who were "fit sponsors" and "duly designated by B.X.'s parents as capable and willing to care for B.X." (Am. Compl., Doc. 4, ¶ 8) They also allege that Respondents' "continued incarceration of B.X." further violates the agreement. (*Id.*)

Respondents advance a three-fold response to the cause of action based on the *Flores* Settlement. Respondents' first challenge contests proper venue. Respondents argue that lawsuits filed in the District Court in which an UAC is held by ORR can only challenge the government's placement determination as to "a particular type of facility," or object to the conditions in which

a child is held in custody.  As to all other matters based on the *Flores* Settlement, the plaintiff must file suit in the Central District of California, from where the *Flores* Settlement issued. (Resp., Doc. 14, 10)  Second, Respondents contend that the Government has not waived sovereign immunity from suit through the *Flores* Settlement, and that B.X. can only pursue his lawsuit under the APA. (*Id.* at 11-12)  And third, Respondents claim that Paragraph 17 of the *Flores* Settlement permits ORR to conduct suitability assessments for potential sponsors before releasing a child to any person or program.  The ORR Guide, according to Respondents, merely addresses how ORR conducts the assessment and does not violate the *Flores* Settlement. (*Id.* at 13)

The Court agrees that B.X. does not allege a claim that the *Flores* Settlement authorizes to be pursued in this venue.  The agreement expressly provides for the enforcement of its provisions in the Central District of California. (*Flores* Settlement, Doc. 4-6, ¶ 37)  The exception is for claims brought under Paragraph 24, which allows for challenges to a determination to "place [a] minor in a particular type of facility," or to assert that a licensed program does not meet the *Flores* Settlement's standards. (*Id.* at ¶ 24)  In the current matter, B.X. contends that Respondents have violated the *Flores* Settlement by disqualifying a potential sponsor that his parents designated. As B.X. does not challenge the conditions of the BCFS Facility in which he currently resides, his claim in this Court under the *Flores* Settlement could only be successfully advanced on a challenge to his placement in a "particular type of facility."

Although ORR's decision regarding the Sewells concerns B.X.'s placement, it does not concern placement "in a particular type of facility."  The *Flores* Settlement consistently uses "facility" to refer to custodial placements of an UAC in a government-operated or contracted institution. (*Id.* at ¶ 8 ("medium security facility"), ¶ 12 ("INS detention facility, or other INS-contracted facility"), ¶ 24(C)("detention or medium security facility"))  The *Flores* Settlement does not utilize the term "facility" to refer to placements with a relative or an individual who the UAC's parents have designated.  In other words, B.X.'s argument that ORR violated the *Flores*

Settlement by disqualifying the Sewell family as potential sponsors is not a challenge to ORR's placement in a particular type of facility. As a result, B.X. would have to bring his present claim before the Central District of California.

Given that B.X. cannot assert in this Court that Respondents have not complied with the *Flores* Settlement, the Court need not reach for purposes of this claim the other arguments that Respondents present as to this cause of action. The Court's conclusion also means that B.X. has not shown a substantial likelihood of success on the merits of this claim.

### 2. Fifth Amendment Right to Procedural Due Process

B.X. alleges that Respondents' "policies and actions . . . have deprived B.X. of freedom from confinement and his right to family integrity without providing him notice, a right to counsel, an opportunity to respond including an opportunity to present and confront evidence, a neutral decision-maker, a written decision, and a right of appeal." (Am. Compl., Doc. 4, ¶ 15) He contends that the Fifth Amendment protects him from being deprived of liberty and family integrity without procedural protections. (*Id.* at ¶ 14)

Respondents argue that B.X. fails to satisfy the applicable test for procedural due process claims, as set out in *Matthews v. Eldridge*, 424 U.S. 319, 334 (1976). (Resp., Doc. 14, 7) They contend that he has not satisfied the three factors from that balancing test.

The parties agree that *Matthews* provides the applicable framework. (Memo., Doc. 11-1, 6; Resp., Doc. 14, 6-10) This test requires the balancing of three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substantive procedural requirements would entail.

*Matthews*, 424 U.S. at 334. The strength of the required procedural protections varies depending upon the private interest at issue.

