# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| B.X., a minor, | § § | |
| Petitioner/Plaintiff, | § § | |
| v. | § § | |
| JONATHAN HAYES, in his official capacity as Interim Director of the Office of Refugee Resettlement, and SERVANDO BARRERA, in his official capacity as Federal Field Specialist, Office of Refugee Resettlement, | § § § § § § § § § | CIVIL ACTION NO. 1:19-cv-00017 |
| Respondent/Defendant. | | |

## DECLARATION OF AMY COHEN M.D.

1. My name is Amy J Cohen MD. I am a Harvard-trained physician/child psychiatrist who has previously submitted my credentials to this court.

2. On April 9, 2019, B.X. suffered a serious injury while in the care and custody of ORR contracted personnel at the BCFS facility in Raymondville, Texas. It is my professional opinion that personnel demonstrated extraordinary medical negligence in response to B.X.'s injury and that this negligence has placed B.X. at ongoing risk of further injury, deformity and disability. Given the demands of the healing process from an injury of this nature and the limits of the personnel, policies and procedures of this ORR facility, it is my opinion that this child requires expedited removal to an environment where he is likely to safely recover. I believe that the optimal environment for this recovery is the home of Holly and Matthew Sewell. I believe that without this expedited transfer the consequences to the psychological and physical health of this child could be long-lasting, complex, and potentially permanent.

3. I base my opinion on the following:

1

- This child sustained a serious injury on April 9th. The response by personnel at his shelter violated all basic standards of emergency response and has placed his long-term prognosis in serious danger.

- This child will now be required to undergo a protracted period of recovery during which his mobility will be very limited and the need to supervise and assist him critical. He requires 1:1 supervision, which, if neglected, could lead to further injury, deformity and disability. It is my belief that there is good reason to doubt the ability of B.X.'s currently placement to offer this level of supervision and assistance.

- Children who undergo such injuries and the subsequent extreme restrictions demanded by their recovery require a kind of nurturance which is contrary to the policies and provisions of ORR. Good data demonstrates that all children require physical touch and holding by nurturing adults, and that those who have been stressed or injured are in greater *physiologic need* of such touch. Indeed, the literature supports that, without this kind of touch, the repair process itself can be impeded. Nurturing touch by adults (or even peers) is strictly forbidden by ORR policies and procedures.

- The injury that this child has sustained and the lack of appropriate attention and care he received represent yet another psychological trauma for him. Institutional staff have already demonstrated an inability to identify and appropriately treat this child's history of psychological trauma.

- The parents of this child have been inadequately informed of his condition and progress. This has created tremendous anxiety and distress for them which in turn is experienced by their son.

- As part of his recovery, this child needs the ability to speak with and receive support from his parents with a frequency not available to him in his current situation. This is especially true as his native language is not spoken by any shelter personnel. It is documented that there have been periods where as much as 3 weeks have passed without this facility connecting him with his parents despite the psychological costs to B.X. This, again, underscores the facility's inability to understand the needs of a highly at-risk child who has suffered psychological trauma

- which is now compounded by this injury: by the uncertainty and chaos surrounding the assessment and treatment, by the pain he has suffered, and by the protracted period of relative immobility which he must now endure.

4. On Tuesday, April 9th I received a call from Sylvia Rodriguez, assistant to B.X. attorney, Mr. Ricardo de Anda. Ms. Rodriguez informed me that she'd been contacted by B.X.'s father, David, who was quite upset and confused. David had stated that he'd been called by personnel at B.X.'s shelter facility and told that Byron had "hurt his ankle" in a soccer accident. There was no mention of any trip to a doctor or emergency room that day and, indeed, David was told B.X. would not be seen until the next day.

5. On Wednesday, April 10th, B.X.'s attorney, Ricardo de Anda and I communicated with each other. As a physician, I was concerned about the apparent lack of attention to B.X.'s injury, as I knew that injury to the limb of a growing child may be dangerous and - if not properly and promptly attended to - lead to problems with growth, deformity and impaired function. I asked that a medical release be obtained from B.X.'s parents enabling me to talk with his treaters and I provided David with a list of simple questions which he might ask of B.X.'s case manager. Mr. de Anda informed me that he, too, was concerned and was on his way to the facility to visit B.X. He later communicated that B.X. had apparently been to see a nurse practitioner that day, that he'd been administered an x-ray and that he had a fracture. He was not placed in a cast, but had a rough bandage wrapped around part of his lower leg. This "bandage" offered no immobilization whatsoever. When seen by Mr. de Anda B.X. was sitting in a wheelchair but on at least one occasion he'd gotten up and walked across the room, placing weight on his injured leg.

6. On Thursday, April 11th, two days after his injury, B.X. was taken to see an orthopedist, Dr. Vishwas Patil, who does not have any specialized training in pediatric orthopedics. The orthopedist did not contact B.X.'s parents to ascertain his history or discuss his injury, the treatment, and prognosis, nor did the facility.