With respect to the first factor, B.X. contends that Respondents' actions infringed on his right to not be deprived of liberty or family integrity without adequate due process. Courts have recognized that parents' right to the care, custody, and control of their children is one of "the oldest of the fundamental liberty interests" that the Constitution protects. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (citing *Pierce v. Soc. of Sisters*, 268 U.S. 510, 534–35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)). Those rights are not absolute, but for the government to deprive parents of the custody of their children, the government must satisfy significant procedural due process requirements. *See, e.g.*, *Santosky v. Kramer*, 455 U.S. 745 (1982) (holding that New York State's standard of "fair preponderance of the evidence" for the revocation of parental rights violated the due process clause, and holding that the State must at least satisfy the burden of clear and convincing evidence).

The cases upholding the right to family integrity, however, are distinguishable from the present matter because B.X. does not request to be reunited with his family, and does not challenge Respondents' ability to keep him separated from his family. On the contrary, in the fall of 2018, B.X.'s family appears to have chosen to allow B.X. to remain in ORR's custody, rather than seek reunification in Guatemala. B.X. bases this cause of action not on his right to family unity, but on the alleged right to have ORR accept the preferred sponsor that his parents have designated. B.X. does not provide authority demonstrating that the Fifth Amendment includes such a right, although courts have recognized parental choice rights in other contexts involving a substantive due process analysis under the Fifth Amendment. *See e.g.*, *Parham v. J.R.*, 442 U.S. 584, 602 (1979) ("[The] right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state."); *Pierce v. Society of Sisters*, 268 U.S. 510, 536 (1925) (holding that a state statute that required children to attend public schools "unreasonably interfere[d] with the liberty of parents and guardians to direct the upbringing and education of children under their control").

Respondents do not contest that the right exists, but instead argue that any such right should receive "significantly lower" weight than the traditional concept of family integrity. The Court agrees. Assuming that B.X. has a right under the Fifth Amendment to have his parents' wishes regarding his custody be considered, such a right, in the current factual context, receives only minor weight in the *Matthews* analysis.[8]

Under the second *Matthews* factor, the Court finds that ORR's procedures protect B.X.'s rights and provide only a low risk of an erroneous deprivation of such interest. B.X. has the right under the ORR Guide to propose potential sponsors. In fact, when ORR takes an UAC into its care and custody, ORR interviews the child and the child's parents to identify possible sponsors. If the parents propose a possible sponsor, ORR will receive that recommendation. At times, ORR will reject the proposed sponsor. In the present case, ORR's determination occurred almost immediately after B.X.'s parents identified the Sewell family. But the ORR Guide did not preclude B.X. from recommending a possible sponsor and having that family considered, albeit nominally. He contests the basis on which Respondents rejected the Sewell family, but that challenge does not focus on the procedures that ORR implements, but rather the merits of ORR's decision.

The third *Matthews* factor also weighs in Respondents' favor. The Government has a strong interest and a responsibility to ensure the safety and welfare of children placed in its care and custody. The procedural change that B.X. requests – i.e., ORR accepting the Sewell family as sponsors because his parents designated them as such – would diminish ORR's ability to conduct the suitability and capability assessments that both the *Flores* Settlement and the TVPRA require. Such a change would undermine ORR's recognized interest with respect to UACs in its care and custody.[9]

---

[8] Respondents' argument regarding his liberty interest dovetails with his claim concerning family integrity. B.X. does not argue that ORR cannot maintain custody and control over him. Rather, he bases his argument on ORR's continued custody over him because it has refused to place him with the Sewells, whom his parents designated.

[9] Respondents also argue that the Sewell family did not apply to become sponsors. (Resp., Doc. 14, ¶ 10) But Respondents disqualified the Sewell family when B.X.'s parents first designated them, so that any application would have been futile. And in Mr. Barrera's declaration, he acknowledges that ORR "determined" that the Sewells were ineligible sponsors.

Considering the *Matthews* factors, the Court finds that B.X. would not be substantially likely to prevail on his procedural due process claim under the Fifth Amendment.