7. Despite having submitted several days earlier his list of questions (including, for example, precisely what had transpired during the accident) and then submitting them again, B.X.'s father

received no answers from B.X.'s case manager and only the name and number of the orthopedist. At the request of the parents, I phoned and spoke with both Dr. Patil and with his assistant to ascertain the nature, treatment and prognosis of B.X.'s injury. I was told that B.X. had sustained a fracture of his distal femur and had to be placed in a "long leg cast" (a cast from his hip to his foot) on which he will not be permitted to weight-bear and in which he will need to remain for up to 6 weeks. The femur is the bone *above* the knee (NOT below, where B.X. had been bandaged). It is the largest bone of the body, and so requires considerable force (which must have been witnessed by shelter personnel) to be fractured. Of concern with any limb fracture in a child is that their bones are growing, and injuries can interrupt or divert the course of that growth. I inquired of Dr. Patil and was told that, indeed, B.X.'s fracture was "very close to his growth plate" (the vulnerable growing area of the bone) and that "one never knows" if there will be bone deformity. Through previous conversations with his parents, I also knew that B.X. had a history of repeated complaints of leg pain. Sometimes fractures in strong bones in a child may indicate that there is some pathology of that bone. In addition to having failed to take a history of the incident which had caused the fracture (Indeed, he was not aware that it had occurred days earlier), Dr. Patil had not taken a medical history which could have indicated some bone pathology which could produce a "pathological fracture".

8. The care which B.X. received following this injury in no way meets any reasonable standard of emergency care. Any child who has sustained a pain-causing, serious injury should be seen immediately in an emergency room where they can be evaluated and treated to prevent worsening of that injury, a poorer prognosis and ongoing pain. B.X.'s caretakers were negligent in having failed to do this. Further, the nurse practitioner to whom he was taken the following day self-evidently was ill-equipped to diagnose and treat any such injury: She appears not even to have known where the injury was (having bandaged the wrong part of his leg), failed to immobilize a diagnosed fracture and as a consequence subjected him to potential additional injury.

9. B.X.'s father reports that in the brief conversation which B.X. had with him after this accident he expressed extreme distress and anger over this injury and his ongoing detention, reporting how miserable he is and asking what it would take to finally release him from this

institution and into the care of the Sewells.

10. As psychologically vulnerable as B.X. was prior to this injury, he is far more emotionally and physically vulnerable now. A child in a long leg cast requires close supervision and a great deal of assistance with all activities of daily living. Given the lack of appropriate responsiveness of shelter personnel in the immediate wake of B.X.'s injury - and their ongoing failure to obtain appropriate care for him, potentially exposing him to permanent disfigurement - it is not at all clear that they can be trusted to deliver the kind of close care which this child will require for the protracted period that he will be in this cast. The first weeks of healing are always the most precarious and failures to adequately protect and care for B.X. during this time could significantly affect his prognosis.

11. What is certainly at significantly greater risk is B.X.'s emotional status which, in turn, will also affect the course of his healing. Physical activity has both a psychological and neurophysiological impact on a children, helping to lift their spirits and enabling their bodies to release substances which counteract the effects of stress and depression. B.X. will now be exceedingly limited in his physical activity and this will undoubtedly impact his mental status directly. It will also mean more isolation from his peers, with whom he already experiences a language barrier. B.X. has already failed to receive the kind of emotional support any child with his traumatic history requires. The documented limitations of the facility staff are likely to continue to keep B.X. from receiving mental health treatment appropriate to a child of his age and background.

12. Children who are ill or injured require additional nurturance, both emotional and physical. Excellent studies have tied the rate and extent of a child's recovery to the nurturance they receive. it is for this reason, for example, that nearly all pediatric hospitals now allow parents to stay at the side of their children during hospitalization: because the touch and care of a parent or parent figure helps a child to heal. While there is no doubt that many of the staff at B.X.'s facility are kind, they certainly do not have the time or capacity to deliver the sort of 1:1 care which is so crucial not only to his mental status, but to the physical recovery itself. Further, ORR's absolute prohibition against nurturing touch by staff would deprive B.X. of this necessary element of recovery and represent a profound deprivation which would not only

5

increase his emotional distress but also adversely impact the immune and cardiovascular systems which are essential for healthy repair of physical damage. Children need to be held and touched for normal growth and development. Ill and traumatized children need this even more.

13. I have spoken at length with Holly and Matthew Sewell regarding the nature of Byron's injury and the importance of a closely supervised, nurturing and thoughtful recuperation. The Sewells are unhesitant in their commitment to care for all of Byron's needs during this period. They are already researching names of Pediatric Orthopedists. In addition, they are committed to putting in the small ramps which would enable B.X. to more easily maneuver a wheelchair throughout their home and into their back yard and hand holds where he might require them for safety. They have figured out a way to remove one of the seats in their van so that B.X. may get in and out easily despite his large and rigid cast while being able to elevated his leg while riding. They've already sorted out the rearrangement of their children's car seats so that everyone will fit. They spontaneously mentioned their pool (which is only 4.5 ft. deep), which they felt would help with any physical therapy B.X. might require following removal of his cast. Also, of note is that both Holly and Matthew themselves mentioned B.X.'s history of leg pain, which they'd learned about in their very first conversation with B.X.'s parents in October of 2018. They have spoken with David several times since the accident to offer support and reassurance and expect that B.X. and his parents might want to check in daily. They have also committed to getting B.X.'s mother her own telephone so that she and B.X. are not dependent upon his father's work schedule in order to speak with each other, especially following this injury, when each may require closer contact with the other.