### 3. Violations of the Trafficking Victims Protection Reauthorization Act

B.X. alleges that Respondents have violated Section 235 of the TVPRA by failing to "promptly place [Petitioner] in the least restrictive setting that is in his best interests." (Am. Comp., Doc. 4, ¶ 17) More specifically, B.X. contends that because his parents requested that ORR place him with the Sewell family, the TVPRA requires that ORR do so. Respondents advance the threshold argument that the TVPRA does not expressly waive sovereign immunity, meaning that B.X. does not have a private cause of action under that statute. (Resp., Doc. 14, 18 n.2)

"To hale the federal government into a court proceeding, a plaintiff must show that there has been a valid waiver of sovereign immunity." *Wagstaff v. U.S. Dept. of Educ.*, 509 F.3d 661, 664 (5th Cir. 2007) (citing *Lewis v. Hunt*, 492 F.3d 565, 570 (5th Cir. 2007)). A waiver of federal sovereign immunity "must be unequivocally expressed in statutory text . . . and will not be implied." *Id.* at 664 (quoting *Lane v. Pena*, 518 U.S. 187, 192 (1996)). "Moreover, a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Id.* Absent such waiver, the "federal government is immune from suit." *Wagstaff*, 509 F.3d at 664 (5th Cir. 2007) (holding that no subject matter jurisdiction existed because the Fair Debt Collection Practices Act did not unequivocally and expressly waive federal sovereign immunity); *see also Lane*, 518 U.S. at 187 (holding that the federal government retained sovereign immunity against awards of monetary damages for violations of the Rehabilitation Act); *Lewis v. Hunt*, 492 F.3d 565 (5th Cir. 2007) (finding that 28 U.S.C. § 2410 waived federal sovereign immunity only as to a limited class of civil actions).

B.X. does not cite to a provision of the TVPRA that removes sovereign immunity as to the federal government. The statute creates civil remedies against individuals who engage in human trafficking, as well as those who benefit from such criminal activity. *See* 18 U.S.C. § 1595(a). But

no statutory language suggests, much less unequivocally expresses, that Congress removed federal sovereign immunity. As a result, this Court lacks subject matter jurisdiction over the cause of action under the TVPRA, and B.X. has not demonstrated a substantial likelihood of succeeding on the merits of this claim.

### 4. Violations of the Administrative Procedure Act

B.X. advances two separate attacks based on the APA. First, he alleges that Respondents violated the APA by creating the Pre-Existing Relationship Requirement without subjecting it to the notice-and-comment process that the APA requires for agency rules. (Am. Compl., Doc. 4, ¶ 22) He contends that when an agency enforces a rule without satisfying the notice-and-comment requirement, the court should set aside that rule.[10]  Second, B.X. alleges that the requirement is also arbitrary and capricious, and represents unlawful government action under the APA. (*Id.* at ¶ 30)

Respondents urge a threshold challenge and then respond substantively to each of B.X.'s specific claims under the APA. First, Respondents contend that the Court lacks jurisdiction to consider a cause of action under the APA because ORR has not issued a final agency action regarding B.X.'s placement. (Resp., Doc. 14, 15) Second, Respondents argue that the Pre-Existing Relationship Requirement is not a rule subject to the APA's notice-and-comment process, but represents an interpretative rule or a policy statement that ORR can implement without public comment. (*Id.* at 16-17) And third, Respondents argue that ample and reasonable justification exists for the Pre-Existing Relationship Requirement, rendering it neither arbitrary nor capricious. (*Id.* at 18)

---

[10] B.X. alleges that the "entire ORR Guide was promulgated in violation of the APA." (Am. Compl., Doc. 4, ¶ 24) But in his briefing and through his attorney at the hearing on the pending motion, B.X. clarified that he challenges only the requirement in Section 2.2.4 that requires non-familial sponsors in Category 3 to have a bona fide social relationship with the child or the child's family that pre-dates the child's entry into the United States. In any event, based on the facts in the record, the Court finds that B.X. would not have a substantial likelihood of success on a claim that sought to set aside the entire ORR Guide as having been issued in violation of the APA.

16

### a.  Final Agency Action

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.   Section 702 waives the Government's sovereign immunity. *See Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 488 (5th Cir. 2014).   But the limited waiver applies only to "actions against federal government agencies, seeking nonmonetary relief, if the agency conduct is otherwise subject to judicial review." *Id.* (citation omitted).

The APA provides for judicial review of final agency action when a relevant administrative agency's statutory provision does not directly provide for judicial review.  *See* 5 U.S.C. § 704. Section 704 restricts judicial review under the APA to "final agency action for which there is no other adequate remedy in a court." *Id.*; *see also Am. Airlines v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999) (absent final agency action, the court lacks subject matter jurisdiction); *Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts*, 50 F.3d 1318, 1323 n.3 (5th Cir. 1995).   Generally, a final agency action must: 1) "mark the 'consummation' of the agency's decision making process, it must not be of a merely tentative or interlocutory nature," and 2) "be one by which rights or obligations have been determined, or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178–79 (1997) (internal citations omitted).