14. As stated above, it is my professional opinion that, given all of the stressors to which this small child has been exposed over his protracted detention, - including BCFS and ORR's demonstrated inability to appropriately care for him, as well as ORR policies and procedures which preclude his getting the nurturance he needs - B.X. now requires a hastened removal from his current placement and into a home where no further damage will be done and he will be able to optimally heal. It is my belief that - given the Sewells' obvious and longstanding devotion to caring for B.X., their ongoing and regular relationship with B.X.'s parents, and their thoughtful understanding of his emotional and physical needs combined with their demonstrated commitment to meet those needs - no more excellent sponsorship home for B.X. exists than with

Matthew and Holly Sewell. It is my recommendation that he be transferred to their care with all due haste.

15. I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge.

                                              EXECUTED ON THIS 15th, day of April 2019

                                              Amy J. Cohen, M.D.

# Exhibit 2

          **Ricardo de Anda &lt;deandalaw@gmail.com&gt;**

---

# Byron Xol

---

**Ricardo de Anda** &lt;deandalaw@gmail.com&gt;          Mon, Apr 15, 2019 at 10:06 AM
To: "Barrera, Servando (ACF)" &lt;servando.barrera@acf.hhs.gov&gt;
Cc: Marcelo Gonzalez &lt;MG3015@bcfs.net&gt;
Bcc: Amy Cohen &lt;acohen8919@mac.com&gt;, Kathy Hernandez &lt;khernandez.deandalaw@gmail.com&gt;, Sylvia Rodriguez &lt;edrod1128@aol.com&gt;

Dear Servando,
Byron's parents and I are concerned over the medical treatment that Byron was provided following the fracture of his leg. Specifically, we are concerned over him not being taken to the emergency room immediately after he suffered the fracture, and that his leg was not immobilized until 3 days following his injury.

We are also concerned over your failure to have Byron examined by a pediatric orthopedic surgeon, who would specialize on the effects of such a fracture on a young growing boy. Accordingly, we have made arrangements for Byron to be seen tomorrow by Dr Michael Lago, a pediatric orthopedic surgeon. Dr Lagos works out of the Valley Care Orthopedic Surgery Clinic, located at 4302 S.Sugar Road in Edinburg. We would ask that you please make arrangements for Byron to be transported to see Dr Lagos tomorrow. I will provide you with the appointment time by separate cover.

Finally, please provide me, by end of business day today, with the medical reports, other medical documents, and the x-ray and MRI images, generated by Byron's visits to the PA you referred him to this past Tuesday, and by Dr Patel, and the incident reports generated by BCFS regarding the injury, so that Dr Lagos may have all of the available information at his disposal when he examines Byron tomorrow.
Thank You
Ricardo de Anda

 Gmail

Ricardo de Anda <deandalaw@gmail.com>

## Byron Xol

**Bellevue Ed.D., Elsie (ACF)** <Elsie.Bellevue@acf.hhs.gov>  Mon, Apr 15, 2019 at 4:30 PM
To: Ricardo de Anda <deandalaw@gmail.com>
Cc: Lizette Garcia-Galvan <lg5916@bcfs.net>, "Jeanie M. Gonzalez" <jg4401@bcfs.net>, Cecilia Villanueva <cq0713@bcfs.net>, Karen Lozano <Kl0314@bcfs.net>, Melissa Calderon <MC4117@bcfs.net>, "Barrera, Servando (ACF)" <Servando.Barrera@acf.hhs.gov>, Marcelo Gonzalez <MG3015@bcfs.net>, "De LA Cruz, James (ACF)" <James.DeLACruz@acf.hhs.gov>, "Curry, Thomas (ACF)" <Thomas.Curry@acf.hhs.gov>

Hello Mr. de Anda –

Thank you so much for reaching out, as you are aware, Byron just had his cast put on his leg on Friday, April 12, 2019. While ORR has no concerns with obtaining a second opinion, ORR has determined that it is a bit pre-mature in the process for one.

For Byron's best interest, once ORR has all the records and a full analysis from the ORR medical team, further guidance will be provided.

As it pertains to the medical records that you are requesting, it is my understanding that you have not completed the authorization for release of records, and will need to do so, prior to receiving any records.

Here is the information on how to do so and where to submit your request:

https://www.acf.hhs.gov/orr/resource/requests-for-uac-case-file-information

Please feel free to reach out if any further assistance is needed.

Thank you,

Elsie Bellevue, Ed.D.

Federal Field Specialist, South Texas

HHS ACF ORR DUCO

Email: Elsie.Bellevue@acf.hhs.gov

Cell: (202) 826-4813