ORR's decision to reject B.X.'s designated potential sponsor represented final agency action.  With respect to the Sewell family, ORR's decision was neither tentative nor interlocutory. The agency applied the ORR Guide, and in particular, the Pre-Existing Relationship Requirement in Section 2.2.4, and found that the designated potential sponsor "would not be eligible for sponsorship". (ORR Email, Doc. 11-1, Ex. 4)  B.X. had no recourse to ORR's decision.  The record does show that B.X.'s counsel persisted in requesting that ORR consider the Sewell family as sponsors. (ORR Email, Doc. 11-1, Ex. 5)  But the record does not show that ORR ever afforded the

Sewell family the formal sponsor-assessment process. In December 2018, ORR re-confirmed that it had found the Sewells ineligible.

Respondents contend that only the final release determination regarding B.X. constitutes a final agency action. But this position would mean that an UAC would have no recourse to judicial review of ORR's decision until the child left ORR's custody. The *Flores* Settlement itself recognizes that an UAC can challenge ORR's decision as to placement in a particular type of facility, even though such a placement is not a final release determination, and ORR can later modify its decision and move a UAC among different facilities. In addition, the ORR Guide allows parents and legal guardians to appeal the denial of a reunification request before a final release determination. (ORR Guide, Doc. 11-1, § 2.7.8) The appeal must be submitted within 30 business days of the denial, even though ORR may continue to vet possible sponsors or consider other placement options for the UAC. As to the denial of a Category 3 potential sponsor, ORR does not provide any administrative review, making the denial a final decision. And in the case of B.X., ORR rejected the Sewell family without the agency's standard vetting procedures for potential sponsors. ORR's argument potentially subjects UACs to incurring substantial harm by having viable sponsors disqualified, with no adequate remedy at law. The decisions in which courts have found that no final agency action has occurred typically concern situations in which the agency has not reached the merits of a particular decision. *See, e.g., Villarreal v. Horn*, 203 F.Supp.3d 765, 773 (S.D. Tex. 2016). In those cases, the aggrieved party usually possessed another opportunity to have the merits of the agency's decision considered. In contrast, ORR reached a final decision as to the Sewells, concluding that they could not be sponsors for B.X.

### b. Substantive Rule versus Policy Statement

The APA must publish substantive rules in the Federal Register to invite public comment. *See* 5 U.S.C. § 552(a)(1); *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir.2001). This notice-and-comment process allows "the agency to benefit from the expertise and input of the parties who file comments with regard to the proposed rule, and (2) to see it that the agency

maintains a flexible and open-minded attitude towards its own rules . . . ." *Nat'l Tour Brokers Ass'n v. United States*, 591 F.2d 896, 902 (D.C. Cir. 1978); *see also Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir. 1994) ("[Congress] prescribed these procedures to ensure that the broadest base of information would be provided to the agency by those most interested and perhaps best informed on the subject of the rulemaking at hand."). If an agency does not comply with the APA's notice-and-comment requirement before promulgating a covered rule, the rule is invalid. *See Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) ("If [the disputed agency document] were a substantive rule it would be unlawful, for it was promulgated without the requisite notice-and-comment.").

But the APA notice-and-comment requirement only applies to certain agency matters. Notably, agencies can implement "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" without following the notice-and-comment process. 5 U.S.C. § 553(b); *Prof'ls & Patients for Customized Care*, 56 F.3d at 595. In the present matter, Respondents argue that the Pre-Existing Relationship Requirement represents an interpretative rule or a policy statement, neither of which would be subject to the APA's notice-and-comment requirements.

In the Fifth Circuit, courts apply the following two-part test to distinguish policy statements from substantive rules: "Whether the rule (1) 'impose[s] any rights and obligations' and (2) 'genuinely leaves the agency and its decision-makers free to exercise discretion.'" *Texas v. U.S.*, 809 F.3d 134, 171 (5th Cir. 2015) (citation omitted). "While mindful but suspicious of the agency's own characterization, [courts] focus[] primarily on whether the rule has binding effect on agency discretion or severely restricts it." *Id.* "A touchstone of a substantive rule is that it establishes a binding norm." *Prof'ls & Patients for Customized Care*, 56 F.3d at 596. "The key inquiry . . . is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case". *Id.*

In *Professionals & Patients*, the court applied this test to a specific provision of the Compliance Policy Guide issued by the Food & Drug Administration. *Id.* at 593. The policy concerned the retail-pharmacist practice of compounding, which occurs when a pharmacist combines ingredients based on a physician's prescription to prepare medications that are tailored to a patient and not commercially available. *Id.* The FDA issued the provision at issue to regulate retail pharmacies that the FDA believed were purchasing bulk drug substances to engage in "large-scale speculative 'compounding'" in a manner that avoided regulations regarding misbranding and adulteration of drugs. *Id.* The FDA issued the CPG provision without notice and comment.

Pharmacists challenged the CPG provision as a substantive rule improperly implemented under the APA. Affirming the District Court's findings, the Fifth Circuit concluded that the provision did not constitute a substantive rule because it did not create "binding norms." Rather, the provision provided FDA agents with nine factors to use as "guidance" when determining whether a pharmacist was engaged in permissible "traditional compounding" or improper "drug manufacturing activities." *Id.* at 600. The afforded discretion proved dispositive to removing the regulation from the category of a substantive rule, to one of a policy statement.

The Fifth Circuit reached the opposite conclusion in *Texas v. United States*, 809 F.3d 134, 146 (5th Cir. 2015). In that case, various states challenged the "DAPA Memo," which the Department of Homeland Security had issued in November 2014, and which extended the scope of the Deferred Action for Childhood Arrivals ("DACA") program. In simplified terms, the DAPA Memo instructed agency heads to consider various factors to determine, via their prosecutorial discretion, whether to grant deferred action to illegal immigrants and, if so, to enable them to be "lawfully present" in the United States. The status of being "lawfully present" meant that states could not deny certain state benefits – e.g., state-subsidized driver's licenses and certain unemployment benefits – that otherwise states would not extend to these individuals. *Id.* at 149. The District Court enjoined enforcement of DAPA, in part as a substantive rule that DHS had issued without notice and comment under the APA. The District Court relied on statistical

information demonstrating that although DACA purported to grant prosecutorial discretion, officials applied DACA to grant deferred action in 95% of cases. The Fifth Circuit affirmed, reasoning that "a rule can be binding if it is 'applied by the agency in a way that indicates it is binding.'" *Id.* at 173 (quoting *General Elec. Co. v. E.P.A.*, 290 F.3d 377, 383 (D.C. Cir. 2002)).

Applying these principles to the instant case leads to the conclusion that ORR's Pre-Existing Relationship Requirement constitutes a substantive rule. As an initial consideration, ORR highlights that it characterizes the provision as a policy, and as one of many within a lengthy ORR Guide that the agency applies to potential sponsors and that it regularly modifies. But despite ORR's own characterization, focusing on the Pre-Existing Relationship Requirement reveals that in itself, the requirement imposes obligations and rights, and determines whether ORR can even consider an individual as a potential sponsor under the ORR Guide. Although ORR characterizes the entire ORR Guide as merely a policy statement, the specific Pre-Existing Relationship Requirement exceeds this characterization and imposes a binding norm on agency officials. During the preliminary injunction hearing, Respondents' counsel acknowledged that the Pre-Existing Relationship Requirement gives ORR officials no discretion whether to consider an identified possible sponsor who does not meet this requirement.

The application of the requirement to the Sewell family demonstrates the binding nature of the rule. The Court finds that the record reflects that ORR considered no other factor when disqualifying the Sewell family, or at most considered other factors only nominally. In early November 2018, when B.X.'s counsel identified the Sewell family to ORR, the response was unequivocal: "Per ORR policy, we can't pursue reunification with families that don't know the minor or his family. . . . Per policy, this family would not be eligible for sponsorship." (ORR Email, Doc. 11-1, Ex. 4; *see also id.* at Ex. 5 ("Per policy, we are not able to reunify any child with people that are not known by the family.")) ORR never sent the Sewell family an application to be sponsors, even though the ORR Guide indicates that within 24 hours of identification of a potential sponsor, ORR "sends the sponsor a package with the application and related

documents". (ORR Guide, Doc. 11-1, Ex. 10 at § 2.2.3)  The absence of evidence showing that ORR sent the Sewell family an application or received an application for consideration supports the finding that ORR automatically disqualified the Sewell family once it determined that they did not meet the Pre-Existing Relationship Requirement.

In his declaration, Mr. Barrera states that ORR concluded that the Sewell family were not viable sponsors in December 2018, after considering several factors beyond the Sewell family's lack of a pre-existing relationship with B.X. or his family.  (Resp., Doc. 14-1, Ex. 1 at ¶ 15)  But the statement does not show that ORR considered the Sewell family under ORR's full-fledged application process that the ORR Guide describes, and does not reference the factors that the ORR Guide lists for vetting a potential sponsor.  In fact, the factors that Mr. Barrera references in his declaration show that while ORR considered the Sewell family in December 2018, it did so from the perspective that his attorney appears to have represented to ORR that the Sewells were relatives of B.X.  (Sealed Exhs. to Resp., Doc. 17, 25)  ORR investigated and concluded that no relationship existed, which rendered the Sewells "a non-viable sponsor" because they did not have the requisite pre-existing relationship. (Id.)  Despite Mr. Barrera's statement, the record as a whole demonstrates that ORR disqualified the Sewell family based on the Pre-Existing Relationship Requirement.

The Pre-Existing Relationship Requirement also contrasts sharply with ORR's procedures when considering potential sponsors that do have the requisite relationship.  For such individuals, the ORR Guide provides numerous factors that ORR will consider when vetting the potential sponsor.  (ORR Guide, Doc. 11-1, Ex. 10 at § 2.4.1)  The "Assessment Criteria" include ten factors, several of which are themselves multi-pronged, and which "ORR considers . . . when evaluating family members and other potential sponsors." (Id.)  But for non-relatives who are identified as possible sponsors, the Pre-Existing Relationship Requirement functions as a gatekeeper, precluding ORR from considering any other information to determine whether the individual would be a suitable sponsor.

The Pre-Existing Relationship Requirement also effectuates a binding norm even more pronounced than the DAPA Memo from *Texas v. United States*.  In that case, the Fifth Circuit affirmed a finding that a "discretionary" policy was nevertheless a substantive rule under the APA because agents applied it in an overwhelming percentage of cases.  In the instant case, ORR applies the Pre-Existing Relationship Requirement to block 100% of all possible non-familial sponsors in Category 3 who do not meet this threshold.  The requirement precludes consideration of possible sponsors, even when identified by the parents of the child over whom ORR maintains custody and care.   Under these circumstances, the Pre-Existing Relationship Requirement constitutes a substantive rule for which the APA requires notice and comment.[11]

This conclusion does not strip ORR of its discretion to determine how best to conduct suitability and capability assessments that the TVPRA and the *Flores* Settlement require.  And the Court does not find that ORR should or should not consider whether a pre-existing bona fide social relationship exists between a potential sponsor and an UAC.   ORR remains free to determine, based on its expertise and experience, what factors to consider when vetting possible sponsors.   But ORR must comply with the APA's notice-and-comment process when it implements a substantive rule as part of this assessment process.  Had ORR simply included the Pre-Existing Relationship Requirement among a host of permissible factors for agents to consider, then ORR could have included that factor without completing the notice and comment process.[12]  But when ORR imposed the requirement in a manner that excluded an entire category of possible individuals from serving as sponsors, ORR triggered the APA's mandate to subject that specific threshold requirement to the public for comment.

---

[11] Although not a binding decision, the Court notes that another federal district court recently concluded that a separate provision of the ORR Guide formed a substantive rule under the APA because the provision "impose[d] a new threshold requirement on all potential sponsors".  *J.E.C.M., a Minor v. Lloyd*, 352 F.Supp.3d 559, 582 (E.D. Va. 2018).

[12] In fact, the "Assessment Criteria" that ORR uses to vet potential sponsors includes "the nature and extent of the sponsor's previous and current relationship with the child . . . and the [UAC's] family, if a relationship exists." (ORR Guide, Doc. 11-1, Ex. 10 at § 2.4.1)  ORR could consider, as one factor among many, the fact that the Sewell family did not know B.X. or his family before he arrived in the United States.

B.X. has demonstrated that he has a substantial likelihood of success on his challenge of the Pre-Existing Relationship Requirement as having been issued without notice and comment under the APA.

### c.  Arbitrary and Capricious Test[13]

The APA allows courts to set aside executive agency action that is "arbitrary" or "capricious." *See* 5 U.S.C. § 706(2)(A).  A rule runs afoul of this standard "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Tex. Oil & Gas Ass'n v. U.S. E.P.A.*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The agency must "examine the relevant data and articulate a satisfactory explanation for its action." *Motor Vehicle Mfrs. Assn.*, 463 U.S. at 43.

"If the agency's reasons and policy choices conform to minimal standards of rationality, then its actions are reasonable and must be upheld." *Tex. Oil & Gas Ass'n*, 161 F.3d at 934.  While a court can review an agency's decision to determine whether it is arbitrary and capricious, the court "is not to substitute its judgment for that of the agency," and should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 286 (1974); *see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009).

In the present matter, Respondents offer two rationales for the Pre-Existing Relationship Requirement.  The first reason is historical, and bears quoting in its entirety:

> First, this policy is meant to encourage genuine sponsorships, and to mitigate the risk of releasing UACs to human traffickers.  Historically, ORR required all potential sponsors to undergo fingerprinting for the purpose of background checks.  In my experience, this requirement led some undocumented immigrant

---

[13] In light of the Court's conclusion regarding B.X.'s challenge under the APA's notice-and-comment provision, the Court need not reach the argument that the requirement was arbitrary and capricious.  Nevertheless, to facilitate review, the Court will consider this additional ground, which has been fully briefed.

> parents in the past to ask acquaintances, friends, or other unrelated individuals
> with legal immigration status to apply as sponsors for their children. This situation
> undermined ORR's ability to conduct proper assessments of the potential home
> environment, and created a risk that human traffickers could exploit the release
> process. Implementing a policy requiring an existing relationship between the
> sponsor and the child or the child's family was a reasonable measure taken to
> mitigate these risks.

(Sualog Aff., Doc. 14-2, ¶ 14)   The second justification stems from the need to ensure a strong

connection "between the UAC and the sponsor before releasing the child to the sponsor." (Sualog

Aff., Doc. 14-2, ¶ 15)   The child's integration with a sponsor "can be especially complicated where

there is no preexisting relationship." (*Id.*)   As a result, ORR has chosen to exclude as potential

Category 3 non-familial sponsors those individuals who do not have the requisite pre-existing

relationship with the UAC.

     The Court does not find these rationales compelling or strongly tailored to the perceived

risks from individuals with do not meet the Pre-Existing Relationship Requirement. ORR at times

places UACs with relatives who have no pre-existing relationship with the child. ORR vets those

relatives to ensure that they pose no risk to the child and can serve as suitable and capable

sponsors. ORR could apply the same vetting procedures to non-relatives in Category 3 who do

not meet the Pre-Existing Relationship Requirement. It does not require a leap of logic to

conclude that in some situations, a proposed unrelated individual in Category 3 would be a more

suitable sponsor than an identified relative in Category 2, but ORR's Pre-Existing Relationship

Requirement automatically disqualifies only the individual in Category 3. And in this case, in

which B.X. has no known relatives in the United States, the requirement excludes consideration

of a family for which considerable evidence indicates could be a suitable sponsor.

     But the Court will not "substitute its judgment for that of the agency" on this issue. ORR's

rationale considers reasonable factors – e.g., risks to UACs of human trafficking, facilitating a

proper integration with sponsors. The agency's path is discernible, even if reasonable minds could

differ on whether ORR has chosen the best course. As a result, the Court finds that the Pre-

Existing Relationship Requirement is not arbitrary and capricious for purposes of the APA.

### B. Substantial Threat of Irreparable Injury

A movant seeking a preliminary injunction must demonstrate a substantial threat of irreparable injury in the absence of the requested injunctive relief.  The harm must be of a nature "for which there is no adequate remedy at law."  *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013).  In addition, the harm cannot be speculative. *See Holland America Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

B.X. has demonstrated that absent the requested injunctive relief, he will be denied the opportunity to have the Sewell family considered by ORR as potential sponsors.  ORR most likely would proceed with its plan to move B.X. into transitional or long-term foster care.  B.X. has submitted evidence indicating that he views the Sewells as a surrogate family, and that placement with another family would occasion significant emotional and psychological harm.  Although the Court does not find that the only permissible placement for B.X. is with the Sewell family, the Court does conclude that having the Sewells disqualified from even being considered as sponsors suffices to show a substantial threat of irreparable injury.

### C. Threatened Injury Outweighs Harm from Injunction

When considering whether to issue a preliminary injunction, a court must "balance the competing claims of injury and consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 543 (1987).  The court must conclude that the movant would suffer more harm without the injunction than the enjoined party if relief is granted.  The court can consider the burden that an injunction will impose on the enjoined party. *Winter v. Natural Res. Def. Counsel, Inc.*, 555 U.S. 7, 27 (2008).

The Court finds that ORR will experience only a minimal burden from the requested injunctive relief.  In the immediate context, ORR will only have to extend to the Sewell family the opportunity to formally apply as potential sponsors, and then apply ORR's normal procedures to their application.  The addition of one applicant as a potential sponsor does not represent a substantial burden to the agency.  In addition, even beyond this specific matter, removing the Pre-

Existing Relationship Requirement, which applies only in the context of Category 3 non-familial sponsors, will not occasion significant burden. ORR acknowledges that the significant majority of UACs are placed with parents and relatives in Categories 1 and 2. The situation related to B.X.'s placement arises only occasionally. As a result, the threat of irreparable injury that B.X. has demonstrated outweighs the modest increased burden to ORR from the requested relief.

### D. Injunction will not Disserve the Public Interest

Finally, a party seeking injunctive relief must show that the requested preliminary injunction will not be adverse to public interest. *Star Satellite, Inc. v. Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986). In this case, the public interest is served by ensuring that the agency responsible for the care, custody, and placement of UACs is not hindered from carrying out its duties as effectively and expeditiously as possible. The *Flores* Settlement and the TVPRA both recognize the need for a prompt decision regarding the placement of an UAC in a setting that advances the best interests of the child.

Requiring ORR to consider the Sewell family as potential sponsors without regard to the Pre-Existing Relationship Requirement does not disserve the public interest. Removing this requirement actually increases the number of potential sponsors for UACs, which may advance the mandates of the *Flores* Settlement and the TVPRA to place UACs in the least restrictive setting possible. To the extent that prioritizing placement in the least restrictive setting echoes a societal value to minimize instances in which children must be cared for in institutional settings, the requested relief furthers that priority. In addition, ORR's existing procedures for vetting potential sponsors ensures that UACs will not be placed with sponsors that cannot care for or that pose a risk to children.

### IV. The Appropriate Relief

B.X. has demonstrated that he is entitled to a preliminary injunction. He requests that the Court consider the record regarding the Sewell family and not only enjoin ORR from enforcing the Pre-Existing Relationship Requirement, but also order ORR to place B.X. with that family.

The Court declines to issue relief to the full extent that B.X. requests.  He has shown a substantial likelihood of succeeding on the merits and obtaining a finding that ORR cannot apply the Pre-Existing Relationship Requirement, as it currently is structured, to Category 3 potential sponsors.  But the record does not contain sufficient information and B.X. has not demonstrated that the law would allow the Court to step into the shoes of ORR, conduct a suitability and capability assessment as to the Sewells, and render a decision regarding whether B.X. should be placed in their care.  Such an assessment falls squarely within ORR's expertise, and the procedures in Section 2 of the ORR Guide provide ample guidance and discretion to ORR agents to consider all factors in such an assessment, once the Pre-Existing Relationship Requirement is removed.  As a result, B.X. has shown only that he is entitled to have ORR apply its standard assessment for potential sponsors to the Sewell family without consideration of the Pre-Existing Relationship Requirement.

The Court highlights the need for expeditious consideration of the Sewell family as sponsors.  ORR has maintained B.X. in its care and custody for over ten months.  The *Flores* Settlement and the TVPRA require *prompt* placement in the least restrictive setting.  Although various factors have contributed to the delay in the consideration of B.X.'s placement, ORR should proceed to expeditiously consider the Sewell family, in the event that ORR decides that they represent a suitable and capable family for B.X.

In addition, the Court will establish an expedited scheduling order to provide the parties sufficient time for discovery and to reach a final consideration of the merits of B.X.'s causes of action.

Accordingly, it is **ORDERED** that Plaintiff B.X.'s Motion for Preliminary Injunction is **GRANTED IN PART AND DENIED IN PART.**

It is also **ORDERED** that by no later than April 12, 2019, Respondents shall provide B.X.'s counsel with the application for potential sponsors.

It is also **ORDERED** that by no later than fifteen business days after receipt of an application by the Sewell family, ORR shall render a decision regarding whether it approves release of B.X. to the Sewell family. ORR shall consider the Sewell family as potential sponsors without regard to the Pre-Existing Relationship Requirement in Section 2.2.4 of the ORR Guide.

All other relief not expressly granted is **DENIED**.

ISSUED at 10:20 am on April 10, 2019.


Fernando Rodriguez, Jr.
United States District Judge

29